```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                           22 Cr. 91 (RA)

5    BILLY ORTEGA,

6                    Defendant.

7    ------------------------------x
                                           New York, N.Y.
8                                          January 23, 2023
                                           9:30 a.m.
9
     Before:
10
                        HON. RONNIE ABRAMS,
11
                                           District Judge
12                                             and a Jury

13

14                          APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     BY:  MICHAEL R. HERMAN
17        MICAH F. FERGENSON
          ROBERT B. SOBELMAN
18        Assistant United States Attorneys

19   DAWN M. FLORIO LAW FIRM, PLLC
          Attorneys for Defendant
20   BY:  DAWN M. FLORIO
          DECLAN J. MURRAY
21            -and-
     B. ALAN SEIDLER
22

23   Also present:

24   Alex Frenchman, Paralegal Specialist, U.S. Attorney's Office
     Christine Woods, Paralegal Specialist, U.S. Attorney's Office
25   Susan Ruiz, Special Agent, Homeland Security Investigations
```

 1                    (Jury not present)

 2            THE COURT:  I received three additional letters late

 3    yesterday and early this morning.  It seems like the only one

 4    we really need to discuss this morning——and you will tell me if

 5    it can wait until later in the day——is the government's motion

 6    for the admission of certain testimony from CW-1 regarding

 7    threats allegedly made to him by the defendant at the MDC.  So

 8    it seems like that is the really only pressing issue, is that

 9    correct?

10            MR. FERGENSON:  That's correct, your Honor, and we

11    expect we can --

12            THE COURT:  Sorry.  Can you bring the microphone

13    closer?

14            MR. FERGENSON:  It was actually off.

15            That's correct, your Honor.  And in terms of timing,

16    we can take that up at the lunch break if your Honor prefers.

17            THE COURT:  Okay.  All right.

18            Why don't we begin to talk about it and if the jury

19    is here, we will stop talking about it and talk about it

20    either in the morning break or at the lunch break.

21            Does the defense want to be heard on this letter?

22    Mr. Murray?

23            MR. MURRAY:  Yes, your Honor.

24            We would believe these items should not be inquired

25    into.  The analysis they are going through, though they do not

1    cite it, is crimes, other bad acts, 404(b) type evidence.  In

2    our motions *in limine*, we explicitly asked that the government

3    be precluded from introducing any 404(b) evidence that was not

4    noticed in their notice.

5          They rendered that moot by stat they did not intend

6    to, but my view is that they did not contest that portion of

7    the motion.  The motion -- our motion *in limine* to have any

8    unnoticed 404(b) evidence excluded was not contested by the

9    government, and it should be granted.  They shouldn't be able

10   to get into this at this stage.  They were aware of this

11   information beforehand, and it should have been noticed to us.

12         THE COURT:  So when did these alleged incidents

13   occur?

14         MR. FERGENSON:  After their arrest, I believe one was

15   relatively, you know, soon after the arrest and another was

16   sometime thereafter, your Honor.  I'm not sure on precise

17   dates.  It was, frankly, the only two times when the

18   separation order was not honored and they were together, or

19   when the defendant made these threats.

20         THE COURT:  And why didn't you mention this in the

21   *in limine* motions or 404(b) notice?

22         MR. FERGENSON:  I think, respectfully, your Honor, it

23   is not 404(b).  It is direct evidence of the defendant's

24   guilt.  It is not somehow some collateral issue that we would

25   provide 404(b) notice.  It is his own words directly related to

 1   his consciousness of guilt of these crimes, attempting to

 2   intimidate a witness at this trial and threaten that witness

 3   and his safety.  So I think, respectfully, our position is it's

 4   not 404(b).

 5         The defense had the notes of CW-1's recalling these

 6   incidents since the time we produced 3500 materials and there

 7   is no lack of notice, there is no unfair surprise, and

 8   respectfully it is clearly admissible, it is the defendant's

 9   own words reflecting, we would submit, clear consciousness of

10   guilt.

11         THE COURT:  Mr. Murray, do you have any case law

12   supporting your assertion that this should be viewed as 404(b)

13   evidence as opposed to direct evidence of consciousness of

14   guilt?

15         MR. MURRAY:  Your Honor, that's based on the fact that

16   the terms the government uses here, they use the phrase on page

17   2 of their letter, "As an initial matter, the threats are no

18   more sensational than the crimes for which the defendant is

19   being tried" and that is the exact same language and argument

20   they use in their 404(b) argument.  So they are arguing it the

21   exact same way their 404(b) argument is used.  I would need to

22   make a comparison, but I believe that is not only in sum and

23   substance the same, it may be word for word from that argument

24   that they are using the same argument.

25         MR. FERGENSON:  Your Honor, that's word for word from

1    the standards applicable under Rule 403.  It doesn't have

2    anything to do with Rule 404(b) that's the Rule 403 analysis,

3    and it's not unfairly prejudicial.  That's the only argument

4    we are making there.

5         THE COURT:  The jury is here, so why don't we bring

6    the jury in and then at the break, Mr. Murray, I will hear you

7    out on any other arguments that you would like to make beyond

8    the alleged late notice.  You don't dispute that this

9    information was contained in the 3500 material that you

10   received, do you?

11        MR. MURRAY:  It was contained in the 3500 material we

12   received, however, that obviously was given to us after

13   motions *in limine* were submitted, but it was contained within

14   that 3500 material.

15        THE COURT:  Okay.  So why don't we bring the jury in

16   and then we will hear additional argument at the break.

17        MR. SEIDLER:  And I would like to make an argument at

18   the break, as well, to the scope of Rainey's testimony.

19        THE COURT:  Okay.  I'm not sure what that argument

20   is.

21        MR. SEIDLER:  Well, the argument is, I'm looking at

22   the indictment and I'm looking at what I think the government

23   proposes to question him about, and the way this indictment is

24   drawn is there is no act in furtherance of the conspiracy

25   concerning March 17.  Counts Two, Three, and Four mention no

1   "in concert" or "acting together" element concerning those

2   counts.

3           So to the extent that Rainey's going to testify that

4   he was involved somehow in distributing the drugs on March 17,

5   it is a -- I would submit it's an amendment of the indictment

6   or it's a constructive variance to the indictment.  The

7   indictment is specifically drawn and, again, any conduct

8   concerning March 17 has nothing to do -- it's just put in the

9   middle of it.  It doesn't even say that that conduct was in

10  furtherance of the conspiracy.

11          THE COURT:  I'm sorry.  Just hold on a second.  So

12  Count One in the conspiracy alleges that, "from at least in or

13  about 2015 up to and including in or about February 2022, in

14  the Southern District of New York, Billy Ortega, a/k/a 'Jason,'

15  the defendant, and others known and unknown, intentionally and

16  knowingly did combine, conspire, confederate, and agree

17  together and with each other to violate the narcotics laws of

18  the United States."

19          MR. SEIDLER:  Right.

20          THE COURT:  Among other things, it mentions, in

21  paragraph 4 that "the use of cocaine, fentanyl, and

22  acetylfentanyl, which had been distributed by Billy Ortega

23  a/k/a 'Jason,' the defendant, on or about March 17, resulted

24  in the death of Julia Ghahramani in New York, New York."

25          And then it has another paragraph that also deals

1    with what -- the cocaine and fentanyl that resulted in the

2    deaths of Amanda Scher and Ross Mtangi.  And you are saying

3    this witness can't -- who is an alleged coconspirator can't

4    testify about what happened on March 17?

5             MR. SEIDLER:  Not the way this indictment is drawn.

6    Paragraph 2, your Honor, talks about what was done in

7    furtherance of the conspiracy.  You have paragraph 4 and 5

8    that make no referral back to being part of the conspiracy or

9    that anybody else was involved except Billy Ortega.  And that

10   is --

11            THE COURT:  But it's a conspiracy.  There has to be

12   someone else involved.

13            MR. SEIDLER:  It's a conspiracy to distribute drugs.

14   It's not a conspiracy on March 17 because they don't charge it

15   as a conspiracy.  They don't charge it as in furtherance of

16   the conspiracy.  They simply say that Billy Ortega on March 17

17   distributed drugs which caused three deaths.  That's all they

18   say.  And it has no referral back to anything as part of the

19   conspiracy.  And then they do the same things in Count Two,

20   Three, and Four.  They just charge him individually.  They

21   don't say "and others known and unknown."  They don't say

22   "acting in concert."  They don't say it was in furtherance of

23   anything.  They charged individual conduct.  They just plop it

24   in the middle of it with no relation back to anything to do

25   with the conspiracy.

 1          The conspiracy, as drawn, is to distribute drugs.  So

 2     to the extent he had drugs on March 17, it may have been part

 3     of the conspiracy, but the deaths had nothing to do with it.

 4     And that's how they charged it.  I didn't draw this indictment

 5     up.  The government did.

 6          THE COURT:  Does the government want to be heard?

 7          MR. FERGENSON:  Just briefly, your Honor.  I mean,

 8     it's difficult to know where to start.

 9          Let's start here.  The time for Rule 12 pretrial

10     motions has long passed.  If they had a challenge to the

11     sufficiency of the indictment or its wording, that challenge

12     should have been brought months ago.  And in fact, after we

13     superseded, your Honor set a new deadline for pretrial

14     motions.  None were filed.  None.

15          MR. SEIDLER:  Your Honor --

16          MR. FERGENSON:  Excuse me, Mr. Seidler.  I'm still

17     speaking.  Thank you.

18          Mr. Seidler has now raised a motion without notice to

19     the government, without notice to the Court, orally, before the

20     jury is about to come in, challenging wording in the

21     indictment?  I mean, if he has a motion, he can file one on

22     the docket and we can respond.  But there is no -- as it's

23     been articulated here, there is absolutely no merit whatsoever

24     to this motion.  Count One charges a conspiracy.  It's clearly

25     a conspiracy.  And to the extent there is no overt act on

1   March 17, narcotics conspiracy does not require an overt act.

2          MR. SEIDLER:  I didn't say anything about an overt

3   act.

4          MR. FERGENSON:  Second --

5          (Unintelligible crosstalk)

6          MR. SEIDLER:  I raised this Friday --

7          THE COURT:  All right.  Just one at a time.  First of

8   all, let's be civil.  I want lawyers always to be civil in my

9   courtroom, number one.

10          Number two, Mr. Fergenson, you can finish your

11   argument.

12          You can make your record, Mr. Seidler.

13          MR. FERGENSON:  Just one last point, your Honor,

14   which is that the substantive counts also cite 18 U.S.C. 2,

15   the aiding and abetting statute.

16          MR. SEIDLER:  You can't aid and abet yourself.

17   Somebody could have aided and abetted him.

18          MR. FERGENSON:  The --

19          THE COURT:  Putting aside aiding and abetting, a

20   conspiracy count is clearly charged in Count One, and what you

21   are saying is that a witness can't come and testify about the

22   nature of that conspiracy.

23          MR. SEIDLER:  No.  He can't testify as to a

24   particular portion of the conspiracy, and everything that

25   comes up -- first off, the government has a chance to put on

 1    their evidence, and then the Court rules.  So all this talk

 2    about motions *in limine* and pretrial motions, that's futile,

 3    and you know it's futile.  I can't get a motion to dismiss

 4    without the government getting a chance to put on their proof.

 5    I am doing it now because I'm looking -- it's the way norm --

 6    normally they could come in and testify.  The way this

 7    indictment is drawn, it carves out from the conspiracy acting

 8    in concert or conspiratorial conduct with regard to March 17.

 9    And clearly in Counts Two, Three, and Four, there is no

10    mention about acting in concert or doing anything other than

11    Billy Ortega sold drugs on March 17 or distributed drugs on

12    March 17 which resulted in death.  They could have charged

13    others unknown and known, but they didn't.  So now they are

14    saying, well, we didn't put it in the indictment but we can

15    come in here and we can put it in our proof.  And that's my

16    objection.  They can't.  It's an amendment of this indictment.

17    It changes the theory of the prosecution.

18            THE COURT:  All right.  The motion is denied.  I am

19    going to allow the testimony.  If there is some argument you

20    want to make at a later date about Counts Two, Three, and

21    Four, I will hear it then, but I think there is no doubt that

22    this testimony is appropriate as to the conspiracy count.

23            There is no doubt that the testimony is appropriate

24    as to all the counts, but whether or not you want to make some

25    motion with respect to the substantive counts at a later time,

1    you can, but in any event, I think the testimony is perfectly

2    appropriate.

3              And with that, we will bring in the jury.  Thank you.

4              (Continued on next page)

1                    (Jury present)

2                    THE COURT:  Good morning, all.

3                    JURORS:  Good morning.

4                    THE COURT:  You can be seated.

5            Thank you again for being so prompt today.  We greatly

6    appreciate it.

7            I'm going to remind the witness that you are still

8    under oath.

9                    THE WITNESS:  Yes, your Honor.

10     ENRIQUE SANTOS, previously sworn.

11   DIRECT EXAMINATION

12   BY MR. HERMAN:

13   Q.  Good morning, Mr. Santos.

14   A.  Good morning.

15   Q.  Do you remember on Friday we were reviewing some phone

16   evidence for phones found at 95 Wooley Road in West Milford,

17   New Jersey?

18   A.  Yes.

19   Q.  Mr. Frenchman, can you please publish stipulation S2.

20            I am going to read some paragraphs from this

21   stipulation and then move to admit certain exhibits that --

22   additional exhibits.

23            Paragraph 1 says:  "It is hereby stipulated and

24   agreed by the parties that Government Exhibit 101 is an iPhone

25   8 Plus assigned phone numbers 646-899-7055 and 646-421-5555

that was lawfully seized from 95 Wooley Road, West Milford,

New Jersey, on February 1, 2022.  Government Exhibit 101-0, and

its subparts, are true and accurate copies of the contents

extracted from the cell phone that is marked as Government

Exhibit 101.  For example, Government Exhibit 101-1 is a

subpart of Government Exhibit 101-0.

"2.  Government Exhibit 102 is an iPhone 8 Plus

assigned phone numbers 646-899-7031 and 646-853-6897 that was

lawfully seized from 95 Wooley Road, West Milford, New Jersey,

on February 1, 2022.  Government Exhibit 102-0, and its

subparts, are true and accurate copies of the contents

extracted from the cell phone that is marked as Government

Exhibit 2.  For example, Government Exhibit 102-1 is a subpart

of Government Exhibit 102-0.

"3.  Government Exhibit 103 is an iPhone XS Max

assigned phone number 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 that was lawfully seized

from 95 Wooley Road, West Milford, New Jersey, on February 1,

2022.  Government Exhibit 103-0, and its subparts, are true

and accurate copies of the contents extracted from the cell

phone that is marked as Government Exhibit 103.  For example,

Government Exhibit 103-1 is a subpart of Government Exhibit

103-0.

"4.  Government Exhibit 104 is an iPhone XS assigned

phone numbers 646-978-0009 and 646-770-6062 that was lawfully

ceased from 95 Wooley Road, West Milford, New Jersey, on

1    February 1, 2022.  Government Exhibit 104A and its subparts

2    are true and accurate copies of the contents extracted from

3    the cell phone that is marked as Government Exhibit 104."

4            Let's go to paragraph 5 now.

5            "5.  Government Exhibit 105 is a Galaxy Note 4,

6    assigned phone number 347-430-7223, that was lawfully seized

7    from 95 Wooley Road, West Milford, New Jersey, on February 1,

8    2022.  Government Exhibit 105-0, and its subparts, are true

9    and accurate copies of the contents extracted from the cell

10   phone that is marked as Government Exhibit 105.  For example,

11   Government Exhibit 105-1 is a subpart of Government Exhibit

12   105-0.

13           "6.  Government Exhibit 106 is an iPhone assigned

14   phone number 516-469-0027, that was lawfully seized from 95

15   Wooley Road, West Milford, New Jersey, on February 1, 2022.

16   Law enforcement was unable to extract the contents of the cell

17   phone marked as Government Exhibit 106, which is locked with a

18   passcode.

19           "7.  Government Exhibit 107 is an iPhone assigned

20   phone number 646-530-4117 that was lawfully seized from 95

21   Wooley Road, West Milford, New Jersey, on February 1, 2022.

22   Law enforcement was unable to extract the contents of the cell

23   phone marked as Government Exhibit 107, which is locked with a

24   passcode.

25           "8.  Government Exhibit 108 is an iPhone 11 assigned

1  phone number 201-354-7149, that was lawfully seized from 95

2  Wooley Road, West Milford, New Jersey, on February 1, 2022.

3  Law enforcement was unable to extract the contents of the cell

4  phone marked as Government Exhibit 108, which is locked with a

5  passcode."

6          Pursuant to that stipulation, the government offers

7  Government Exhibit 101-16L, 101-19, 102A, 102D, 102E, 103-2,

8  103-3, 103-2A and 103-3A?

9          THE COURT:  Admitted.

10          (Government's Exhibits 101-16L, 101-19, 102A, 102D,

11  102E, 103-2, 103-3, 103-2A, 103-3A received in evidence)

12          MR. HERMAN:  Pursuant to stipulation S1, the

13  government offers Government Exhibit 207-B.

14          THE COURT:  Admitted.

15          (Government's Exhibit 207-B received in evidence)

16  BY MR. HERMAN:

17  Q.  Now let's look at some exhibits from the first phone which

18  had the number ending in 5555.

19          Before we do so, Mr. Santos, you heard the

20  stipulation read that some of the phones had multiple cell

21  phone numbers associated with them.  You heard that

22  stipulation?

23  A.  Yes.

24  Q.  How could a phone have more than one number associated with

25  it?

A.   There are two different cases come to mind.  One is that

usually a SIM card, which is a little chip that goes inside the

phone, that usually maintains a record of the phone number

associated to an account, so in the first scenario, that little

chip is swapped out for one containing a different phone number

and the phone maintains a record of both phone numbers, and

that would appear in a phone extraction that I would perform.

        And in the second scenario is certain phone models

will let you have two phone numbers at the same time.  So, for

example, if you wanted to have a phone number for business and

one for your personal life, you can insert two SIM cards at

the same time, but only some phone models support that.

Q.   I want to ask you just a little bit more information about

the SIM card.  Do you know what SIM stands for?

A.   Subscriber identity module.

Q.   And what information is contained on a SIM card?

A.   It's usually information that's required by the carrier

for the phone to be able to connect to its network and

transmit data.  So usually it's the phone number associated

with the device, something called the MSISDN, which is sort of

like an accounting number that the carrier uses to keep track

of the SIM card, something called an ICCID number, which is

another number that's usually printed on the SIM card itself,

and it's just like a serial number for that little chip.

Q.   Once you insert a SIM card into a phone, can it come out

1   and can you insert a new SIM card into the phone?

2   A.  Yes.

3   Q.  So if you wanted to have multiple phone numbers and use

4   one phone, could you just continually swap in and out

5   different SIM cards?

6   A.  Yes.

7   Q.  All right.  Now, as I said earlier, I want to show you

8   some exhibits from the phone ending in 5555, and first I want

9   to show you some photos and a video from the phone.  Can you

10  explain the ways -- and I think you mentioned this on Friday,

11  but if you could remind us, the ways in which a photo or video

12  could get saved to a phone?

13  A.  Well, you can capture a photograph using the built-in

14  camera, you can take a screenshot of an image and save it on

15  your phone, you can navigate to a website and the phone saves

16  the images on that website like as part of the web browsing

17  cache, and you can be sent a photograph as part of like a

18  message or an e-mail and that gets saved on to your phone.

19  Q.  Mr. Frenchman, can you publish Government Exhibit 101-16K,

20  K as in "KitKat."

21          Mr. Santos, again, this is just an example of one of

22  the photos that was found on the phone, correct?

23  A.  Yes.

24  Q.  Okay.  And this is the phone just to be clear that has the

25  phone number ending in 5555?

1   A.  Correct.

2   Q.  Mr. Frenchman, can you now display or publish Government

3   Exhibit 101-16A.

4            Mr. Santos, are you able to make out the brand name

5   for the watch that's displayed in this photograph?

6   A.  Rolex.

7   Q.  Mr. Frenchman, can you now publish Government Exhibit

8   101-16B.

9            Mr. Santos, what do you see in this photo?

10  A.  It's money, U.S. dollars.

11  Q.  Do you see a $100 bill in there as well?

12  A.  Yes.

13  Q.  Let's go to the next photo on this phone, Government

14  Exhibit 101-16C.

15           Mr. Santos, what number is displayed on this

16  calculator?

17  A.  4,020.

18  Q.  Let's go to the next photo 101-16D.  What do you see

19  displayed on this photo?

20  A.  It appears to be a screenshot of a search, an image search

21  for bullets.

22  Q.  Thank you, Mr. Santos.  Can you please now go to 101-16E?

23           Mr. Santos, what number is displayed on the

24  calculator in this photo?

25  A.  12,174.

1    Q.  Okay.  Can you go to the next photo, 101-16F.

2            Mr. Santos, do you see -- what do you see in this

3    photograph?

4    A.  A handgun.

5    Q.  What is -- do you see any text in the search bar at the

6    top?

7    A.  Yes.

8    Q.  What does the text say at the search bar at the top of

9    this photo?

10   A.  Glock 30.

11   Q.  Mr. Frenchman, can you now publish the next photo,

12   101-16G.

13           What number is displayed on the calculator?

14   A.  20,411.

15   Q.  Let's go to the next photo, 101-16H.

16           What appears to be in this photo, Mr. Santos?

17   A.  Ziploc baggies containing multiple bluish pills.

18   Q.  Do you see a number printed on those pills?

19   A.  Yes.

20   Q.  What number is it?

21   A.  30.

22   Q.  All right, Mr. Frenchman, let's go to the next photo,

23   101-16I.

24           What number is displayed on this -- in this

25   calculator?

1    A.  2,704.

2    Q.  Let's go to the next photo, 101-16J.

3         What number is displayed on this calculator?

4    A.  8,664.

5    Q.  Let's go to the next photo, 101-16L.

6         And what do you see displayed in this photo?

7    A.  It looks like a white rock substance inside small Ziploc

8    baggies.

9    Q.  How many baggies do you see?

10   A.  Three.

11   Q.  Thank you, Mr. Frenchman.

12        Now let's look at some messages on this phone that

13   ends in 5555.  Mr. Frenchman, can you publish Government

14   Exhibit 101-8.  And can you blow up sort of the numbers shown

15   at the top where it says "participants."

16        Mr. Santos, is this a conversation between the phone

17   number ending in 5555 and another number?

18   A.  Yes.

19   Q.  What's the contact name for that other number?

20   A.  Saved as Lil Mike.

21   Q.  Can you blow up -- first, how many messages are in this

22   conversation?  Are you able to tell how many messages there

23   are?

24   A.  There are 9,866 messages.

25   Q.  Let's blow up the first message that's sent from the 5555

1    phone to the Lil Mike conversation, and I will read -- this is

2    the one sent from the phone.  It says, "Make sure no one gets

3    this # bro, Billz."  Did I read that correctly?

4    A.  Yes.

5    Q.  Yes?  Okay.

6          Can we scroll down to the next photo -- next message?

7          It says "let me know when you get back to make sure

8    you're good," and that's sent from the 5555 to Lil Mike,

9    correct?

10   A.  Yes.

11   Q.  Let's go to the next message.

12          What does Lil Mike say in response?

13   A.  "Say less."

14   Q.  Can we go to the next page?  Can you keep scrolling down?

15   What does he say in response?

16   A.  "Already told Kev to come out."

17   Q.  "Okay."

18   A.  "Yo."

19   Q.  And what does he say there?

20   A.  "Yo."

21   Q.  Keep going to the next message.

22   A.  "Can I take a dime?  Good afternoon, *jefe*.  Just got home.

23   WTM."

24   Q.  Mr. Santos, do you understand the Spanish language?

25   A.  Yes.

1   Q.  And how -- what's your level of fluency in Spanish?

2   A.  Native fluency.

3   Q.  Did you grow up speaking Spanish or English or both?

4   A.  Both.

5   Q.  Do you know what the word *jefe* means?

6   A.  Yes.

7   Q.  Is that -- what language is that in?

8   A.  Spanish.

9   Q.  Spanish?

10  A.  (Nodding head).

11  Q.  What does *jefe* mean in English?

12  A.  Like chief or boss.

13  Q.  And just to be clear, that's sent from Lil Mike to the 5555

14  number, right?

15  A.  Yes.

16  Q.  Can you please now go to page 2,118 of this message -- of

17  this conversation.

18          Can you blow up the green?  So I'm going to now read

19  the green messages sent from the 5555 to Lil Mike, and I am

20  going to ask Mr. Frenchman to scroll down and for you to read

21  the blue messages from Lil Mike.  So the first message says,

22  "Did you hear back from Matt?" on March 18, 2020, at 5:01 p.m.

23          Did I read that correctly?

24  A.  Yes.

25  Q.  Okay.  You can start scrolling down.

1   A.  "He checkin'."

2   Q.  "Okay, cool."

3   A.  "Nothing yet."

4   Q.  "Damn, he's not the toy men then.  Morning bro.  Any word

5   from that little N word Matt"?

6   A.  "Slow."

7   Q.  "You know anybody else?"

8   A.  "Na."

9   Q.  Sorry.  Would you repeat that?  I don't think we heard it.

10  A.  "Na.  I'll look around."

11  Q.  "Next time you hear anything like that, just let me know

12  right away.  I'll get all of them for us."

13  A.  "There's one person up the block w a 9mm."

14  Q.  And Mr. Santos, are you familiar with what a millimeter

15  is?

16  A.  Yes.

17  Q.  Do you know how millimeter is often abbreviated?

18  A.  Mm.

19  Q.  All right.  Keep going.

20  A.  "$1,000.  Copy."

21  Q.  Okay.  Thank you.

22          Let's look at some other messages from this phone.

23  Can you please publish Government Exhibit 101-17.

24          Can you publish the top two numbers under

25  "participants."

 1              And Mr. Santos, is this a conversation between the

 2    5555 number and a number ending in 2481?

 3    A.   Yes.

 4    Q.   What's the name for that number in the 5555's phone?

 5    A.   "Will's new" and then the pound sign, number sign.

 6    Q.   Are you familiar with how the word "number" can be

 7    abbreviated?

 8    A.   Yes.

 9    Q.   Do people use the pound sign sometimes for that?

10    A.   Yes.

11    Q.   Yes, okay.

12              You can Zoom out Mr. Frenchman.

13              Mr. Santos, how many conversations or instant

14    messages are there in this conversation between the 5555 and

15    Will's new number?

16    A.   2,721.

17    Q.   And can you just blow up the first message?  What's the

18    date of the first message here?

19    A.   It's June 27, 2020, at 1:49 p.m.

20    Q.   I want to ask you about how there is sort of -- I think

21    you were reading the number -- the date and time in the lower

22    right of the bubble, is that right?

23    A.   Yes.

24    Q.   You also see another date and time in the middle of the

25    bubble under the word "read"?

1    A.   Yes.

2    Q.   Do you know, based on your dealing with Cellbrite and

3    phones, what the difference between those two dates and times

4    means?

5    A.   One is the date in which the message was sent or received

6    and the other is a message -- excuse me, the date and time

7    that the message was actually read.

8    Q.   So which one is the one that's in the bottom right of the

9    bubble?

10   A.   That's the date that the message was sent, date and time.

11   Q.   Okay.  So that could be before it is read obviously,

12   right?

13   A.   Yes.

14   Q.   Can we now go to page 711 of this exhibit.

15        Let's blow up the last message on this page and

16   again, Mr. Santos, if you could read the blue messages, the

17   messages sent from Will to the 5555, and I will read the green

18   ones sent back to Will.

19   A.   "Send me all the information and tell your Mom I'll be

20   there in five minutes."

21   Q.   And what's the date of that message?

22   A.   It was sent February 26, 2021, at 9:09 p.m.

23   Q.   All right.  You can scroll down.

24        "73 Fifth Avenue, 15th Street, Apartment 6B.  Go now,

25   bro.  He's out by 9:30."

```
 1              "Yo."

 2   A.   "Yeah."

 3   Q.   "how long?  He's about to dip."

 4   A.   "4 min.  75 Fifth Avenue wants what?

 5   Q.   "6 will.  Give him 1 on the house.  Mercedes SUV.  He's in

 6   that."

 7   A.   What color?"

 8   Q.   "14 Spring Street will 2.  Yo."

 9   A.   "Yeah.  Send it one more time."

10   Q.   "14 Spring Street 2 will.  Hey, how long?  Yo."

11   A.   "6m, 7 min."

12   Q.   "Cool."

13             All right.  Thank you, Mr. Frenchman.

14             Mr. Frenchman, can you now publish Government Exhibit

15   207-B.  And I think, Mr. Santos, you looked at an exhibit like

16   this on Friday.  What type of exhibit is this?

17   A.   It's our subscriber records for a T-Mobile phone number

18   ending in 5724.

19   Q.   And, Mr. Frenchman, can you just publish from right above

20   account details to the top of the page.  And what's the

21   subscriber name?

22   A.   Josefina Marine.

23   Q.   And, Mr. Frenchman, can you scroll up a little so we can

24   see the phone number.

25             Mr. Santos, what's the phone number?
```

1    A.  646-339-5724.

2    Q.  Mr. Frenchman, can you keep this exhibit up and publish

3    Government Exhibit 103-2A.

4              (Pause)

5              MR. HERMAN:  Sorry, one moment.  I meant 103-2.

6    Excuse me.

7    Q.  Mr. Santos, do you see the Exhibit 103-2?

8    A.  Yes.

9    Q.  What type of exhibit is that?

10   A.  It's a message from What's App.

11   Q.  And who is the message sent to or what phone number?

12   A.  The contact saved at Mother and the phone number is

13   646-339-5724.

14   Q.  Is that the same phone number whose subscriber information

15   you just read in Government Exhibit 207-B?

16   A.  Yes.

17   Q.  Yes?

18   A.  Yes.

19   Q.  And that is subscribed to Josefina Marine?

20   A.  Yes.

21   Q.  Okay.  Mr. Frenchman, you can pull down 207-B and keep up

22   103-2.

23             Now, Mr. Frenchman, can you blow up the top message.

24   Mr. Santos, what type of message is this?

25   A.  This is a voice message.

1    Q.  And what app are the participants using?

2    A.  What's App.

3    Q.  How do you know they are using What's App?

4    A.  The phone number in "to" and "from" have What's App in the

5    name, so it says What'sApp.net.

6    Q.  What is What's App?

7    A.  It's a messaging application that lets you send text

8    messages as well as audio, video, and other attachments back

9    and forth.

10   Q.  Is What's App encrypted?

11   A.  It's end-to-end encrypt.

12   Q.  What does that mean?

13   A.  It means that the content is encrypted in transmission,

14   but once it lands on the device it becomes decrypted.

15   Q.  And so what does that mean in terms of security for that

16   type of message?

17   A.  It means it's a secure way to send messages in that only

18   the device that it's intended for will be able to read or view

19   that message.

20   Q.  Are you familiar with what a What's App push name is?

21   A.  Yes.

22   Q.  What is that?

23   A.  If you are a What's App user and you have a certain phone

24   number saved in your address book, What's App will

25   automatically push the name that's associated with that phone

1    number from the person who owns that phone number.

2    Q.   So do you see sort of the word "KingBillz" next to the

3    top -- sort of the "from" phone number in this message?

4    A.   Yes.

5    Q.   Is that an example of a What's App push name for that

6    phone number?

7    A.   Yes.

8    Q.   And then the second one says "Mother"?

9    A.   Yes.

10   Q.   Now, you said that this is a voice note message.  What is

11   a voice note?

12   A.   Users have the option of sending an audio message rather

13   than a text message, so you can record a small audio message

14   and send it, and then the other user can play that message

15   whenever they want, either immediately or later on.

16   Q.   And are voice notes then sort of saved by What's App?

17   A.   Yes.

18   Q.   Before we move on, I just want to ask you a few questions

19   about voice notes.  Previously we were looking at iMessages,

20   not What's App.  Does iMessage also have a voice note

21   capability?

22   A.   Yes.

23   Q.   Are you familiar with sort of expiration dates or

24   expiration ability for voice notes on iMessage?

25   A.   Yes.

1   Q.  Can you explain what that means?

2   A.  So iMessage also has the feature where you can send audio

3   notes or audio messages, except with the iMessage application,

4   the messages expire after two minutes of listening to the

5   message, although you can change that setting for it to expire

6   a little bit later.  The default setting is for two minutes.

7   Q.  And so once a message expires, what happens to it?

8   A.  The message disappears from the conversation.

9   Q.  And so it will no longer be on the phone or you can't play

10  it again, it's gone?

11  A.  It's gone.

12  Q.  Okay.  Now, did you review the attachment to Government

13  Exhibit 103-2, which is marked as 103-2A?

14  A.  Yes.

15  Q.  Did you also listen to another voice note that we will get

16  to in a minute, Government Exhibit 103-3A?

17  A.  Yes.

18  Q.  And what language were those voice notes in?

19  A.  Spanish.

20  Q.  I think you previously testified that you're fluent in

21  Spanish, is that correct?

22  A.  Yes.

23  Q.  Have you reviewed translations and transcripts of those

24  two voice notes?

25  A.  Yes.

1  Q.  And those were marked respectively as Government Exhibit

2  103-2AT and 103-3AT, is that correct, Mr. Santos?

3  A.  Yes.

4  Q.  And did you listen to the voice note while comparing it to

5  the translation in the transcript?

6  A.  Yes.

7  Q.  And based on your familiarity and fluency in Spanish and

8  English, were those transcripts accurate translations from the

9  Spanish to the English?

10  A.  Yes.

11        MR. HERMAN:  Your Honor, at this time the government

12  offers Government Exhibits 103-2AT and 103-3AT.

13        THE COURT:  Any objection?

14        MS. FLORIO:  No objection.

15        THE COURT:  Admitted.

16        (Government's Exhibits 103-2AT, 103-3AT received in

17  evidence)

18  BY MR. HERMAN:

19  Q.  Mr. Frenchman, can you now please play the first voice

20  note, Government Exhibit 103-2A, while having page 2 of

21  103-2AT on the screen.

22        (Audio played)

23  Q.  And just to remind us, the jury, what we are listening to,

24  this was a voice note sent from the King Billy What's App

25  account to the one that says Mother?

1  A.  Yes.

2  Q.  And I think you testified that the translation of the

3  transcript was accurate.

4          Why don't we play that one more time.

5          (Audio played)

6  Q.  Mr. Santos, can you read the English translation of that

7  voice note, please?

8  A.  "Hey.  Give the package that I have there in my jacket,

9  the fuzzy one, to the black girl for me.  Tell me how much,"

10  and then there is unintelligible part, "would be left, were

11  left, and the little sticks, too, before you give it to her.

12  No, when you give it to her, tell me how many might be left

13  be -- were, were left."

14  Q.  Mr. Frenchman, can you now publish Government Exhibit

15  103-3 and can you blow up the bottom message here.

16          Mr. Santos, what is this message?

17  A.  This is another audio message that was sent from the

18  KingBillz phone number to the Mother phone number.

19  Q.  And what's the date of the message?

20  A.  May 19, 2021, at 3:10 p.m.

21  Q.  Mr. Frenchman, can you please now publish the Exhibit

22  Government Exhibit 103-3A while displaying page 2 of the

23  associated transcript, 103-3AT.

24          (Audio played)

25  Q.  Mr. Santos, can you please read the English translation of

1    that to us now?

2    A.  "Do me a favor and stop calling the guys, you hear?  Do me

3    that favor, because you look real stupid calling Will and

4    asking him things.  When I tell him to give it to you, he'll

5    give it to you.  Stop fucking calling."

6            (Continued on next page)

7            MR. HERMAN:  All right.  Thank you, Mr. Santos.

8            Let's go back to the iMessage chat with Will's new

9    number now, which is Government Exhibit 101-17.  If you could

10   go to page 8, 38.

11           If you could just blow up the top of that very bottom

12   green message at the bottom and then scroll down to the next

13   page.  So this is again a message again from 5555 to Will.

14   It's a new number.  Can you just blow up that whole thing at

15   the bottom.

16   Q.  What is the first line that the 5555 sends to Will?

17   A.  It reads:  "February Will worked."

18   Q.  What's the first line following that?

19   A.  "18, Thursday.  Will working.  $1,300."

20   Q.  Do you see the first line of the next sort of group of

21   texts?

22   A.  Yes.

23   Q.  What does that say?

24   A.  "3:30 p.m. sale.  $100.  1Will."

25   Q.  What does it say after that?

1    A.  "3:48 p.m., Jula $200.  2Will."

2    Q.  What does it say after that.

3    A.  "5:58 p.m.,  Henry $500.  6Will."

4    Q.  What does it say after that?

5    A.  "6:17 p.m., Jack $200.  2Will."

6    Q.  And after that?

7    A.  "8:50 p.m., Aaron $300.  3Will."

8    Q.  What does the first line of the next group of texts say?

9    A.  "19, Friday, Will working.  1700$."

10   Q.  I'm not going to ask you to read that whole paragraph.  But

11   do you see where it says "20 Saturday" after that?

12        What does that line say?

13   A.  "20 Saturday.  Will working.  $1,300."

14   Q.  Just so I understand, do you see each paragraph start with

15   a day of the week?

16   A.  Yes.

17   Q.  Sort of does it go in order the days of the week --

18   Thursday, Friday, Saturday?

19   A.  Yes.

20   Q.  Before the day of the week, do you see a number -- 18, 19,

21   20?

22   A.  Yes.

23   Q.  Are those also going in order?

24   A.  Yes.

25        MR. HERMAN:  Mr. Frenchman, can you just start slowly

1  scrolling down to the end of this message.

2  Q.  Do you see where it says, "March Will worked" and then more

3  dates and money amounts?

4  A.  Yes.

5  Q.  All right.  What is Will's response to that?

6         What is the first line?

7  A.  "2-18, 2021, new tab."

8  Q.  What is the first line right below that?

9  A.  "41 Street 5th and Mad.  1 Will 100."

10  Q.  Do you see similar messages like that afterwards?

11  A.  Yes.

12  Q.  Do you see the word "cab" below that?

13  A.  Yes.

14  Q.  Do you see that six different times it says "cab"?

15  A.  Yes.

16  Q.  Are you familiar with different words for the word "taxi"?

17  A.  Yes.

18  Q.  Is "cab" one of those?

19  A.  Yes.

20  Q.  Do you see a number below the cab 15?

21  A.  Yes.

22  Q.  What number is that?

23  A.  Cab 12.

24         Do you mean at the very bottom?

25  Q.  At the very bottom.

```
 1   A.  1,210.

 2   Q.  Let's go to the next message.

 3           Sir, is this message very similar to the previous

 4   message?

 5   A.  Yes.

 6   Q.  What's the date of this message?  What's the first line of

 7   the first message?

 8   A.  The date at the top of the message is February 20, '21.

 9           MR. HERMAN:  Mr. Frenchman, you can just start

10   scrolling down.

11   Q.  Do you see a number right below all the "cabs" at the

12   bottom?

13   A.  Yes.

14   Q.  What number is that?

15   A.  1,360.

16           MR. HERMAN:  Can you scroll down to the next message.

17   Q.  Again, I'm not going to ask you to read this.

18           Is this very similar to the last couple of messages?

19   A.  Yes.

20           MR. HERMAN:  Again, keep scrolling down.

21   Q.  Same thing?

22   A.  Yes.

23           MR. HERMAN:  Let's do one more.

24   Q.  What does the 5555 say in response to that message?  What

25   does he say then?
```

1          What does the 5555 say?

2   A.  "Okay, Karen."

3          MR. HERMAN:  Now let's look at another chapter in this

4   phone, Government Exhibit 101-19.  Can you blow up the

5   participants.

6   BY MR. HERMAN:

7   Q.  Mr. Santos, is this a conversation between the 5555 and a

8   phone number ending in 5049?

9   A.  Yes.

10  Q.  What's the contact name for that?

11  A.  Gman.

12         MR. HERMAN:  Let's go to page 18.  Again, I'm going to

13  read the green messages sent to GMan, and if you could read the

14  responses sent back to 5555.  So the first message on November

15  14, 2020, says:

16  "Q. 548 East 82nd Street 5Will $400.

17  "A. Tato.  Apt.  Get the apartment for me.

18  "Q. Tato.  5C buzzer doesn't work.  17 St. Mark's Place 3Will.

19  Yellow.  How we looking.

20  "A. We almost there.

21  "Q. Yo.  Where you at?  Bro.

22  "A. Yooo.  Walking.  A block away.  17 St. Mark's?

23  "Q. Ya.  Get the receipts from the cab.

24  "A. Tato."

25  BY MR. HERMAN:

1    Q.  Do you know what the word "tato" means?

2    A.  It's like "will do" or "okay".

3    Q.  What language is that?

4    A.  Spanish.

5            MR. HERMAN:  Now can we please publish Government

6    Exhibit 101-5.  Can you blow out the participants in this

7    message.

8    Q.  Mr. Santos, what type of message is this?

9    A.  This is a group chat.

10   Q.  How do you know it's a group chat?

11   A.  There are more than two participants here.

12   Q.  Do you see the word "admin" somewhere?

13   A.  Yes.

14   Q.  Which contact is the admin for this group chat?

15   A.  It's saved as Gman.

16   Q.  Is this the same Gman phone number we just read?

17   A.  Yes.

18   Q.  And we see another participant is Little Mike.

19           We just read those chats too; correct?

20   A.  Correct.

21   Q.  Which app are they using for this communication?

22   A.  WhatsApp.

23           MR. HERMAN:  Let's go to page 444.

24           I'm going to read the 5555's chats.  And if you could

25   read the other participant's chats.

1              If you could just blow out the top chat on this page.

2              So 5555 Says:  "Bros, you need to grip up for real."

3    Q.  If you can just read who is speaking, since this is a group

4    chat, Mr. Santos.

5              Who applies so that?

6    A.  Gman replies, "You got my toy."  And he's also replying to

7    that specific message.

8    Q.  How do you know that?

9    A.  Because you have a copy of the previous message that he's

10   replying to that specific message and not to any previous

11   messages that may have appeared in the thread.

12   Q.  Is that a feature of WhatsApp that let's you do that?

13   A.  Yes.

14              MR. HERMAN:  You can go to the next message.

15   "Q. I'm waiting for the guy to reply.

16   "A. N-word pass me my Uz.  I forgot it behind you.  Can just

17   bring that it's cool.  And copy.  Got it ready.

18   "Q. That's too big to have on you at all times.

19   "A. Still want it.  TY."

20   BY MR. HERMAN:

21   Q.  Are you familiar abbreviations for thank you?

22   A.  Yes.

23   Q.  Is "TY" an abbreviation?

24   A.  Yes.

25              MR. HERMAN:  Can we go to the next message.

1   "A.  And Glock on auto is what I would walk with" for "w."  I

2   want a Glock 30 to walk around with."

3           And then Gman sends a picture of what appears to be a

4   pistol.

5           MR. HERMAN:  Mr. Frenchman, can you publish what that

6   attachment is, Government Exhibit 101-5A.

7   Q.  What's in the sort of the search bar at the top of this

8   image?

9   A.  A Glock 30.

10  Q.  What does the photo appear to be?

11  A.  A Glock pistol.

12          MR. HERMAN:  I want to now go to some of the notes

13  that are saved on the phone.

14          Can you publish Government Exhibit 101-14,

15  Mr. Frenchman.

16  Q.  Now, Mr. Santos, what are notes that are saved on to a cell

17  phone?

18  A.  Some phones have a note application where you can put in

19  text or copy and paste from another source and just save it for

20  another viewing.

21  Q.  So this is something that's actually saved on the phone

22  itself.  You had to type it into the phone.  Correct?

23  A.  Yes.

24          MR. HERMAN:  It we take a look at the first entry.

25  And if you could, Mr. Frenchman, just blow up the first column

1    under "Time."

2    Q.  What do you see under the column "Time"?

3    A.  There are two dates and times lists.  One is the date in

4    which the note was actually created, which is November 2, 2020,

5    at 5:48 p.m.  And then the second date that's listed is the

6    last time that the note was updated or modified, which is

7    November 8, 2020, at 11:46 p.m.

8    Q.  So once you create a note, does application allow you to

9    sort of edit it and look at it again?

10            Is that right?

11   A.  Yes.

12            MR. HERMAN:  Let's go to the second column under

13   "Note."

14   Q.  Mr. Santos, what appears in the second column under "Note"?

15   A.  This is the actual text that was entered in the note?

16   Q.  What's the tile of the note?

17   A.  "November 1 earnings."

18   Q.  What's the first sort of text in the body of the notes?

19   The note's contents.

20   A.  November.

21   Q.  What's right below November?

22   A.  1.

23   Q.  And then what?

24   A.  Sunday, $1,140.

25   Q.  And then can you just read the next three entries.

1    A.  "4:00 p.m., p, $200 2Will.  8:05 p.m., Adam, $200.  10

2    bars.  9:00 p.m., Davana, $900.  45 Addy."

3              Do you sort of see more days of the week and numbers

4    in the next couple of entries?

5    A.  Yes.

6    Q.  What's the next day of the week?

7    A.  2 Monday.

8    Q.  What's the day of the week after that?

9    A.  3 Tuesday.

10   Q.  Are those numbers and days of the week sort of moving in

11   sequential order?

12   A.  Yes.

13   Q.  So it's Sunday, Monday, Tuesday, Wednesday, basically?

14   A.  Yes.

15             MR. HERMAN:  Let's just scroll down to the end of this

16   note.

17   Q.  Does it look like there's an entire week in that note?

18   A.  Yes.

19   Q.  Let's go to the next note.

20             What's the title of this note?

21   A.  "October 1 Earnings."

22   Q.  Does this note appear to contain the same type of

23   information as the prior note?

24   A.  Yes.

25             MR. HERMAN:  Let's scroll down to the end of this

1   note.

2   Q.  Let's just read some of these.

3       So what does it say next to 8 Thursday?

4   A.  $2,065.

5   Q.  What does it say next to 9 Friday?

6   A.  $3,100.

7       MR. HERMAN:  Keep scrolling down.  Let's just scroll

8   all the way to the end of this note.

9   Q.  What's the number next to Saturday?

10  A.  31.

11  Q.  Do you know how many days are in October?

12  A.  31.

13      MR. HERMAN:  Now the next note.

14  Q.  What is the title of this note?

15  A.  Just keep in mind.  Best in the city.

16  Q.  Sorry.  What's the actual title of the note?

17  A.  "Just keep in mind.  Menu.  Top shelf."  Excuse me.

18  Q.  What's the first line of the note?

19  A.  Christina, and then there's like an emoji, best in the

20  city.

21  Q.  Is that like a snowflake emoji?

22  A.  Yes.

23  Q.  Can you read the rest of the note.

24  A.  Molly World; ectasy; shrooms; tabs; Viagra, more on Monday;

25  Adderall; Xanax bars; perk yellow, bananas, perk pinks 10s,

```
 1    perk 30mg., blues; flower; grass.

 2    Q.  Go down to the next note.

 3            What's the title of this note?

 4    A.  "August 1 Earnings."

 5            MR. HERMAN:  Mr. Frenchman, can you just sort of zoom

 6    out.  Let's sort of scroll down to the end of the notes

 7    category.  Can you stop right there.

 8    Q.  What does it say after "14 Friday"?

 9    A.  "Cash available $11,500."

10            MR. HERMAN:  Keep scrolling.

11    Q.  What's the title of the next note?

12            Do you see a title, Mr. Santos?

13    A.  "July 1 Earnings."

14    Q.  Keep scrolling down.

15            What's the title of the next note?

16    A.  "June 1 Earnings."

17            MR. HERMAN:  Keep scrolling down.

18    Q.  What's the title of the next note?

19    A.  "May 1 Earnings."

20    Q.  What's the title of the next note?

21    A.  "March 1 Earnings."

22    Q.  What's the title of the next note?

23    A.  "First Week of February."

24    Q.  What's the title of the next note?

25    A.  "January 1 Earnings."
```

1    Q.  What's the title of the next week?

2    A.  "The First Week of December."

3    Q.  What's the title of the next week?

4    A.  "The First Week of November."

5    Q.  Can you read what's the title of the next note?

6    A.  "First Week of October."

7    Q.  What's the title of the next note?

8    A.  "First Week of September."

9         MR. HERMAN:  Keep scrolling.  Keep scrolling.

10   Q.  What's title of this note?

11   A.  "People Who Owe Money."

12        MR. HERMAN:  Stop there.

13   Q.  What's the title of this note?

14   A.  "May cash, $16,680."

15   Q.  "First of Month of May" it says; right?

16   A.  Yes.

17        MR. HERMAN:  Keep scrolling.  If you could just scroll

18   to the end of this note, please.

19   Q.  Is that sort of the last note in the note category?

20   A.  Yes.

21        MR. HERMAN:  Mr. Frenchman, can you just go to page 1,

22   page 1 of Government Exhibit 101-14.

23   Q.  How many notes in total were there?

24   A.  20.

25   Q.  20?

1    A.  Yes.

2    Q.  Now I want to go back to some more messages on the phone.

3          Can you publish Government Exhibit 101-2.

4    Mr. Frenchman, can you blow out the top two participants here.

5          Mr. Santos, this is a conversation between 5555, and

6    what's the name of the contact there?

7    A.  Julia Miles Cousin.

8    Q.  I'm going to read the messages sent from the 5555, and if

9    you could read Julia's messages.

10          Before we get there, how many total messages are

11    there?

12    A.  436.

13          MR. HERMAN:  You can zoom in.  Thanks.

14    BY MR. HERMAN:

15    Q.  What's Julia's first message?

16    "A. Hey, hey.  It's Miles' cousin, Julia."

17    Q.  What's the date of that message?

18    A.  December 17, 2019, at 7:57 p.m.

19    Q.  And then the response is:  "Hey, how you doing, Julia.  Can

20    you send me his contact."

21    "A. Like in number?"

22    Q.  What type of attachment is that?

23    A.  This is just a contact.

24    Q.  Does iMessage have a function where you can sort of send

25    someone's contact to another person?

1    A.  Yes.

2    Q.  Is that what this is?

3    A.  Yes.

4    Q.  And the response is:

5            "It was the first one LOL.  Hey.  All good.  Hey, send

6    me your full address.

7    "A. 34 Thompson Street, Number 11.  ZIP code 10012."

8    "Q. How many invites?  Anything else you're looking for?  We

9    mostly have everything.

10   "A. Nah.  Just the usual.  Thank you.  Do you do one, or do I

11   need two?"

12   "Q. Yeah.  It's two minimum.

13   "A. Sounds good.  LMK" or let me know "when to expect you."

14   "Q. 30 minutes or less.  My guy's on the way."

15           MR. HERMAN:  Can we go down to page 51.  Can you blow

16   up the bottom message on this page, the bottom one.

17   Q.  What's the date of Julia's message?

18   A.  30-22 at 6:17 p.m.

19   Q.  What does she say?

20   A.  "I moved out of the city.  Is it possible for me to meet

21   you somewhere?  It would be for tm" or tomorrow.

22   "Q. Hi.

23   "A. Like I don't have an apartment to come to" and then sad

24   emoji.

25   "Q. Okay.  Cool.  We can meet in the city.

1    "A. Okie awesome.  Whereabouts?  I have a car.  Probs around

2    1:00 p.m. or 2:00 p.m. tm" or tomorrow.

3    "Q. 450 west 17th, New York, New York.

4    "A. Dope.  Thank you."

5          You can stop there.  Mr. Frenchman, can you publish

6    Government Exhibit 12A.

7    Q.  Mr. Santos, do you see a flag associated with an address on

8    this map?

9    A.  Yes.

10   Q.  What address is there?

11   A.  431 West 17th Street.

12   Q.  Do you generally know the geography of Manhattan?

13   A.  Yes.

14   Q.  Where is 450 located compared to 431 West 17th Street?

15   A.  It's on the same street.

16   Q.  Is it across the street?

17   A.  Yes.

18          MR. HERMAN:  Can we go to that exhibit, Mr. Frenchman,

19   Government Exhibit 101-2.  And can you turn to page 141.  Can

20   we blow up the bottom message on the page.

21          Again, Mr. Santos, if you could read Julia's message,

22   and I'll read the 5555s.

23   Q.  To start with first, what's the date of the message?

24   A.  March 17, 2021, at 2:02 p.m.

25   Q.  What is she saying?

1    "A. Hey.

2    "Q. What's up.

3    "A. Can you come through?  Last time was three hours late, not

4    to be rude, so can you make sure accurate ETA today, please.

5    "Q. My apologies.  I'll send them right now if you want.

6    "A. That would be great.  Thank you.  Really appreciate it.

7    185 Avenue B, Number 6G.

8    "Q. No worries.  We family.

9    "A. LMK the ETA when you can.

10    "Q. Hey.  Ten min.

11    "A. Can they come upstairs pls" or please "instead of me going

12    to car?

13    "Q. Hey, yeah.  He's going up.

14    "A. Awesome."

15    Q.  What's the time that she says "awesome"?

16    A.  On march 17, 2021, at 2:39 p.m.

17    "Q. Hey, hey you there?  Hey, can you give me a call.  I need

18    to ask you something real fast."

19            You can scroll up.

20            Is that sort of the end of the message chain,

21    Mr. Santos?

22    A.  Yes.

23            MR. HERMAN:  Can you just zoom back into those

24    messages on this page.  All three is fine.

25    Q.  What's the date and time of the first message on this page

1    that says, "Hey"?

2    A.  March 17, 2021, at 8:31 p.m.

3    Q.  8:31 p.m.?

4    A.  Correct.

5    Q.  Can you just scroll up again to the prior message.

6         What's the time for the last message from Julia?

7    A.  3:39 p.m.

8    Q.  That's five hours later approximately?

9    A.  Yes.

10        MR. HERMAN:  Can we now publish Government Exhibit

11   101-3.  Can you blow up the top participants in this.

12   Q.  This is a message between the 5555 and the phone number

13   ending in 3717?

14   A.  Yes.

15   Q.  What's the name associated with that contact?

16   A.  Amanda, Melissa's friend.

17   Q.  How many messages are in this conversation?

18   A.  1,063.

19   Q.  What's the date of the first message?

20   A.  January 15 2018, at 5:23 p.m.

21   Q.  Now I'm going to read the first percentage sent from the

22   5555 to Amanda:

23        "Hey, what's up.  It's me Jason.  This is my new

24   contact.  Save it.  Delete the old one.  You just text."

25        That's at December 15, 2018, at 5:23 p.m.

 1          Is that right?
 2   A.  Yes.
 3          "Okay.  Cool.  Thanks.  I was wondering if you were
 4   around.  50 East 8th Street."
 5   "Q. Hey, yeah.  How many invites?
 6   "A. Two.  When are you -- and then there's a word I can't make
 7   out, t-g-i-n-k-i-k-t-n.  "Thinking" is the next message.
 8   "Q. Hey, 30 minutes.  Cool?
 9   "A. Sounds good."
10          MR. HERMAN:  Can we now go to page 347.  Let's blow up
11   the top green message first.  Again, I'll read the messages
12   from the 5555, and if you could read Amanda's responses.
13          So the first message says:  "Hey, he's there."
14   BY MR. HERMAN:
15   Q.  And on March 14, 2021, at 7:18 p.m.?
16   "A. "Hey" at 7:18 again.
17          "Hey."
18   Q.  What's the date and time of that message?
19   A.  March 17, 2021, at 4:48 p.m.
20   "Q. Hi.  Full address?"
21   "A. Question first.  Is it the same as it was Sunday?  Because
22   that was not good LOL, had to get rid of it.
23   "Q. No.  New batch."
24          And then it says "batch" again.
25   "A. Okay.  Because that was bad LOL.  Not gonna be home 'till

6.

"Q. Always tell me, please.  Same day or the next.

"A. Okay.  I will.  Like you know it's not good if you toss

it."

          Let me how's this one."

          MR. HERMAN:  Can you go up a little bit.

Q.  Do you see there's sort of a blank message right above the

one I just messaged?

A.  Yes.

Q.  Does Cellebrite sometimes not export emojis and

double-chats?

A.  Correct.

Q.  So this could have been an emoji in there.

A.  It could have been.

Q.  At 4:35 p.m. on March 17, 2021, the 5555 says:

          "Let me how's this one."

"A. Okay.  Yeah.  That was like pure chemical paint thinner

smell.  Should I let you know when I'm off train?"

"Q. Hey, yeah.

"A. Or just know any time after 6 is cool.

"Q. Ready when you are.

"A. K.  Walking from train.

"Q. He's on the way" at 6:01 p.m.

"A. Thanks.

"Q. Hey, how's this batch?

1    "A. Haven't tried yet.  Let you know in a few."

2    BY MR. HERMAN:

3    Q.  What time was that sent?

4    A.  At 8:15 p.m.

5    Q.  What's the next message?

6    "A. Def better."

7    Q.  What time was that sent?

8    A.  8:21 p.m.

9    "Q. Hey, try not to do too much because it's really strong,"

10   sent at 8:21 p.m. and 49 seconds.

11          The next message at 8:46 p.m. is:  "Hey, boss lady,

12   you heard?  LOL.  Hey, can you give me a call back.  I need to

13   ask you something real fast."  And that's at March 18, 2021, at

14   11:32 a.m.

15          Are they any other messages in the conversation?

16   A.  No.

17          THE COURT:  If at any time you think it's a good time

18   for a break, just let me know.

19          MR. HERMAN:  Yes, your Honor.  It is a good time, your

20   Honor.

21          THE COURT:  Ladies and gentlemen, don't discuss the

22   case.  Remember to keep an open mind.  We'll take a very short

23   break now.

24          (Recess)

25          (Continued on next page)

1          (In open court; jury not present)

2          THE COURT:  Mr. Murray, I want to make sure that I

3   hear you out.  I want to make sure there are no additional

4   arguments with respect to Rainey's testimony about the alleged

5   threats.  I know you made the timing point.

6          Is there anything else you'd like to say?

7          MR. MURRAY:  Yes, your Honor.  So, again, the case

8   cited by the government -- this is a case they cite for the

9   admissibility of those statements, not for any prejudicial

10  versus probative issue of revealing the defendant is

11  incarcerated -- is *United States v. Sakoc*, 2014 WL 7336079, a

12  case from the District of Vermont.

13         That decision relates to *United States v. Sakoc*

14  13-CR-106.  It is a decision on a motion in limine filed by the

15  government on docket entry 101.  The basis for the admission of

16  the statements provided for the government, the sole basis

17  provided by the government in that case, is that they are

18  admissible under Rule 404(b).

19         This is from the decision at the Westlaw citation:

20  "The government seeks to admit all relevant statements under

21  Rule 404(b) as establishing Mr. Sakoc's consciousness of guilt.

22  The government contends conversations between Mr. Sakoc and his

23  wife relate to a conspiracy to attempt to tamper with potential

24  witnesses against the defendant."  That is at page 5.

25         The Court later states, in relevant part:  "Since the

1    jail tapes are being offered for a purpose, other than to show

2    Mr. Sakoc's bad character or criminal propensity, the Court's

3    analysis hinders on whether the tapes are relevant and satisfy

4    Rule 403."  The threshold of the case they cite, before any

5    idea of a Rule 403 analysis is cited, is a Rule 404(b) motion.

6              THE COURT:  Even if I were to consider it a

7    Rule 404(b) motion and this as 404(b) evidence, what's the

8    harm?

9              What would you have done differently if you had

10   gotten -- you got the information before trial.

11             MR. MURRAY:  It's not, your Honor, what we would have

12   done differently.  Our motions in limine specifically stated

13   that we asked that the government be precluded from entering

14   any unnoticed --

15             THE COURT:  I'm asking how you've been prejudiced, if

16   at all.  That's the question.

17             MR. MURRAY:  Well, your Honor, I think that the entry

18   of this evidence is absolutely prejudicial, but it wasn't

19   noticed.  And the government never contested our motion related

20   to the 404(b) evidence.  They argued they would not admit

21   unnoticed 404(b) evidence therefore was moot.  But in absence

22   of contesting that, I think that motion should be granted.

23             THE COURT:  They don't view it as 404(b) evidence.

24   They view it as direct evidence of intent and consciousness of

25   guilt.

1          But my question to you is:  To the extent that I could

2     also hear it as 404(b) evidence, what is the prejudice to you

3     in getting this notice late?

4          You got it in advance of trial.  It was 3500 material.

5     You got it before you opened.

6          What is the prejudice to you of this alleged late

7     notice?

8          MR. MURRAY:  The prejudice is that the government

9     affirmatively represented to counsel and this Court they would

10    not seek to introduce any 404(b) evidence, other than that

11    provided in their Rule 404(b) notice.

12         THE COURT:  Are they any other arguments you want to

13    make with respect to this evidence?

14         MR. MURRAY:  I do want to say, your Honor, as far as

15    it being a 404(b) issue, if we were to consider it as simply a

16    direct evidence issue, then the government hasn't provided case

17    law on that.

18         The case law they provide relates specifically to a

19    Rule 404(b) motion.  They have cited no case law saying that

20    this should be admitted.  They've cited no argument that it

21    should be admitted, other than the citation to a Rule 4049(b)

22    motion decided on Rule 404(b) grounds by the Court.

23         So absent it being a Rule 404(b) motion, I don't see

24    how the case they've cited is relevant to the issue of

25    admissibility since it's predicated on it being a Rule 404(b)

1    motion.

2         THE COURT:  I have found cases from this district, as

3    well as the Eastern District.  And one, for example, is

4    *United States v. Ulbrecht*, 79F.Supp.3d 466 at 488 to -89, which

5    found consciousness of guilt evidence to constitute direct

6    evidence of the charged conspiracy; and then *United States v.*

7    *Hatfield*, 685 F. Supp. 2d at 320 to 327 from the Eastern

8    District, in which the court observed that -- now I'm going to

9    quote -- "Evidence of flight is direct evidence as it shows

10   consciousness of guilt."

11        MR. MURRAY:  I would argue again that the posture of

12   the citations in the motion made by the government, the fact

13   that they don't cite to either of those cases.  The only case

14   they cite to is a Rule 404(b) motion, I think it should be

15   treated as what it is.

16        The government has made a motion where the only case

17   they cite to substantively on this issue is a Rule 404(b), and

18   it's a Rule 404(b) motion.  And we're prejudiced because they

19   affirmatively represented that they would not seek to admit any

20   evidence pursuant to that rule.  They have not cited any case

21   law stating it's direct evidence solely citing one that looks

22   into a similar issue one under Rule 404(b).

23        THE COURT:  Okay.  Thank you.  Why don't we take a

24   five-minute break, and we'll come back then.  Thank you.

25        (Recess)

1          THE COURT:  Everyone may be seated.  Thank you.

2          I'm just going to rule briefly on the government's

3     motion.

4          So last night, the government moved for the admission

5     of certain testimony from Kalen Rainey regarding threats

6     allegedly made to him by the defendant at the MDC.

7          The defense has objected to the admission of these

8     alleged threats because notice was not provided by the

9     government pursuant to federal evidence 404(b)(3).  The defense

10    further cites this Court's ruling on its motion in limine to

11    exclude 404(b) evidence for which notice was not provided.

12         I will say that I frankly think the government should

13    have provided notice of this testimony earlier.  But I

14    nonetheless grant the motion.  The government argues that the

15    testimony goes to the defendant's consciousness of guilt and is

16    therefore direct evidence of the defendant's participation in

17    the conspiracy and substantive counts in the superseding

18    indictment.

19         As I noted a few moments ago, some district courts

20    have observed that evidence of a consciousness of guilt or that

21    which shows his intent may constitute direct evidence of a

22    charged offense.  And as I noted earlier, I cited the *Ulbricht*

23    case, 79 F.Supp. 3d at 488 to −49, and the *Hatfield* case from

24    the Eastern District, 685 F.Supp. 2d at 327.

25         Here, the Court agrees that the alleged threats made

1    to Rainey by the defendant may go to the defendant's

2    consciousness of guilt and intent and are direct evidence of

3    the counts charged in the superseding indictment.

4         To the extent, however, that the cases that I cited

5    can be distinguished or that the evidence is better viewed as

6    404(b) evidence, admissible to prove intent or absence of

7    mistake, I will allow it on that basis, even though it was

8    produced together with the 3500 material and not at the time

9    that the 404(b) evidence was required to be produced.

10        I find that because there's case law that I read that

11   indicates or supports the argument that this is direct evidence

12   and not 404(b), I find that there is good cause for the

13   government to have produced it when it did.  And I'll note that

14   I don't think there are is prejudice to the defendant because

15   it was produced pretrial with the 3500 material prior to the

16   defense opening.

17        The Court, moreover, does not believe that any risk

18   that the jury may recognize that the defendant is incarcerated

19   should preclude the testimony of these alleged threats.  See

20   e.g. *United States v. Guang Ju Lin*, 5050 F. App'x, 10 at 13

21   through 14.

22        Evaluated under a Rule 403 standard, I find that the

23   probative value of the testimony is not substantially

24   outweighed by the danger of the prejudice.  The government's

25   motion to allow the testimony regarding these threats is

1    therefore granted.

2            MS. FLORIO:  Your Honor, would you give a limiting

3    instruction when that testimony comes in?

4            THE COURT:  Yes.  I'm happy to do that.

5            MS. FLORIO:  My request would be when it comes in and

6    is also the end of the case.

7            THE COURT:  Yes.  I'm happy to do that.  The

8    government suggested a limiting objection at the bottom of its

9    letter.

10           Do you have any objection to the language that the

11   proposed?

12           MS. FLORIO:  I actually was there for that trial.  So

13   I don't.

14           THE COURT:  That's the instruction I'll give.  Thank

15   you.

16           Now we'll bring the jury in.

17           (Continued on next page)

18

19

20

21

22

23

24

25

1          (In open court; jury present)

2          THE COURT:  Everyone may be seated.

3   BY MR. HERMAN:

4   Q.  Blows, before the break, do you recall reviewing some

5   messages from the 5555 phone?

6   A.  Yes.

7          MR. HERMAN:  Mr. Frenchman, can you please publish

8   another of those messages, Government Exhibit 101-4.

9          Mr. Frenchman can you blow up the two contacts at the

10  top here.

11  Q.  Mr. Santos, is this a conversation between the 5555 phone

12  and the phone number ending in 2492?

13  A.  Yes.

14  Q.  What's the name of that contact in the 5555's phone?

15  A.  Ross.

16          MR. HERMAN:  You can zoom out.

17  Q.  How many messages are in this conversation?

18  A.  921.

19  Q.  Again, I'm going to reading the 5555's messages.  If you

20  could read Ross' responses.  I'll start with the first message.

21          The first message says:  "Hey, bro, I still have the

22  same contact if anything," on March 10, 2019.

23          Did I read that correctly?

24  A.  Yes.

25  Q.  Next is:  "Hey, what's up, brother.  It's me, Jason.  This

1    is is my new contact.  Delete the old one.  You just text.  I'm

2    here, bro.

3    "A. Okay.  Cool."

4                MR. HERMAN:  Can we now go to page 299.  Okay.  Blow

5    up the top message.  Again, I will read the messages from 5555.

6                The first message says:

7                "Yo" on March 16, 2021.  The next message says:  "What

8    up bro?

9    "A. Yo.  303 Lexington Avenue, Manhattan."

10   Q.  Again, what's the date of that message?

11   A.  March 16, 2021.

12   Q.  And the response is:

13               "Cool.  How many invites can?"

14   "A. "3.

15   Q.  "What time?

16   A.  ?

17   Q.  "30 minutes" at March 16, 2021, at 4:26 p.m.

18   "A. Okay."

19   "Q. Come out.  He's there" on March 16, 2021, at 4:52 p.m.

20   "A. Yo.  Yo.  Yooo.  I'm calling you, bro.  Yo, I'm here.

21   "Q. Hey, apt" or apartment.

22   "A. Room 1106."

23   Q.  What's the date and time that room 1106 was sent?

24   A.  March 16, 2021, at 5:14 p.m.

25   Q.  Let's go to the next message.  What's the message there?

1    A.  "Yo.  Yo."

2    Q.  What's the date and time of that message?

3    A.  March 17, 2021, at 4:43 p.m.

4    Q.  The next day?

5    A.  Yes.

6    Q.  The response is:  "Hey, wassup, bro."  And that's at

7    March 17, 2021, at 4:43 p.m.

8    "A. Yup.

9    "Q. Yes.  Full address.  How many invites?"

10   "A. Three.  303 Lexington Avenue.

11   "Q. Room?

12   "A. 1106.

13   "Q. On the way," March 17, 2021, 4:45 p.m.

14          What's the last message?

15   A.  "Aight bet."

16   Q.  Is that the last message in the conversation?

17   A.  Yes.

18          MR. HERMAN:  All right.  Let's look another chat from

19   the 5555 phone.

20          Can you publish Government Exhibit 101-10.  Can you

21   blow up the two participants.  Thank you.

22   Q.  Is this a conversation between the 5555 phone and a phone

23   number ending in 9333?

24   A.  Yes.

25   Q.  What's the contact saved in the phone?

1    A.  "Matt, rob friend."

2    Q.  How many messages are in this conversation?

3    A.  1018.

4    Q.  Let's read from the beginning to page 2.

5         Mr. Santos if you could read the messages that were

6    sent from that rob friend, and I'll read the ones from 5555:

7         "Hi, Jason.  This is Matt, rob's mate.  I have your

8    details and will use you in the future.  I am on the UES,"

9    upper east side.  "Is that location okay?  Thanks.

10   "Q. Hey, brother.  How you doing.  Nice to meet you.  That's

11   perfect.  Contact me any time."  This is June 20, 2020.  Just

12   keep in mind menu top shelf.  Pre-rolls; coms; grass; edibles

13   getting more in a few days; Christina with a snowflake symbol;

14   X; Molly World; Adderall; Xanax bars, perk pinks 10s; perk 3mg

15   blues; oil; Juul pod tabs, shrooms.  Getting more in three

16   days.

17   "A. Thanks, pal.  Will be in touch."

18   Q.  Can you now go to page 332.  Can you read starting at the

19   bottom message of this page.

20   "A. Can I get 200 at 142 Bleeker Street, NY, 10012?  Let me

21   know an ETA, please."

22   Q.  What's the date and time of that message?

23   A.  March 15, 2021, at 4:52 p.m.

24   "Q. Will do.  BRB with time."

25   "A. ETA.

1    "Q. Hey, bro, 25 min.  Cool?

2    "A. Cool, thanks.

3    "Q. Hey, come out.

4    "A. Coming."

5    Q.   That's March 15, 2021, at 6:08 p.m.?

6    A.   Yes.

7            MR. HERMAN:  Scroll to the next message.  Keep going.

8    "Q. Good afternoon, brother.  Was the bag double and sealed?"

9    That was at March 16, 2021, at 12:28 p.m.

10           Did I read that right?

11   A.   Yes.

12   Q.   Continue reading.

13   "A. Pretty sure it was."

14   "Q. Thank you, brother.  How was this batch?

15   "A. Pretty good.  Hey, man.  Just on a followup from yesterday.

16   I gave most of my last bag to my buddy.  And he just called me

17   this second to say he ended up in hospital last night.  I am

18   not blaming you, just warning you of a problem my buddy had.

19   He had to get a NARCAN shot and was released in the early

20   hours.  Just letting you know."

21   Q.   What's the date and time that message is sent?

22   A.   March 17, 2021, 2:29 p.m.

23   Q.   Thank you.  You can continue.

24   "A. Do you have any of the older batch?  I'm heading upstate

25   tomorrow and told my pal I would take him something up.  Just

1    let me know, please.   Thanks.

2    "Q. Hey, bud.  Yaas.  Full address?

3    "A. Let me find out how much he wants.  You do have the old

4    batch, though?

5    "Q. Cool.

6    "A. Hey pal.  I need 400 of the old batch, please.  I'm at GMT

7    Tavern, 142 Bleeker Street, 10012.  If you have it, please let

8    me know an ETA.  Thanks.

9    "Q. Hey, bro.  Give me 5 min.  BRB.

10   "A. No worries.  Any news, pal?

11   "Q. Hey, bro.  Sorry new one only.  And, yeah.  It's too

12   strong.  Someone else just told me" on March 17, 2021, at

13   8:21 p.m.

14            Did I read that right?

15   A.  Yes.

16   Q.  Continue.

17   "A. Okay.  No worries.  My buddy doesn't want that.  I have had

18   a bit of the new stuff, and it is weird, doesn't feel like a

19   high.  It's more of an opiate nod, not a complaint, just my

20   opinion.  He'll catch you another time.  Speak soon.

21   "Q. No problem, bro.  I'll have new stuff this week.

22   "A. Cool, thanks."

23            MR. HERMAN:  Now, Mr. Frenchman, can you go back to

24   page 336.

25            Can you blow up the middle chat that starts:  "Hey,

1    man."

2    Q.  Mr. Santos, you can read this message again.

3    "A. Hey, man.  Just on a followup from yesterday.  I gave most

4    of my last bag to my buddy.  And he just called me this second

5    to say he ended up in hospital last night.  I am not blaming

6    you, just warning you of a problem my buddy had.  He had to get

7    a NARCAN shot and was released in the early hours, just letting

8    you know."

9    Q.  When was that message sent?

10   A.  March 17, 2021, at 2:29 p.m.

11   Q.  This is a silly question.  But what was the date yesterday

12   or the day before March 17?

13   A.  It's March 16, 2021.

14           MR. HERMAN:  Mr. Frenchman, while keeping this message

15   up, can you please publish Government Exhibit 101-2 at page

16   144.

17           Can you scroll to the next page.  Can you blow up

18   where it says, 10 min.  Can you also simultaneously blow up the

19   prior, the message on the other chat where it says, "Hey, man."

20   Q.  Now, Mr. Santos, what's the date and time that the message

21   from Matt, rob friend who mentions NARCAN was read by the 5555

22   phone?

23   A.  March 17, 2021, at 2:29 p.m.

24   Q.  What's the date and time that that 5555 phone tells Julia

25   "10 min"?

1  A.  March 17, 2021, at 2:36 p.m.

2  Q.  So the message to Julia is after receiving the message

3  about the NARCAN shot.  Is that correct?  Yes?

4  A.  Correct.

5       MR. HERMAN:  Mr. Frenchman, can you now take down the

6  Julia chat and publish Government Exhibit 101-3 at page 354.

7  Q.  Just like we did before, can you blow up the Matt, rob

8  friend chat and also blow up the chat to Amanda that says:

9  "He's on the way."

10       I'm sorry.  When was the chat to Amanda where the 5555

11  phone says he's on the way?

12       What's the date and time?

13  A.  March 17, 2021, at 6:01 p.m.

14  Q.  And, again, what's the time that it receives the message

15  about NARCAN?

16  A.  March 17, 2021, 2:29 p.m.

17  Q.  So the message to Amanda is several hours later; correct?

18  A.  Yes.

19       MR. HERMAN:  Now let's publish Government Exhibit

20  101-4 at page 306.  Why don't we just do this one at a time.

21  Q.  What's the date and time of the message from Matt, rob

22  friend, about NARCAN and the buddy ending up in the hospital?

23  A.  March 17, 2021, at 2:29 p.m.

24       MR. HERMAN:  Now, on the Ross chat, Mr. Frenchman, can

25  you blow up:  "Yaas.  Full address?" and "how many invites?"

```
 1   Q.  What's the date and time of these messages sent to Ross?

 2            What's the time of these chats?

 3   A.  March 17, 2021, at 4:44 p.m.

 4   Q.  Was that a little over two hours earlier?

 5   A.  Yes.

 6   Q.  Before me finish with the 5555 phone, I'd just like to play

 7   a video from the phone.  Can you please publish 101-2 1B.

 8            When you're ready, Mr. Frenchman, can you play the

 9   video from this phone, 101-2 1B.  Thank you.

10            (Video played)

11   BY MR. HERMAN:

12   Q.  Mr. Santos, do you see a sort of a symbol on it?

13   A.  Yes.

14   Q.  Do you recognize that symbol?

15   A.  Yes.

16   Q.  What is it a symbol of?

17   A.  It's the logo for the Maybach brand.

18   Q.  What is a Maybach?

19   A.  It's a luxury car brand.

20   Q.  Do you know who owns it?

21   A.  Mercedes owns it I believe.

22   Q.  Do you know how much Maybachs -- how much they retail for?

23   A.  Several hundred thousand dollars.

24            MR. HERMAN:  Mr. Frenchman, can you continue playing

25   the video.
```

1          (Video played)

2          MR. HERMAN:  I'd now like to discuss a few extractions

3   from other phones found at 95 Wooley Road.

4          Mr. Frenchman, can you publish Government Exhibit

5   102A.

6   Q.  Mr. Santos, I think we went over that these types of

7   extractions are from the other phone, the 5555 phone.

8          What is this type of report from Cellebrite?

9   A.  This specific part of the report comes from the notes

10  section of the report.

11  Q.  So, again, notes are something that somebody has to enter

12  into the phone?

13  A.  Yes.

14          MR. HERMAN:  Can you please blow up the title of the

15  first note in the middle column under "Note."  Actually let's

16  start with the time.  Thank you.

17  Q.  What's the time this note was created and date?

18  A.  April 30, 2021, at 12:11 p.m.

19          MR. HERMAN:  Can you scroll over to the next column

20  where it says "Note."

21  Q.  What does the note say?  What is the title of the note?

22  A.  It says, "Sold 100 to D at 42."

23  Q.  What does the summary say?

24  A.  "Sold 100 to Lu at 41."

25  Q.  Is that text repeated anywhere in the email where it says

1    "body"?

2    A.  Yes.

3              MR. HERMAN:  Can we go to entry number three.

4    Q.  What is the title of this note or what is the body?

5              It's the same text in both.

6              Correct?

7    A.  Yes.

8    Q.  Can you read what the text is.

9    A.  It says:  "$17,346 ma haus."

10   Q.  Let's now go on to note number 4.

11             What does note number 4 say under "Title"?

12   A.  "Picked up 100 from Hustle Runner."

13             MR. HERMAN:  Let's go to line note 6.  Let's go to

14   first when this note was created.  Since you have it up, let's

15   read the text first.  Even better.  Thank you, Mr. Frenchman.

16   Q.  What's the date this note was created?

17   A.  May 14, 2019, at 8:36 a.m.

18   Q.  Can you read the body in the next column over of this note.

19   A.  Yes.  "646-421-5555, new number, gold iPhone."

20   Q.  What does it say in the text right below that?

21   A.  "646-354-3122, old number, gold iPhone."

22             MR. HERMAN:  Let's go to the next note over, note 7.

23   Can we blow up the whole contents of note 7.

24   Q.  Do you see PayPal on the bottom of the note text?

25   A.  Yes.

1  Q.  What's the PayPal password?

2  A.  Kingbilly0812$.

3  Q.  What's the email address right above that?

4  A.  Kingbilly0812@gmail.com.

5  Q.  What's the password?

6  A.  BKbillz0812.

7  Q.  What are the credentials above that?

8  A.  Above that it's jable813@gmail.com, and the password is

9  able0812, white iPhone.

10  Q.  What are the credentials above that?

11  A.  Michlop812@icloud.com, password billzking123, gold iPhone.

12  Q.  Was that one of the iCloud accounts we discussed on Friday?

13  A.  Yes.

14  Q.  Let's go to the next one above that.

15  A.  Kingbillyscocky@iCloud, password King0812, black iPhone.

16  Q.  Can you read above that.

17  A.  Tomfunnyone@iCloud.com, password Mikedtb0812, little black

18  iPhone.

19          (Continued on next page)

20

21

22

23

24

25

1    Q.   What's the contact above that?

2    A.   Jasonbell1234@iCloud.com, password gmoney0812, big black

3    iPhone.

4    Q.   Now I would like to read a few messages from this phone.

5    Can you publish Government Exhibit 102-D.  Mr. Frenchman, can

6    you blow up the blue bubble in the middle of the page.

7         Mr. Santos is this a message sent between a phone

8    number ending in 6294 and the owner of the cell phone using a

9    phone number 7031?

10   A.   Yes.

11   Q.   How do you know it's -- sorry.  All right.  Let me -- can

12   you read that and I will read the messages back from the owner

13   of the phone?

14   A.   Sure.  "My mans just text me.  He got the chemdawg, but

15   it's even better now 'cause it's fresh n properly cured.  He

16   gonna send me pics now."

17   Q.   "Okay.  Cool.  Send me pics.  Yo ask John about the 9 I

18   want."

19   A.   "I'm here.  What's the count?"

20   Q.   "20 blues and 10 bars $10,000.

21   A.   "He just sold a Glock."

22   Q.   "Ohk.  Cool.  What type of Glock it was?  Yeah I want OT.

23   Want it."

24         And what's the response to that?

25   A.   "I don't know, but I'll ask."

1  Q.  Can you now publish Government Exhibit 102-E.  All right.

2  Can you blow up the first green message from the owner of the

3  phone to the phone number ending in 5633, and I will just read

4  it.

5          It says, "Cool.  Where you at and how many invites,"

6  on January 11, 2018, and what is the response?

7  A.  "That prolly 4 or 5.  How long?"

8  Q.  "Cool send me if you will address."

9  A.  "At Paul's baby grand."

10 Q.  Can we go to page 12 now.  Sorry, page . . .

11         Okay.  That's right.  Can you now publish the top

12 message.

13         It is January 11, 2018, the owner of the phone says "8

14 min."  What's the response?

15 A.  "Okay."

16 Q.  "He's there.  Come out."

17         All right.  Now can we scroll down to page 10 of the

18 PDF or page 10 of the document.  Can you blow up the top

19 message on this page.  What is the other text message sent to

20 the owner of the phone at January 13, 2018, at 8:25 p.m.?

21 A.  "Can I hit your boy later once I'm done with the girl?"

22 Q.  "You have his #?"

23 A.  "Nah."

24 Q.  "Okay.  Cool.  Just asking.  You only need mines.

25 Everything go through me.  But if you need anything, just hit

1    me up."

2            And what's the response to that?

3    A.  "Okay.  Will do."

4    Q.  All right.  I would now like to publish an image from

5    another phone found at 95 Wooley Road.  Can you please publish

6    Government Exhibit 103-1.  And Mr. Frenchman, can you please

7    zoom in to the bottom of this.  Yeah, that's great.  Thanks.

8    Bottom of the image.

9            Mr. Santos, are you able to make out what the

10    zoomed-in portion is?

11    A.  The bottom says "Billz" and the top, I believe, is "king"

12    or "K," something with a "K."

13    Q.  Does it look like it could be "king"?

14    A.  Yes.

15            MS. FLORIO:  Objection.

16            THE COURT:  I will allow it, but just going forward,

17    let's not lead, okay?

18            MR. HERMAN:  No further questions, your Honor.

19            THE COURT:  All right.  Any cross-examination?

20            MR. MURRAY:  Yes, your Honor.

21    CROSS-EXAMINATION

22    BY MR. MURRAY:

23    Q.  Good afternoon, Mr. Santos.  If you don't hear any

24    questions or need me to repeat anything, please just let me

25    know, all right?

1          So, Mr. Santos, you mentioned that a cell phone has

2    something called a SIM card, correct?

3    A.  Yes.

4    Q.  And that's kind of like an ID card that the phone has.

5    A.  It's an ID card but it contains information regarding the

6    cellular network, not the phone itself, but yes.

7    Q.  And just I want to go back to something.  If I was to take

8    the SIM card from my phone and put it in another phone, that

9    second phone, that phone would have my phone number, right?

10   A.  Yes.

11   Q.  And if some -- so someone who had that second phone could

12   send texts or calls and they would say they were coming from

13   my phone number.

14   A.  Potentially.

15   Q.  And potentially if someone had saved me as a contact, it

16   would show up as being from my contact, correct?

17   A.  Depending on the application that you are using, it's

18   possible.

19   Q.  Mr. Santos, to your knowledge, is it possible for multiple

20   devices to use one phone number?

21   A.  Yes.

22   Q.  So you could have a situation where multiple individuals

23   with multiple devices are sending or -- are sending messages,

24   calls, texts that are shown as data from the same phone

25   number?

A.  All these devices would need to be logged in under the same

account, so, for example, we have been using iCloud a lot in my

testimony.  You could send a message, say, from an iPhone, IOS

tablet and, say, a MacBook and if you send messages from those

devices, they would appear to be from the same device, but the

person who owns those devices would have to be logged in under

their, you know, iCloud account.

Q.  So, for example, with the 5555 number, if anyone was logged

into the iCloud account associated with that number, they could

send calls and texts that would appear to be coming from that

number.

A.  Potentially, yes.

Q.  So there is no way for us to know for sure who actually

sent a message that appears from that 5555 number.

          MR. HERMAN:  Objection.

          THE COURT:  I will allow it.

A.  I don't know.

Q.  I just had a couple more questions.

          So we had looked at some call subscriber records.

Does the fact that a name is listed as the name on the

subscriber mean that that is their phone or for example --

strike that.

          If a person had a family or shared cell phone

account, you could have one person's name be on all of those

phones, or all of those accounts.

1    A.  Yes, it would usually be the person who is getting billed

2    for the account.

3    Q.  But so the fact that somebody is listed as the subscriber

4    on the account doesn't necessarily mean that they used a

5    particular phone.

6    A.  Correct.

7            MR. MURRAY:  One moment, your Honor.

8            (Counsel confer)

9            MR. MURRAY:  We have no further questions, your

10   Honor.

11           THE COURT:  All right.  Any redirect?

12   REDIRECT EXAMINATION

13   BY MR. HERMAN:

14   Q.  Mr. Santos, you were asked questions about SIM cards.  Do

15   you remember that testimony?

16   A.  Yes.

17   Q.  Can one SIM card be simultaneously inserted into multiple

18   phones?

19   A.  No.

20           MR. HERMAN:  No further questions.

21           THE COURT:  All right.  You can step down.  Thank

22   you.

23           (Witness excused)

24           THE COURT:  The government can call its next witness.

25           MR. HERMAN:  Your Honor, the government calls

1    Dr. Stacey Hail, H-A-I-L.

2      STACEY HAIL,

3          called as a witness by the government,

4          having been duly sworn, testified as follows:

5    DIRECT EXAMINATION

6    BY MR. HERMAN:

7    Q.  Good afternoon, Dr. Hail.

8    A.  Good afternoon.

9    Q.  Are you a medical doctor?

10   A.  Yes.

11   Q.  What is your educational background?

12   A.  I received my bachelor of science in chemistry from

13   Southern Methodist University in Dallas, Texas; followed by my

14   medical doctor degree at the Medical College of Georgia in

15   Augusta, Georgia; and then I did my internship in residency at

16   Parkland Hospital in Dallas, Texas.  Parkland is the single

17   busiest emergency department in the entire country and also

18   where J.F.K. was taken when he was shot.  And then I did a

19   two-year fellowship in medical toxicology.

20   Q.  And what type of doctor are you?

21   A.  I am board certified in both emergency medicine and medical

22   toxicology.

23   Q.  What does it mean to be an emergency medicine physician?

24   A.  Well, I think most people are quite familiar with ER

25   doctors and what we do, but I work shifts in the Parkland

1    emergency room and I see anything that comes in, from heart

2    attacks to strokes, to traumas, to toxic exposures from

3    overdoses or snake bites, to lacerations, to toe pain,

4    anything that comes in.

5    Q.   You also mentioned medical toxicology.  What is

6    toxicology?

7    A.   Toxicology is, quite simply, the study of poisons.

8    Q.   And what does a medical toxicologist do?

9    A.   Well, that's what I think can be confusing for a lot of

10   people.  Toxicology is the study of poisons, and that can be

11   anything from a chemical substance to a prescription

12   medication, to an illicit drug, to sea creatures, even.

13          But a medical toxicologist is different from a Ph.D.

14   toxicologist or a chemist because I am not working in a

15   laboratory setting.  My practice in medical toxicology is that

16   I manage and treat poisoned patients.  So the field of medical

17   toxicology, the interaction is with the patient at the bedside

18   in a healthcare setting as opposed to a Ph.D. toxicologist

19   which works in a laboratory setting and their interaction with

20   the patient is a test tube of blood or urine.

21   Q.   Dr. Hail, where are you currently employed?

22   A.   I am employed by the University of Texas Southwestern

23   Medical Center and the faculty that are part of UT southwestern

24   are actually the attending physicians that staff Parkland

25   Hospital.  So even though I am employed by UT Southwestern, I

1   work at Parkland Hospital as well as the Children's Hospital

2   and also through the North Texas Poison Center.

3   Q.  And where do you practice emergency medicine?

4   A.  I practice emergency medicine in the Parkland ER.

5   Q.  And you referred to both an ER and an emergency

6   department.  Is there a difference between those two terms?

7   A.  There is.  I think most people are used to the term "ER"

8   because there was the television show ER back in the '90s,

9   which stands for emergency room, but the truth is that in most

10  hospital settings the emergency room is actually the entire

11  first floor of the hospital.  And our emergency room is

12  actually two to three football fields big, and it has its own

13  pharmacy, its own radiology suites with CAT scans, we have

14  different areas for psychiatry patients to trauma patients to

15  even women's health issues.  And so it is more than just a

16  room.  It's actually an entire department.

17  Q.  How long have you worked at the Parkland emergency

18  department?

19  A.  For 24 years.

20  Q.  As an emergency medical doctor at Parkland, do you treat

21  patients experiencing drug intoxication?

22  A.  Yes.

23  Q.  Do you often use the word "drug overdose"?

24  A.  Well, we do use the term "drug overdose," however, it's not

25  very descriptive when your whole life is centered around

1  intoxications.  And so an overdose may not necessarily imply

2  what has happened.  Is it a suicidal overdose because somebody

3  intentionally took a whole bottle of Tylenol?  Or is it a

4  toddler with an exploratory investigation, where they like to

5  put things in their mouth and they may take their grandmother's

6  blood pressure medications?  So when your whole focus in

7  medical toxicology is about intoxication, an overdose is not

8  really a very descriptive term.

9  Q.  Have you ever treated a patient suffering from a drug

10  intoxication?

11  A.  Yes.

12  Q.  And would that include illicit drugs like fentanyl?

13  A.  Yes.

14  Q.  About how often have you treated patients suffering from an

15  intoxication of an illicit drug?

16  A.  Too numerous to count.

17  Q.  On a general level, what steps do you take when treating a

18  patient experiencing a drug intoxication?

19  A.  Well, first and foremost, as an emergency physician, our

20  job is always what we call the ABCs——so A stands for airway; B

21  stands for breathing; C stands for circulation, or what is

22  somebody's blood pressure and pulse.

23          So the approach to any patient that comes into the

24  emergency department is to first evaluate those three things

25  and then followed by further history and physical and ancillary

1    studies to help with your differential diagnosis.  And

2    specifically for patients that are intoxicated by whatever

3    substance, we are trained to focus on a very unique term of art

4    called toxidrome.

5    Q.  We will get to what that means later, but I first want to

6    ask some different preliminary questions, which is, in your

7    practice as an emergency medicine doctor and a medical

8    toxicologist, have you ever had the unfortunate experience of

9    having to pronounce the cause of death for a patient in your

10   care?

11   A.  Yes, of course.

12   Q.  And what does that process involve?

13   A.  Well, that involves, first of all, trying to resuscitate

14   the patient.  But if we are unsuccessful in resuscitating the

15   patient, then we would pronounce them dead and choose a time of

16   death and then we would need to call the medical examiners'

17   office and proceed with whether it's a medical examiner case or

18   not.

19   Q.  We will get to that a little bit later, but I want to ask

20   you some additional questions.

21        You mentioned a poison center.  Have you also worked

22   at a poison center associated with Parkland?

23   A.  Yes.  So the poison center that is associated with Parkland

24   is called the North Texas Poison Center.  We have six poison

25   centers in the State of Texas, and these are based on the

1   population and how many regions are in a certain state.

2          So I think a lot of people are familiar as parents

3   that you may call the poison center if your child gets under

4   the sink and drinks a chemical and you can call the poison

5   center.  And the people that answer the phone at the poison

6   center are not just telephone operators, they are actually

7   called SPIs, which stand for Specialists of Poison Information.

8   They are specifically trained.

9          But also what goes on at the poison center is there

10  are medical toxicologists like myself, and we do consultations

11  with healthcare personnel around the region, when doctors come

12  across poisoned patients and need advice on how to manage them.

13  So we actually take call out of the poison center.

14          And then we actually are a rotation, where medical

15  students and residents in different specialties will come and

16  do class in the poison center for poison center rounds, and we

17  actually discuss how to manage poisoned patients that were

18  called in to the poison center and then we do a lot of

19  classroom work in teaching our doctors in training.

20  Q.  You mentioned you are employed by a university.  Do you

21  teach course work?

22  A.  Yes.  So I am an associate professor, but unlike what you

23  traditionally think about a professor in a classroom, our

24  roles as faculty in emergency medicine or other specialties

25  like surgery, even, would be more bedside teaching.  So

1    instead of necessarily spending the entire time in a medical

2    school classroom, we, as faculty, spend a lot of time teaching

3    mainly in -- at the patient's bedside and in the hospital

4    setting.

5    Q.  Are you -- in your clinical and teaching roles, have you

6    become familiar with opioids and opiates?

7    A.  Yes.

8    Q.  What are they?

9    A.  Well, an opiate is specifically a substance that comes

10   straight from the poppy plant, so these include things like

11   morphine or codeine or opium.  And if you ever remember

12   watching the movie *Wizard of Oz*, when they are running to the

13   Emerald City, they are running through a field of poppies and

14   they get very, very sleepy, and that's because of opiates in

15   the poppy plant.  An opioid is still a substance that

16   stimulates opiate receptors in the body, but in the setting of

17   an opioid you take an opiate and you tinker with it in the

18   laboratory and that would be called a semisynthetic opioid as

19   opposed to something that was created from scratch in the

20   laboratory is a synthetic opioid.  So opiates come from the

21   poppy.  Opioids are created either from scratch or tinkered

22   with in the laboratory setting.

23   Q.  What are some of the examples of synthetic opioids?

24   A.  Well, a semisynthetic opioid, perhaps the classic example

25   is heroin.  Now, heroin was developed by Bayer Pharmaceuticals

1  in the late 1800s, so it was actually treating the morphine

2  molecule with a couple different chemical groups to create

3  heroin.  So that's the classic example of a semisynthetic

4  opioid.

5          An example of a synthetic opioid on the other hand

6  would be a drug like fentanyl because it is completely created

7  from scratch in the laboratory.

8  Q.  And what is fentanyl?  What is it used for medically?

9  A.  Fentanyl is an opioid and we have historically used it for

10  a number of years in the healthcare setting, mainly for

11  treating pain.  And in the healthcare setting, we may use it

12  to treat pain, acute pain, in the emergency department.  We may

13  use it for procedures like if somebody's shoulder pops out and

14  we need to put it back in the ER, we would give fentanyl for

15  pain, for sedation, and for the procedure.  And then it's been

16  classically used as patches that people can put on their body

17  for cancer pain or chronic pain types of situations.  So

18  fentanyl is a drug that most physicians are very familiar with

19  using.

20  Q.  And when you administer fentanyl in a medical setting do

21  you administer a lot or a little?

22  A.  When we administer fentanyl, it is generally intravenously

23  and I would start at about 25 micrograms as a starting dose to

24  titrate because people react to opioids differently.

25  Q.  When you calculate using micrograms, how much is that?

1    A.   So a microgram is one times ten to the minus sixth grams.

2    So in other words, it is one with six zeros after it, and

3    that's how many micrograms would be in one gram.  So a

4    milligram of a substance is a thousand times more than a

5    microgram.

6    Q.   You mentioned intravenous administration.  What does that

7    mean?

8    A.   So intravenously is going straight into the vein.

9    Q.   Now, is fentanyl also a common illicit drug of abuse?

10   A.   It is.

11   Q.   And have you treated patients experiencing an overdose or a

12   drug intoxication from sort of fentanyl administered outside of

13   the medical setting?

14   A.   Yes.

15   Q.   I want to ask you now about your litigation experience.

16   Have you been hired by the government to be an expert witness

17   in this case?

18   A.   Yes.

19   Q.   Apart from this case, have you previously been hired as an

20   expert witness by the federal government?

21   A.   Yes.

22   Q.   And specifically, what have you been asked to determine?

23   A.   Generally, when I am asked to review these cases for the

24   federal government, they generally are surrounding opioid

25   cases.  I mean, there are other cases as well, but generally

1    opioid cases, and I am being asked not to render just a cause

2    of death opinion, but what is called a "but for" cause of death

3    opinion.

4    Q.   What is a "but for" cause of death opinion?

5    A.   A "but for" cause of death opinion means that without this

6    particular factor, that person would not have died.

7    Q.   Is it also sometimes referred to as an independent

8    sufficient cause of death?

9    A.   Yes.

10   Q.   Have you ever reported that you cannot determine whether a

11   particular substance was a "but for" cause of death?

12   A.   Yes.

13   Q.   How often does that happen?

14   A.   About half of time.

15   Q.   Have you ever been retained as an expert by defendants in

16   criminal cases?

17   A.   Yes.

18   Q.   In fact, are you expected to be called by defendant in a

19   criminal case later this week?

20   A.   Yes, as soon as I leave New York, I am going to Wisconsin

21   to testify for the defense.

22   Q.   And are you paid for your work as an expert witness?

23   A.   I am.

24   Q.   Can you just give us a sense, do you charge per hour, per

25   case, approximately how much?

1    A.  I am charging for my time, which is $750 an hour.

2    Q.  And how much time do you typically take for a case?

3    A.  Well, it just depends on the case and the number of victims

4    and the volume of material to review.

5    Q.  Now, what methods do you use in reaching conclusion about

6    whether a particular substance was the "but for" cause of

7    death?

8    A.  Well, the methodology is that of differential diagnosis,

9    which is what physicians do every day when they are rendering

10   an opinion about a diagnosis.  And remember, cause of death is,

11   after all, a diagnosis, and so differential diagnosis means

12   that if somebody comes in to the emergency department with

13   chest pain, I ask a series of questions and start narrowing

14   down in my mind do I think that this is a heart attack, do I

15   think this is pneumonia, do I think it is just musculoskeletal

16   chest wall pain?  And that is the process.

17            But the same process is used for a cause of death

18   opinion, although the material that you look at is different

19   from exactly when you have a patient in front of you at the

20   bedside answering questions.  So even though I am a medical

21   toxicologist, I am of course an emergency physician.  So when I

22   am looking at a cause of death and more specifically a "but

23   for" cause of death, I want to rule out trauma, I want to rule

24   out natural causes of death, in other words, considering other

25   types of things that could have caused somebody to die.  I will

1   consider whether an abnormal heart rhythm or an arrhythmia is a

2   cause of death even though that is what we call a diagnosis of

3   exclusion, because there is nothing you can see on an autopsy

4   to exclude that.

5           And then finally, looking at the toxicologic cause of

6   death, which is considering the substances that are found and

7   correlating that with the timeline leading up to the death and

8   what are called perimortem circumstances, which are the things

9   surrounding that person's death.

10  Q.  And what type of materials would you typically consult in

11  reaching your conclusion?

12  A.  Well, just like when a physician is making a medical

13  diagnosis in the healthcare setting and you review not just

14  the history or the physical exam, but you might get comments

15  from the patient's family or friends, you look at ancillary

16  studies, the same type of things are done in this kind of

17  analysis, which include reviewing the totality of the

18  evidence.  So, in other words, not just what drugs are present

19  post-mortem, but you have to consider those findings based on

20  witness statements, based on seen photographs, based on police

21  reports, evidence found at the scene, laboratory testing of

22  drug paraphernalia at the scene, and so that's why I say that I

23  look at the totality of the evidence, not just what is found in

24  the post-mortem blood.

25          MR. HERMAN:  Your Honor, at this time the government

1    offers Dr. Hail as an expert in medical toxicology.

2              THE COURT:  Any objection?

3              MR. MURRAY:  Brief *voir dire*, your Honor?

4              THE COURT:  Sure.  Go ahead.

5    *VOIR DIRE* EXAMINATION

6    BY MR. MURRAY:

7    Q.  Dr. Hail, are you aware of what a forensic pathologist is?

8    A.  Yes.

9    Q.  And what is a forensic pathologist?

10   A.  A forensic pathologist is somebody that has done a

11   pathology residency in -- after medical school and their focus

12   is to perform autopsies or sometimes they are the individuals

13   that look at tissue samples under a microscope if somebody has

14   cancer or a blood disorder and so their training, if they go on

15   to be a medical examiner, would be the pathologist that does

16   autopsies for forensic, meaning legal, purposes.

17   Q.  So they would be somebody whose expertise is in determining

18   cause of death?

19   A.  Yes.

20   Q.  Are you a forensic pathologist?

21   A.  No.

22   Q.  Do you have any training in forensic pathology?

23   A.  No.

24             MR. MURRAY:  Nothing further.

25             THE COURT:  Any objection?

1          MR. MURRAY:  We would have no objection solely as to

2    the medical toxicology.  If anything comes up, we would object

3    at the proper type.

4          THE COURT:  Do you want to clarify?

5          MR. HERMAN:  No, your Honor.  In fact, we offer

6    Dr. Hail as an expert in medical toxicology.

7          THE COURT:  Then she will be so qualified.  Thank you.

8    BY MR. HERMAN:

9    Q.  Dr. Hail, how does your role in determining a "but for"

10   cause of death differ from the role of a forensic pathologist?

11   A.  Well, first of all, forensic pathologists don't hold the

12   monopoly on rendering cause of death opinions.  In fact, every

13   physician, no matter what kind of physician they are, are

14   qualified to render a cause of death opinion.  In fact, most

15   cause of death opinions are rendered by a patient's primary

16   care physician that signs the death certificate with the cause

17   of death.  A much smaller number of patients actually go to

18   the forensic pathologist, and that's usually for circumstances

19   where there might be a gunshot wound or the cause of death is

20   unclear because it's in criminal circumstances.  But the vast

21   majority of cause of death opinions are rendered by everyday

22   internists or family practice doctors, or even pediatricians,

23   emergency physicians, of course, and so what my role, as an

24   emergency physician and medical toxicologist, is to actually

25   make sure my patients don't meet the medical examiner.  And so

1    I render opinions on diagnosis every single day without

2    performing an autopsy.

3    Q.  Mr. Frenchman, can you please show the witness what is

4    marked as Government Exhibit 852.

5           Dr. Hail, do you recognize the first slide of this

6    exhibit?

7    A.  Yes.

8    Q.  Does this contain a PowerPoint presentation of terms and

9    materials that would assist you in your testimony today?

10   A.  Yes.

11   Q.  Have you reviewed this presentation before your testimony?

12   A.  I have.

13          MR. HERMAN:  Your Honor, the government offers

14   Government Exhibit 852.

15          THE COURT:  Is there any objection?

16          MR. MURRAY:  No objection, your Honor.

17          THE COURT:  All right.  It will be admitted.  Thanks.

18          (Government's Exhibit 852 received in evidence)

19   BY MR. HERMAN:

20   Q.  Dr. Hail, I'm going to ask you generally what you were

21   retained to do in this case, and before I ask for your -- for

22   the reason for your conclusions, I'm just going to ask you to

23   walk the jury through some terminology.

24          Now, so, first, in this case were you asked by the

25   government to render an expert opinion on the "but for" cause

1    of death of Julia Ghahramani, Amanda Scher, and Ross Mtangi?

2    A.  Yes.

3    Q.  Before I get to your determinations, like I said, I would

4    like you to explain to the jury some terminology that was

5    relevant to your determination.

6         Dr. Hail, first, are you familiar with the term

7    "toxidrome"?

8    A.  Yes.

9    Q.  What does it mean?

10   A.  The word "toxidrome" is a very specific bread-and-butter

11   term in medical toxicology, and the word "toxidrome" are the

12   words "toxic" and "syndrome" mashed together.  And I think

13   that when you watch the news or the media, you would get a

14   sense that an overdose is an overdose is an overdose, that

15   being intoxicated from one substance looks the same as being

16   intoxicated by another substance, but that is absolutely not

17   true.

18        When you learn medical toxicology, the first day of

19   your fellowship you learn about the toxidrome, and so that

20   word means the constellation of signs and symptoms unique to a

21   certain substance or group of substances.  So being high on

22   heroin looks different from being high on cocaine and dying of

23   heroin looks different from dying from cocaine.  So that is the

24   first thing that you have to understand when looking at a

25   cause of death from a toxic substance is to understand what a

1    toxidrome is.

2    Q.  I think you mentioned heroin.  Would dying from fentanyl

3    also look very different from dying from cocaine?

4    A.  Absolutely.

5    Q.  Which toxidromes were relevant to your cause of death

6    determinations in this matter?

7    A.  So there are a number of different toxidromes that you

8    learn about in medical toxicology.  There is absolutely no

9    reason to teach every single one of those today because there

10   are only three that are relevant in this particular case.

11   Q.  And what are those three?

12   A.  The first is the opioid toxidrome.

13   Q.  I will just ask you to list them and then we will go

14   through them.

15   A.  Sure.

16   Q.  What is the second one?

17   A.  The second one is the sympathomimetic toxidrome.

18   Q.  And what is the third one?

19   A.  The third one is the sedative-hypnotic toxidrome.

20   Q.  Mr. Frenchman, can you go to slide 2?

21        The first, Dr. Hail, toxidrome you talked about was

22   the opioid toxidrome.  What is that?

23   A.  So the opiate or opioid toxidrome is how somebody looks if

24   they were high on a drug, such as fentanyl or heroin or

25   oxycodone, any of the opiates or opioids.  So this toxidrome

1    has three parts to it.  This is what somebody looks like when

2    they are intoxicated by a drug like fentanyl.  The first is

3    that they have pinpoint pupils.  The second is that they have

4    central nervous system depression.  Now, this is not depression

5    like being sad.  This means that your central nervous system,

6    your brain, is slowed down.  And so this would look like

7    somebody being lethargic, meaning very sleepy, all the way to

8    being unconscious or comatose.  And then the third and the most

9    important part of this toxidrome is called respiratory

10   depression.  Now, this is not respiratory distress like when

11   somebody has an asthma exacerbation and they are short of

12   breath and could barely breathe.  This is somebody who is

13   breathing slower and slower and slower until they stop

14   breathing.  And the medical term for cessation of breathing or

15   stopping breathing is called apnea.  So opioid deaths are

16   ultimately caused by somebody that is unconscious, they stop

17   breathing, and that is how they die.  Opioids have a very, very

18   specific effect on the part of the brain stem that causes you

19   to breathe without thinking.  And opioids cause that particular

20   reflex to stop.

21   Q.  Now, at the bottom of the slide is listed pulmonary edema

22   and foam cone?

23   A.  Pulmonary edema, not an enema.

24   Q.  Yes, you are right.

25   A.  Pulmonary edema, and that stands for fluid in the lungs.

1    Q.   What is a foam cone?

2    A.   Well, it requires a bit of an explanation, but the fluid in

3    the lungs, when you see somebody that is unconscious, the

4    tissue in their airway collapses on itself, and somebody is

5    having to breathe against that obstructed airway.  Now, the

6    most common example would be somebody snoring at night.  So

7    when my husband, not to pick on him, but when he gets into a

8    deep sleep, he starts to snore and that's because he is in a

9    deep sleep.  The tissue collapses on itself and it makes that

10   noise.  And what do you do to get somebody to stop?  Well, you

11   kick them so that they are aroused again, and then they are not

12   making that sound anymore.

13        Well, a similar thing happens when somebody is

14   unconscious, especially from opioids.  Their airway tissue

15   collapses on itself and they are breathing against this

16   obstruction.

17        Now, if you were to plug your nose and close your

18   mouth and try to take a deep breath against that 100 percent

19   obstruction, you would feel inside your chest cavity like the

20   sucking in.  You are trying to suck in the air.  That's

21   negative pressure.  That negative pressure inside the chest

22   sucks fluid out of the blood vessels that go to the lungs and

23   that fluid can be clear, it could be pink because it's blood

24   tinged, or it can even actually be bloody.  And as that opioid

25   toxic patient is dying, they are still breathing, but they are

1    breathing against that obstruction.  Air mixes in with that

2    fluid and that fluid gets very frothy, not unlike making a

3    latte at Starbucks, and that fluid will start coming out of the

4    airway.  And so almost in every opioid death you will see

5    pulmonary edema.  And if they are face up, you will very

6    frequently see a bunch of foam around their face.  And so that

7    is what is called a foam cone because that froth is coming out

8    of their mouth and nose.

9    Q.  And again, I think you mentioned this, but what are some

10   commonly known substances that could produce the opiate or

11   opioid toxidrome?

12   A.  Morphine, codeine, oxycodone, hydrocodone, heroin,

13   fentanyl.

14   Q.  Mr. Frenchman, can we go to the next slide.

15           Dr. Hail, what is the sympathomimetic toxidrome?

16   A.  So this toxidrome refers to substances that are referred to

17   as stimulants or uppers.  We don't really use -- those are

18   terms in medical toxicology.  We use the term sympathomimetic,

19   meaning a drug that mimics your sympathetic nervous system.

20   Your sympathetic nervous system is your fight or flight nervous

21   system.  So when you get scared or startled, you release

22   hormones in your body that stimulate your sympathetic nervous

23   system.  So drugs that mimic that nervous system are drugs like

24   cocaine or methamphetamine.  PCP is another example.  And so

25   these kinds of drugs cause a completely different toxidrome

1    that looks completely different from opioids.

2    Q.   What are some common telltale signs or symptoms of the

3    sympathomimetic toxidrome?

4    A.   So the aspects of this toxidrome are that, as opposed to

5    the opioids, where the pupils are pinpoint, when they are

6    intoxicated their pupils will be big and dilated.  They get

7    very, very agitated, basically tearing things apart, running

8    around, and just very angry, upset, and not calm.  They get

9    very, very sweaty.  They have an elevated heart rate.  They

10   have an elevated blood pressure.  They can develop seizures.

11   So you might see biting of the tongue.  And death occurs

12   because of seizures that won't stop, along with a lethal heart

13   rhythm or an arrhythmia.  So what happens is it causes somebody

14   to drop dead very quickly.  So they don't have pulmonary edema,

15   because edema, that foam cone takes time to develop as somebody

16   is slowly dying from an opioid.  This is a fast type of death.

17   And also they may have elevated temperature.  So their

18   temperatures will be higher than you might ever see from a

19   fever that you get from like an infection.

20   Q.   What is excited delirium syndrome?

21   A.   Excited delirium syndrome is the most common way that I see

22   individuals die from these type of substances.  It turns out,

23   believe it or not, that dying from cocaine or methamphetamine

24   is quite rare.  We do not see that happen very much and it

25   generally only occurs in the setting of like drug smugglers

1   that have swallowed huge quantities of these drugs, and then

2   while they are crossing the border or going through the

3   airport, one of those balloons ruptures and they get a surge of

4   cocaine or a surge of methamphetamine into their body, and that

5   is how they may die.

6           But most people aren't taking that kind of quantity.

7   There is a way that you go from the sympathomimetic toxidrome

8   into what's called the excited delirium toxidrome, which is a

9   terminal phase of this toxidrome, and in this phase it is very,

10  very dangerous.  And that is when their temperatures can get

11  as high as 106, 107, 108.  They strip naked because they are

12  hot.  They are running down the highway or in somebody's

13  neighborhood, and it draws attention.  And oftentimes these

14  individuals are not dying alone, they are dying in a setting of

15  drawing attention to themselves.  And so that is how I most

16  often see deaths from sympathomimetic substances is when they

17  have developed the excited delirium syndrome.

18  Q.  Again, that would include cocaine, correct?

19  A.  Correct.

20  Q.  All right.  Let's go to the next slide, slide 4.

21  Dr. Hail, what is the third toxidrome that you mentioned

22  earlier?

23  A.  The third toxidrome is called the sedative-hypnotic

24  toxidrome, and this toxidrome involves drugs like ethanol,

25  which is just, you know, alcohol from wine or beer or liquor.

1    And then benzodiazepines, which is a fancy word for substances

2    that are sedatives that are antianxiety agents, where they are

3    used to calm people down.

4    Q.  And what are the telltale signs or symptoms of the

5    sedative-hypnotic toxidrome?

6    A.  The most common thing that you see with individuals that

7    take these kinds of substances, whether it be ethanol or, like,

8    benzodiazepines, which are things like Valium or Xanax or

9    clonazepam, all of these antianxiety agents, they have central

10    nervous system depression, so they can be very, very sleepy.

11    They can even to get to the point where they are unconscious.

12    But unlike the opioids, these agents do not have significant

13    respiratory depression.  In fact, I have seen individuals

14    overdose on entire bottles of Xanax or entire bottles of

15    Ativan, and they come in and they may be very, very sleepy,

16    but they don't stop breathing and die.

17         You may see somebody  in the emergency department who

18    is an alcoholic, and they come in with astronomical alcohol

19    levels and they are so drunk, but you don't need to put them on

20    a monitor and make sure that they don't stop breathing.  You

21    just let them sober up on a stretcher, you know, in a back

22    room, and they will be fine.  If alcohol had significant

23    respiratory depression, then half the planet would be dead

24    tonight.

25         So when we talk about respiratory depression, same

1    with the opioids, we are talking about, like I said, a very

2    specific effect on the brain.

3           These drugs may cause you to breathe a little slower

4    because they are meant to cause you to relax, but they don't

5    have that same mechanism.

6           THE COURT:  Tell me when is a good time to break for

7    lunch.

8           MR. HERMAN:  This would be a good time.

9           THE COURT:  Why don't we do that, folks.  Remember,

10   don't discuss the case and keep an open mind, and we will

11   resume testimony at 2:15.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (Jury not present)

 2                    THE COURT:  You can step down as well.  We will start

 3       again at 2:15.  I just ask the lawyers to be back at 2:10.

 4       Thank you.

 5                    (Luncheon recess)

 6                    (Continued on next page)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          AFTERNOON SESSION

2                              2:20 p.m.

3              (In open court; jury not present)

4              THE COURT:  I'm going to put one quick thing on the

5     record, and then we'll put the witness back on the stand.

6              I wanted to follow up briefly on the defendant's

7     objection to the scope of Rainey's expected testimony arguing

8     that it falls outside of the conspiracy charged in the

9     superseding indictment.

10             As I noted earlier, although I'm denying the motion, I

11    want to be clear that at the appropriate time, the defendant

12    will be permitted to make a motion as to prejudicial variance

13    from or constructive amendment to the superseding indictment

14    which is what I understood the argument to be, at least in

15    part.

16             So I'm not going to preclude Mr. Rainey from

17    testifying about the nature of the alleged conspiracy as he

18    understood it at the time.  But the objection to the scope of

19    the testimony is denied, but he will be permitted to make that

20    motion, if he chooses to do so.

21             Can we put the witness back on the stand and bring the

22    jury in.

23             MS. FLORIO:  Judge, may I put one quick thing on the

24    record.

25             THE COURT:  Yes.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

1          MS. FLORIO:  I had informed the Court last week that I

2     am the attorney for a witness in AUSA Thomas Wright's case.  I

3     understand that they're picking a jury today and that the

4     witness is going to get on first thing Wednesday tomorrow.  I

5     will confer with AUSA first thing as to what time, and I will

6     report back to you as soon as I hear from AUSA Wright.

7          THE COURT:  Thank you for that reminder.  As best you

8     can, give us your best estimate of when you think I should ask

9     the jury to come in.  I'm happy to work around that schedule.

10    I just don't want to keep them waiting.  I'd rather just ask

11    them to come in later.  So once you speak to the appropriate

12    folks and get a sense of timing, if you could let us know at

13    the end of the day tomorrow.  Thank you.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

 1                    (In open court; jury present)

 2                    THE COURT:  Everyone may be seated.  Thank you.

 3                    Mr. Herman, you may proceed.

 4                    MR. HERMAN:  Thank you.

 5                    Mr. Frenchman, can you please publish Government

 6     Exhibit 852.  Can you turn to slide 5.

 7     Q.  Now, Dr. Hail, before the lunch break, we were discussing

 8     the relevant toxidromes to your analysis in this case.  Now I

 9     want to ask you another question which is:  Are you familiar

10     with drug potency?

11     A.  Yes.

12     Q.  What does that mean, "Drug potency"?

13     A.  Potency is effectively how strong a medication is.  With

14     respect to opioids and opiates, it refers to how strongly these

15     substances bind to those receptors.  So the stronger it binds,

16     the higher the potency.  So generally we have discussions about

17     relative potency of different opiates and opioids.

18     Q.  How powerful is fentanyl as compared to morphine or heroin

19     or another opiate?

20     A.  So just by convention, we assign morphine the number 1.

21     That's, just by convention, how strong it is.  Everything is

22     relative to morphine with that number 1.  So when you think

23     about Tylenol with codeine being a pretty strong pain

24     medication, the codeine is actually .1 compared to morphine.

25                    And drugs like oxycodone and heroin are between 1 1/2

1   to 5 times more potent than morphine.  And that kind of varies

2   depending on how the drug is ingested.  But what makes fentanyl

3   so dangerous and why we are seeing so many deaths associated

4   with it is because it carries the number 100 compared to

5   morphine.

6   Q.  So does that mean fentanyl is 100 times as strong or as

7   potent as morphine?

8   A.  Yes.

9   Q.  Now I'd like to turn to your expert opinions as to the "but

10  for" causes of death in this case.

11          Now, you testified that you were asked to render that

12  type of opinion with respect to Julia Ghahramani, Amanda Scher,

13  and Ross Mtangi.

14          Is that correct?

15  A.  Yes.

16  Q.  Were you able to reach conclusions as to each of those

17  individual's "but for" cause of death?

18  A.  I was.

19  Q.  I'm going to ask you to explain your conclusions first and

20  then walk through the bases.

21          So starting with Julia Ghahramani, what is the basis?

22          MR. MURRAY:  Objection, your Honor.

23          THE COURT:  What is the basis of the objection?

24          MR. MURRAY:  There is nothing in the evidence related

25  to it that this conclusion could be based on at this time.

1              THE COURT:  Do you want to ask some foundational

2   questions as to what Dr. Hail relied on.

3              MR. HERMAN:  Yes.  I believe she already testified to

4   that before lunch.  I'm happy to ask additional questions now

5   just to refresh her recollection.

6              THE COURT:  Mr. Murray, is that what you think you

7   need?

8              MR. MURRAY:  Those documents are not in evidence.

9              MR. HERMAN:  Your Honor, some of the materials are in

10  evidence.  Other materials she's entitled to rely on for her

11  expert opinion, even if they're not in evidence.

12             THE COURT:  Why don't I see the lawyers at sidebar for

13  a minute.

14             (Continued on next page)

1                   (At the sidebar)

2          THE COURT:  What are you saying is not in evidence

3    that she's basing her conclusion on?

4          MR. MURRAY:  I suspect that that's going to be based

5    on the OCME toxicology reports, at least part in the OCME

6    toxicology reports, which were done by the OCME, not the NYPD

7    lab.  The OCME did blood tests on each of the victims.

8          We have not stipulated to those.  We have not

9    stipulated to any records from any medical examiner.  And we

10   repeatedly said we wanted of those witnesses called.  So

11   anything from the medical examiner' office is not in evidence.

12   Nothing from those toxicology reports is in evidence.  I think

13   We have a right to cross-examination how those were brought in,

14   what the procedure was, what was the accuracy was those, before

15   they are used to base a conclusion.

16         MR. HERMAN:  Your Honor, that is simply not the

17   federal rule with respect to expert opinions.  She's entitled

18   to rely on materials, even if they're not in evidence.

19         Now, just to be clear, we are intending to call all

20   three of the forensic toxicologists who produced the relevant

21   toxicology reports.  Due to scheduling, they were unable to

22   testify before her.  But that's sort of irrelevant.

23         She can -- we can introduce those reports.  She relied

24   on them subject to a later connection which we're happy to do,

25   if the Court prefers.  Regardless, we produced a fulsome expert

1    report to the defense.  We put on expert notice for this

2    witness.  It contains the bases of all her opinions.

3           It is simply not the rule that every single thing an

4    expert relies on has to be in evidence

5           MR. MURRAY:  Your Honor, at a bare minimum, I think it

6    would have to be clear.  It's also subject to connection.  I

7    think there's a real overall issue in that without having these

8    toxicologists called, even subject to connection, we are in

9    essence -- the jury has Dr. Hail, who is a medical doctor -- I

10   think her CV is 30 pages long -- lending credence to those --

11   lending credence to those reports where she did not perform

12   those tests.  So at a bare minimum, they would still have to be

13   subject to connection, but I still think that's not sufficient.

14          THE COURT:  I'm going to allow it subject to

15   cross-examination.  You can of course cross her on that.

16          MS. FLORIO:  Your Honor, I think that they would have

17   to be marked for identification because she's just talking in a

18   vacuum.  I think the government would at least need to mark the

19   toxicology reports.

20          THE COURT:  Were you going to seek to admit any of

21   these reports through this witness?

22          MR. HERMAN:  Just subject to connection, your Honor.

23          THE COURT:  Okay.  So, yes.  You should follow the

24   procedure that the defense lawyer just mentioned.  And you can

25   mark them for identification so the record will be clear

1    exactly what she relied on.

2        MR. HERMAN:  Absolutely.  Just to be clear, the

3    forensic toxicology reports have already been produced and

4    marked.  The defense has them.  They've had the expert notice

5    for this witness.  They've never made a motion.

6        MS. FLORIO:  We thought that the toxicologists were

7    going to testify first.

8        THE COURT:  Understood.  That would have been a better

9    way to do it or at least, at the very least, have flagged this

10   issue.  In any event, she'll be able to testify what she relied

11   on.  They'll be marked.  They'll be part of the record.

12       And then she can testify as to her conclusion.  And

13   then later in the trial, you'll have the other witnesses who

14   will lay the foundation for the appropriate documents.  I'm

15   comfortable with this procedure.  Thank you.

16       MR. MURRAY:  Your Honor, one other thing I want to

17   quickly address related to this is obviously, for the purpose

18   of making sure we're preserving everything in our record,

19   frankly, I would want to make sure it's on the record that we

20   would still be objecting to each of those.

21       THE COURT:  I'm happy to just keep that objection.

22   And that will be noted for the record.

23       MR. MURRAY:  Okay.  I just wanted to make sure.

24   That's all, your Honor.

25       THE COURT:  Thank you.

1                    (In open court; jury present)

2    BY MR. HERMAN:

3    Q.  I will just repeat my question, Dr. Hail, which Is:

4    Starting with Julia Ghahramani, what is your conclusion about

5    the "but for" cause of her death?

6    A.  My opinion is that she would not have died but for fentanyl

7    and acetafentanyl.

8    Q.  With respect to Ross Mtangi, what is your conclusion?

9    A.  He would not have died but for the fentanyl.

10   Q.  And with respect to Amanda Scher, what is your conclusion?

11   A.  That she would not have died but for the fentanyl.

12   Q.  I'm now going to ask you about some general questions about

13   the three victims.  And then I'll ask you some specific

14   questions about your analysis.

15          First, what types -- again, can you remind the jury

16   with.

17          What types of materials did you review in preparation

18   for rendering your expert opinion.

19   A.  Yes.  Well, as I alluded to before, you don't render a "but

20   for" cause of death just based on the post mortem toxicology

21   testing.  You don't look at that in a vacuum.  You have to

22   consider that with the totality of the evidence.

23          So with that said, of course I look at the autopsy

24   report, if it was done.  Of course I look at the post mortem

25   toxicology testing.  But then I consider that with regard to

1    seeing photographs, paraphernalia at the scene, testing at the

2    scene, witness statements, investigator types of reports.  And

3    I consider all of those in its totality.

4    Q.  Did you consider all of those in this particular case?

5    A.  Yes.

6    Q.  All right.  Now, did you review toxicology reports that

7    were marked for identification as Government Exhibits 801, 802,

8    and 803?

9    A.  Yes.

10   Q.  Those are the toxicology reports for each of these three

11   victims?

12   A.  Yes.

13            MR. HERMAN:  Your Honor, the government offers

14   Government Exhibits 801 through 803 subject to connection.

15            THE COURT:  They'll be admitted subject to connection.

16            (Government's Exhibits 801 through 803 received in

17   evidence)

18   BY MR. HERMAN:

19   Q.  Based on your review of the materials you just outlined for

20   the jury, what did you determine as to whether any of the three

21   victims died as to natural causes?

22   A.  I considered their past history, if it was discussed; in

23   one patient where there was an autopsy performed, I considered

24   those findings.  And I did not find any natural causes to

25   explain their death.

1   Q.  Did you consider whether any of the victims died due to

2   trauma?

3   A.  Trauma is always a consideration in sudden death.  And

4   trauma is considered in light of police reports indicating

5   signs of foul play or forced entry, as well as external

6   examination of the body, any traumatic findings on the outside

7   of the body, as well as, when an autopsy is performed, if there

8   are any findings on the autopsy.

9   Q.  Were you able to determine whether any of the victims died

10  due to trauma?

11  A.  No.  They did not die due to trauma.

12  Q.  What is trauma?

13  A.  Trauma would be like a penetrating injury like a stab wound

14  or a gunshot wound, as well as blunt trauma, which can be from

15  a fall, a blow to their head, car accidents obviously --

16  anything that is a blunt mechanism that could cause somebody to

17  bleed internally.

18  Q.  Now, I want to ask you about the role of toxicology reports

19  in your "but for" cause of death determination.

20          What is a toxicology report?

21  A.  A toxicology report is, in this circumstance, where blood

22  is taken from the decedent, from the victim, and it is sent to

23  a laboratory.  In many cases it's not just blood.  It may also

24  be urine, or it may be what's called the vitreous, which is the

25  eyeball jelly.

1          So these are the specimens that are frequently sent to

2     a toxicology laboratory, which is a chemistry laboratory.  And

3     they test for certain kinds of substances.

4     Q.  I think you've mentioned this a couple of times.

5          But would you typically make a "but for" cause of

6     death determination based on a toxicology report alone?

7     A.  No.  Never.

8     Q.  Why is that?

9     A.  Well, it's basically rendering an opinion in a vacuum.  I

10    think that there are a lot of people that think that there is

11    some magical level, when you look at a substance in the blood,

12    that suggests that that is a toxic level and therefore a cause

13    of death is based on that level.  That is junk science.  You

14    should not do that.

15         We don't even do that in living people.  I think

16    that -- when I'm teaching law enforcement and attorneys about

17    drug levels, teaching them that you don't hang your hat just on

18    the level is hard to comprehend.  When somebody comes into the

19    emergency department intoxicated by a substance, we actually do

20    not send drug levels.

21         If somebody has suicidally overdosed on a medication,

22    we don't send a drug level unless it's Tylenol or aspirin,

23    which is a conversation for another day.  We don't send cocaine

24    levels.  We don't send fentanyl levels.  We don't send

25    oxycodone levels because it means different things in different

1    people.  And it even means less in a dead body specimen in the

2    blood.

3           And there are a lot of things that happen after death

4    that can change what those levels are.  And if you take a dead

5    body and you draw a blood level, let's say from a scalp vein,

6    and the vein right here and the femoral vein, which is usually

7    where they draw blood from, or stick it in the heart and get

8    heart blood or a blood vessel in the toe, you will get numbers

9    all over the place.

10          They will not be the same like in a living person.

11   And that's because of something called post mortem

12   redistribution.  When we're alive and our hearts are pumping

13   and our blood is mixing and, if you were to draw blood levels

14   from different spots in the body, it should be about the same

15   within some laboratory error.

16          But when you die and your heart stops, everything

17   stops.  The blood pools in locations that are against gravity.

18   Then part of the decaying process is when your cells burst

19   open.  That's what happens when they die.

20          And drugs don't just stay in the blood.  They go in

21   fat.  They go in tissue.  When you die, those cells burst open

22   and release that drug.  So depending on where the needle goes

23   to draw the blood level, you're going to get different numbers.

24    So relying on that number, relying on that number in a vacuum

25   is inappropriate.

1    Q.  All right.  Now let's discuss what your determinations were

2    for each of the three victims in a little more detail starting

3    with your analysis of Julia Ghahramani's "but for" cause of

4    death.

5         Mr. Frenchman, can you please publish Government

6    Exhibit 826 in evidence.

7         Dr. Hail, did you consider this image in rendering

8    your determination?

9    A.  Yes.

10   Q.  Now, what, if anything, are you able to deduce about

11   Ms. Ghahramani's death from this photograph?

12   A.  Well, first, this is unfortunately somebody that died very

13   quickly, where they lost consciousness quickly I should say,

14   just from the fact that she is sitting on the sofa and then

15   kind of slumps over to one side.  The glasses are askew.

16        So generally, before fentanyl became a problem on our

17   streets, I used to say that people who died from opioid

18   toxicity would go to sleep and die.  They were frequently found

19   in positions of comfort, like in bed having gone to sleep or

20   under a blanket on the sofa or in the recliner chair.

21        And that's because there's time.  Oxycodone or heroin

22   is not as potent and there is time for that individual to go

23   get comfortable while they're experiencing the effects of these

24   drugs.

25        But as we talked about before, fentanyl is so potent.

1    And you may not die in a split second, but you will lose

2    consciousness rapidly.  And ever since fentanyl hit our streets

3    in an illicit fashion, I am now seeing individuals in much

4    stranger positions, which is consistent with fentanyl toxicity.

5    And then more importantly, in this situation, you can see the

6    presence of a foam cone --

7        MR. HERMAN:  Mr. Frenchman, can you just briefly zoom

8    in to Ms. Julia Ghahramani's face.  Okay.  You can zoom out

9    now.

10   Q.  What did we see in that zoom-in, Dr. Hail?

11   A.  That is what we talked earlier about a foam cone.  A foam

12   cone is when the fluid gets sucked into the lungs as someone is

13   breathing against an obstructed airway.  And the air mixes with

14   that fluid, and it gets very frothy.  And it fills their air

15   spaces, and then it comes up their trachea and out their mouth

16   and nose.

17       Because she died in this position where she's face up,

18   the fluid stays right there.  This is indicative of an opioid

19   intoxication, not a cocaine intoxication because, if one dies

20   from cocaine, they die very quickly and they don't develop this

21   kind of pulmonary edema and foam cone.

22       So her body position and the foam cone is something

23   that I would consider in context of her post mortem toxicology

24   testing.

25       MR. HERMAN:  Mr. Frenchman, can you please publish

1  Government Exhibit 824 in evidence.

2  Q.  Dr. Hail, did you consider this photograph in rendering

3  your opinion?

4  A.  Yes.

5  Q.  How is this photograph relevant?

6  A.  So this is a picture of a white substance in a small baggie

7  with a credit card or debit card that looks like it was used to

8  crush up the material and maybe create a line.  And then the

9  rolled-up paper is used to snort the white powder.  So that was

10  how the drug was ingested.  So there are signs of obvious drug

11  use at the scene.

12       MR. HERMAN:  Mr. Frenchman, can you now publish

13  Government Exhibits 804 and 805.

14  Q.  Dr. Hail, did you consider these drug testing lab reports

15  with respect to the drugs found in Ms. Ghahramani's apartment

16  in rendering your opinion?

17  A.  Yes.

18       MR. HERMAN:  Mr. Frenchman, can we just blow up

19  Government Exhibit 804 under "Results."

20  Q.  Dr. Hail, what about these lab reports were relevant to

21  your analysis?

22  A.  The analysis of these items shows the presence of both

23  fentanyl and cocaine.  So I was aware that there were these two

24  drugs presents at the scene at the time of death.

25       MR. HERMAN:  Mr. Frenchman, can you now publish

1   Government Exhibit 801.

2   Q.  Dr. Hail, what is this report?

3   A.  This is the post mortem toxicology report that was

4   performed on both femoral blood and vitreous.  So femoral,

5   again, is the blood vessel that is between like in your

6   subclavian region going to your thigh.  So it's the vessel that

7   takes blood away from your leg, and the vitreous is jelly from

8   inside your eyeball.

9   Q.  Did you review this report in forming your cause of death

10  opinion for Ms. Julia Ghahramani?

11  A.  Yes.

12  Q.  I'd like to go through the substances detected in

13  Ms. Ghahramani's blood.

14          Mr. Frenchman, can you blow up under "Results" in this

15  report.

16          What substances were found in Ms. Ghahramani's blood?

17  A.  So at first glance, this might look quite intimidating.

18  But there are a lot of drugs that are present.  But in fact,

19  it's not as intimidating as it looks.  The drugs that are

20  actually present are fentanyl, acetafentanyl, and cocaine.

21          MR. HERMAN:  Mr. Frenchman, can you highlight

22  fentanyl, stint, and cocaine.

23  Q.  Do you see, Dr. Hail, next to fentanyl in the second column

24  it says, 62mg per ml.

25          What does that mean?

A.  It means that fentanyl was there.  Like I just said, we

don't want to focus on what the level is because it could have

been a different number higher or lower, depending on where it

was drawn from.

Now, I like to see a drug level because there are two

kinds of toxicology testing.  There is something called

qualitative testing, which is it's positive or it's negative, a

yes or no answer that something is present.

And what is problematic with qualitative testing is

that you could have a false positive or you could have a false

negative.  Then there is what's called quantitative testing

where you are actually quantitating or counting the amount of

substance present.

And so when you see a drug in a corresponding level,

that means that it was actually quantitated.  There is no

chance of it being a false positive.  So it means that fentanyl

was there and they were able to quantitate it.  But don't hang

your hat, again, on the number.

Q.  Dr. Hail, what is acetafentanyl?

A.  Acetafentanyl is another analogue of fentanyl.  And from

time to time, I will see it by itself where it is illicitly

synthesized.

And I have also been seeing it mixed in with fentanyl.

So it may be a contaminant or part of the process of making it.

But it is not an FDA-approved drug.  So fentanyl we do use in a

1    healthcare setting.  Acetafentanyl we do not.

2    Q.   And you see that acetafentanyl was found in some amount in

3    her body.  Is that right?  In her blood?

4    A.   Right.  It was barely detectable because you see that

5    less-than sign, but it was enough to trip that test positive.

6    Q.   What are the substances between acetafentanyl and cocaine?

7    A.   So the first is norfentanyl.  Norfentanyl is a metabolite

8    of fentanyl.  So in other words, when fentanyl is brought into

9    the body, your body changes it, metabolizes it, to norfentanyl.

10   Norfentanyl is not active.  It is merely a metabolite of

11   fentanyl.

12   Q.   So it's created by the body?

13   A.   I'm sorry?

14   Q.   So it's created by your body?

15   A.   Yes.

16   Q.   And what are the substances underneath norfentanyl?

17   A.   The first is beta-hydroxy fentanyl.  And beta-hydroxy

18   fentanyl is a metabolite of fentanyl.  So, in other words, your

19   body metabolizes fentanyl to beta-hydroxy fentanyl.  So that is

20   coming from the fentanyl.

21   Q.   And what is 4-ANPP -- and I'm not going to say the whole

22   long chemical name.  But 4-ANPP is a substance that is used in

23   the illicit synthesis of fentanyl.  Now it can also be a

24   metabolite of fentanyl but not very often.

25            Say, for example, the fentanyl in this case did not

1    come off the street but it had come from a healthcare setting,

2    more likely than not, you would not see 4-ANPP.  So someone who

3    dies because let's say in the hospital they were given too much

4    fentanyl and they stopped breathing and died or a cancer

5    patient that died because their fentanyl patch was too strong,

6    you would probably not see this substance.  This substance is

7    something that you see from illicit synthesis of fentanyl off

8    the street.

9    Q.   Now, I see the next substance you noted was cocaine.

10   A.   Yes.

11   Q.   Do you believe that Ms. Ghahramani ingested fentanyl,

12   acetafentanyl, and cocaine?

13   A.   Yes.

14   Q.   What is the substance that starts with a B that is very

15   long underneath cocaine?

16   A.   So the substance is called benzoylecgonine.  And that is a

17   metabolite of cocaine.

18   Q.   In other words, that's something your body creates when it

19   tries to metabolize cocaine?

20   A.   Yes.

21   Q.   And I see the next substance is not detected, but just for

22   completeness, what is that substance?

23   A.   Ethel benzoylecgonine is also a metabolite of cocaine.

24   Q.   And what is the substance right below that?

25   A.   Cotinine is a substance that is found in tobacco products.

1   So it is an anagram which is when you take a word that's

2   spelled and mix up the letters in a different way.  So nicotine

3   comes from tobacco, and cotinine is another substance similar

4   to nicotine.  Because it's so similar, they just renamed it

5   cotinine.

6   Q.  What is the substance underneath cotinine?

7   A.  Cannabinoids.

8   Q.  What is that?

9   A.  Those are substances from marijuana.  But notice it says

10  "presumptive positive."  So that is a qualitative test, not a

11  quantitative test.

12  Q.  Then there is a whole list of other substances that were

13  not detected.

14          What does that mean?

15  A.  These are all opioids, except for morphine.  Morphine is an

16  opiate.  But morphine; oxycodone; oxymorphone; hydrocodone;

17  hydromorphone; codeine; 6-acetylmorphine, which is important

18  which I'll say in a second, Buprenorphine, Tramadol, and

19  methadone -- these are all common opiates or opioids that could

20  be either illicit or prescription.

21          And 6-acetylmorphine is the fingerprint molecule for

22  heroin.  It only comes from heroin.  So the fact that that's

23  negative, was not detected, means that there was no heroin used

24  in this case, as well as no other opioids that are common.

25  Q.  And what about the substances underneath those opioids?

1    A.  So underneath that you have ethanol, which is alcohol, that

2    was not present.  And then amphetamines, barbiturates, and

3    benzodiazepines.  So barbiturates and benzodiazepines are a

4    sedative, hypnotic agent.  And they were not detected either.

5    Q.  Based on your review of this material, which substances

6    were actually relevant to your determination to

7    Ms. Ghahramani's "but for" cause of death?

8    A.  So what was relevant is looking at the evidence and what

9    was present, which was fentanyl, acetafentanyl, and cocaine.

10   And this is not what a cocaine death looks like.  This is

11   consistent with an opioid death.  So the two opioids that are

12   present are fentanyl and acetafentanyl.

13   Q.  Now, based on your review of all of the materials we've

14   discussed, were you able to render an opinion as to the "but

15   for" cause of death of Julia Ghahramani's death?

16   A.  Yes.

17   Q.  What was that opinion?

18   A.  That she would not have died but for the fentanyl and

19   acetafentanyl.

20   Q.  And what's the basis for that opinion?

21   A.  The basis is that these are the substances that are present

22   post mortem.  And like I said, if this is all that I was

23   looking at, I would not be able to reach a "but for" cause of

24   death.

25          I would have to look at the perimortem circumstances.

1    This was not a person that was agitated, running down the

2    street, causing a ruckus, causing problems, causing a bar

3    fight, agitated, seizing.  This is not somebody that died from

4    an arrhythmia in a split second.

5              So looking at all of the material -- the photos, the

6    witness statements, the police reports, the external

7    examination -- and in light of these findings, that is how I

8    reached the "but for" cause of death.

9    Q.  Just to be clear, cocaine was not the "but for" cause of

10   death?

11   A.  Absolutely not.

12   Q.  Is that for the reasons you mentioned?  You would have

13   expected a different toxidrome?

14   A.  A different toxidrome.  The circumstances of dying from

15   cocaine are completely different.  As I said before, cocaine

16   deaths are rare.  And when I do see cocaine intoxication and

17   cocaine intoxication that leads to death, the circumstances are

18   completely different.

19   Q.  Was this a close call for you, Dr. Hail?

20   A.  Not at all.

21   Q.  Why is that?  I know you've said it a few times.

22              Why was it not a close call?

23   A.  For all of the reasons that we've discussed.

24   Q.  Let's move on to Ross Mtangi.

25              Were you asked to render an expert opinion on the "but

 1   for" cause of death of his death?

 2   A.  Yes.

 3         MR. HERMAN:  Mr. Frenchman, can you please publish

 4   Government Exhibit 834 in evidence.

 5         Dr. Hail, what, if anything, were you able to deduce

 6   about the cause of Mr. Mtangi's death from this photograph?

 7         THE WITNESS:  You can see that the position of his

 8   body is quite unusual.  It's that he's kneeling at the edge of

 9   a bed in a hotel room.  This is a strange position to die in

10   and is consistent with a rapid loss of consciousness.

11   Q.  And which toxidrome -- a rapid loss of consciousness is

12   consistent with which toxidrome?

13   A.  In this situation, the toxidrome would be opioid and

14   specifically fentanyl causing a rapid loss of consciousness.

15         MR. HERMAN:  Mr. Frenchman, can you please publish

16   Government Exhibit 832 in evidence.

17   Q.  Dr. Hail, did you consider this photograph in rendering

18   your opinion?

19   A.  I did.

20   Q.  How was this photograph relevant in your determination?

21   A.  Well, present at this scene, you can see some -- the small,

22   gray plastic baggies of a white powder.  And -- yes.  So there

23   are the baggies of white powder.

24         And then there's also a -- it's not a credit card, but

25   the concept is the same.  It's a hotel key.  Also present is a

1    rolled up -- I don't know if it's a dollar bill or what

2    currency it is, but it's a rolled up dollar bill.

3    Q.  Having Mr. Frenchman pull it up, are these the items you

4    just described?

5    A.  Yes.

6    Q.  Why is that important?

7    A.  It shows obvious drug paraphernalia at the scene.  And,

8    again, credit cards or hotel keys are used to crush up the

9    powder and create lines on a table.  And then a rolled-up -- so

10   it's a $20 bill -- is rolled up so you can snort it through

11   that kind of straw-like -- it makes like a straw to snort it.

12        MR. HERMAN:  Mr. Frenchman, can you now publish

13   Government Exhibits 807 and 808.

14   Q.  Dr. Hail, did you consider the lab reports testing the

15   drugs which were taken from Mr. Mtangi's hotel room?

16   A.  Yes.

17        MR. HERMAN:  Why don't we blow up just one of these,

18   Mr. Frenchman, Government Exhibit 808 on the right, and the

19   results.

20   Q.  Dr. Hail, what about these results was important to your

21   analysis?

22   A.  Well, obviously just looking at those bags of white powder

23   on a table, I don't know what they are.  But the testing of

24   this puts cocaine and fentanyl at the scene.

25        MR. HERMAN:  Mr. Frenchman, can you now publish

1  Government Exhibit 802.

2  Q.  Dr. Hail, is this Mr. Implanting's toxicology report?

3  A.  Yes.

4        MR. HERMAN:  Mr. Frenchman, can you blow up the

5  results.

6  Q.  Dr. Hail, you've already discussed toxicology reports in

7  general.

8        What were the relevant substances in Mr. Mtangi's

9  blood?  And I guess vitreous as well.

10  A.  There was fentanyl, there is 7-aminoclonazepam, there's

11  cocaine, and there's ethanol.

12  Q.  I think last time we discussed what norfentanyl and 4-ANPP

13  are, metabolites, things of that nature.

14  A.  That's correct.  The norfentanyl is a metabolite.  The

15  4-ANPP is a substance from the illicit synthesis of fentanyl.

16  Q.  What is 7-aminoclonazepam?

17  A.  That is a metabolite of a drug called clonazepam.  The

18  trade name is called Klonopin.  And this is a benzodiazepine

19  which falls into the sedative, hypnotic class of drugs, so

20  therefore causes the sedative hypnotic toxidrome.  And I

21  believe that he was prescribed Klonopin for anxiety.  So this

22  is a metabolite of that medication.

23  Q.  We already discussed what cocaine is and what the two

24  metabolites listed underneath are last time.

25  A.  Yes.

 1  Q.  Now, in this case ethanol was actually present.

 2       How was that relevant in your analysis?

 3  A.  So ethanol is of course alcohol.  There were alcoholic

 4  beverages at the scene.  And you can look at -- the ethanol

 5  level in the blood is .05.  And you can look down at the

 6  vitreous, and it shows .07.

 7       So that is approximately two to three alcoholic

 8  beverages in the blood at that time or in the body at that time

 9  which is, looking at a blood alcohol concentration, is less

10  than .08 which would be illegal to drive.

11  Q.  Now, I think you mentioned earlier that you shouldn't just

12  look at concentrations.

13       Why were the concentrations important with respect to

14  alcohol or ethanol?

15  A.  Well, alcohol is one of the few substances where it has

16  somewhat predictable effects at certain levels.  If it was as

17  unpredictable as other kinds of drugs, then we wouldn't have a,

18  per se, law to drive.  So alcohol gets absorbed and eliminated

19  from the body somewhat predictably.

20       Now that doesn't mean that people act the same because

21  a 20-year-old girl at .02 may be acting quite intoxicated.  And

22  my record in the ER is I actually had a guy who was an

23  alcoholic at .534; not .05, .534.  Not only was he not acting

24  intoxicated, he was actually withdrawing from alcohol.

25       So that is not to say that everybody behaves the same

1  at the same level.  But the levels are predictable as far as

2  elimination from the body.  So ethanol is one substance that

3  you can think about as having some meaning when you see a

4  concentration.

5       And probably the best place to look is vitreous which

6  is the eyeball jelly because the eyeball jelly is kind of a

7  compact situation and it's not prone to postmortem distribution

8  the way that blood is.  So you can look in either place and get

9  a sense of what the alcohol level was.  Either way, these are

10 not levels compatible with death.

11 Q.  Now, in short, what is your opinion as to the "but for"

12 cause of death it for Ross Mtangi?

13 A.  So for him, the "but for" cause of death is he would not

14 have died but for the fentanyl.

15 Q.  And can you explain the basis of your opinion.

16 A.  Yes.  So I'm considering this death with the fentanyl, the

17 7-aminoclonazepam, the cocaine, and the ethanol.  The ethanol

18 level is not consistent with death.  These are levels that are

19 safe to drive.  I shouldn't say that.  You wouldn't get in

20 trouble if you were caught with this ethanol level and driving.

21 And the 7-aminoclonazepam is a benzodiazepine that would cause

22 the sedative hypnotic toxidrome.

23      As I described before, this can cause some sleepiness

24 or some central nervous depression.  But it does not have

25 significant respiratory depression by itself.  So the fact that

1    it's there could certainly enhance the respiratory depression

2    of an opioid, but it would not be the "but for" cause of death.

3           And then finally, considering the fentanyl and

4    cocaine, the position that his body was in, pulmonary edema

5    postmortem -- he was upside down.  So there would not be a foam

6    cone.  It would be flowing out.

7           And just the circumstances and the totality of the

8    evidence is that the fentanyl is the "but for" cause of death.

9    Q.  Was this a close call?

10   A.  No.

11   Q.  Lastly, were you asked to render an expert opinion on the

12   but-for cause of Ms. Amanda Scher's death?

13   A.  Yes.

14   Q.  Did you review the same types of materials as you did for

15   Ms. Ghahramani and Mr. Mtangi?

16   A.  Yes.

17          MR. HERMAN:  Mr. Frenchman, can you please publish

18   Government Exhibit 846 in evidence.

19   Q.  Dr. Hail, what are you able to deduce about the cause of

20   Ms. Scher's death from this photo?

21   A.  So, again, this is an individual who suffered a rapid loss

22   of consciousness.  These are odd positions to be in when you

23   die.  And as I was describing before, until I saw fentanyl on

24   the streets, finding deaths like this was very unusual.

25          And now, when I look at deaths caused by fentanyl,

1   individuals who have died are in extremely strange positions

2   because they have slumped over doing whatever it was that they

3   were doing at that moment.

4          So in this particular case, you can see that she has

5   slumped over the coffee table.

6          MR. HERMAN:  Mr. Frenchman, can you please publish

7   Government Exhibits 845 and 848.

8   Q.  Dr. Hail, what, if anything, were you able to deduce about

9   the cause of Ms. Scher's death from these photographs?

10  A.  So in these photos, you see a flat surface with a card, a

11  credit card I suppose, and a straw.  So in the other examples,

12  it was rolled-up paper or a rolled up $20 bill.

13         In this circumstance, it's a straw.  The card is used

14  to create a line with the white powder, and the straw is used

15  to snort that line.  And the white powder is presumably from

16  this bag over here which is a baggie of white powder.

17         MR. HERMAN:  Mr. Frenchman, can you publish Government

18  Exhibit 811.

19  Q.  Dr. Hail, did you consider the results of the drug lab

20  testing for the drugs found at Ms. Scher's apartment?

21  A.  Yes.

22         MR. HERMAN:  Mr. Frenchman, can you blow up the

23  results of this lab report.

24  Q.  What do the results indicate that were relevant to your

25  determination?

1   A.  So the straw that we saw was tested, and it was positive

2   for fentanyl and cocaine.  It also says "additional

3   substances."

4   Q.  Do you see a Ziploc bag that tested positive for fentanyl?

5   A.  Yes.

6           MR. HERMAN:  Mr. Frenchman, can you now publish

7   Government Exhibit 803.

8   Q.  Dr. Hail, is this Ms. Scher's toxicology report?

9   A.  Yes.

10          MR. HERMAN:  Mr. Frenchman, can you blow up the

11  results.  Thank you.

12  Q.  What was relevant about Ms. Scher -- I guess everything was

13  relevant.

14          What are the substances that you viewed that were

15  found in Ms. Scher's blood and vitreous?

16  A.  So in this particular situation, there is fentanyl.  The

17  norfentanyl was a metabolite.  The 4-ANPP is the substance in

18  the illicit synthesis of fentanyl.  The benzodiazepine is a

19  metabolite of cocaine.

20  Q.  What about in the subclavian blood?

21  A.  There is cocaine and fentanyl and cotinine which is from

22  tobacco, cigarettes.  And doxylamine.

23  Q.  What is that?

24  A.  Well, one of the statements in this case from one of the

25  witnesses who was a dog-walker was that the decedent had

1    complained of having a sinus infection earlier in the week.

2    And doxylamine is a component of over-the-counter cold

3    medications.

4            I don't know specifically, because there are a lot of

5    over-the-counter cold medications, but it can be something such

6    as NyQuil or one of those kinds of over-the-counter

7    medications.

8    Q.  And did you review this report in forming your cause of

9    death opinion for Ms. Scher?

10   A.  Yes.

11   Q.  And based on all of the materials you reviewed, what is

12   your opinion as to the "but for" cause of Ms. Scher's death?

13   A.  That she would not have died but for the fentanyl.

14   Q.  What's the basis for your conclusion?

15   A.  The fact that there is fentanyl present postmortem, there

16   is fentanyl present at the scene, and that the position of her

17   body -- there was also pulmonary edema.  You couldn't see that

18   because she was face down on a coffee table.

19           But on autopsy, as well as on the table, was pulmonary

20   edema, which is consistent with opioid intoxication and that

21   the circumstances of her death with not consistent with a

22   cocaine death.

23   Q.  Was this a close call?

24   A.  No.

25           MR. HERMAN:  No further questions, your Honor.

```
 1                THE COURT:  Cross-examination.

 2                MR. MURRAY:  Your Honor, just one moment.

 3   CROSS-EXAMINATION

 4   BY MR. MURRAY:

 5   Q.  Good afternoon, Dr. Hail.  If at any point you don't

 6   understand one of my questions or you don't hear me, just stop

 7   me.  Okay.

 8   A.  Okay.

 9   Q.  Dr. Hail, how many hours did you bill on this case?

10   A.  Oh, goodness.  I actually don't remember.  Several.

11   Several hours.

12   Q.  And you bill at $750 an hour?

13   A.  Yes.

14   Q.  So for several hours, you would have made a couple thousand

15   dollars for this case?

16   A.  Correct.

17   Q.  Are you billing for the time you are here testifying today?

18   A.  Yes.

19   Q.  Again, at $750 an hour?

20   A.  Yes.

21   Q.  Doctor, I want to go back.

22   A.  Sorry.  Can you into the microphone.

23   Q.  When you speak about what we kind of colloquially call

24   "overdose" with regard to stimulants, though it's not the

25   colloquial phrase, you mentioned something called excited
```

1    delirium syndrome?

2    A.   Yes.

3    Q.   Doctor, to your knowledge, does excited delirium syndrome

4    appear in the Diagnostic and Statistical Manual of Medical

5    Disorders?

6    A.   It doesn't.

7    Q.   To your knowledge, does the American Academy of Emergency

8    Medicine believe that it is a proper diagnosis?

9    A.   It does not.

10   Q.   Now, Doctor, you stated that -- correct me if I'm wrong --

11   the only way you're going to see respiratory depression in

12   overdoses is from opiates.

13          Is that the case?

14   A.   That is incorrect.

15   Q.   Just that it's generally only going to occur there?

16   A.   No.   You're just taking my testimony out of context.   There

17   are other toxidromes that exist that were not relative or were

18   not relevant to this particular case where there are other

19   substances that cause respiratory depression.   So there are

20   other things that cause respiratory depression besides opioids.

21   But in this particular case, those are not relevant.

22   Q.   Doctor, you stated that, at least in part, you based your

23   determinations on the cause of death based on the lab reports,

24   Government Exhibits 801, 802, and 803.

25          Correct?

1    A.   That is a component of the puzzle, yes.

2    Q.   Did you personally perform those lab tests?

3    A.   Of course not.

4    Q.   Did you see them being performed?

5    A.   Of course not.

6    Q.   You have no knowledge if they were performed correctly?

7    A.   Correct.

8    Q.   You stated as well that you relied on things such as the

9    examination of the scene and anything reported perimortem,

10   prior to death.  Correct?

11   A.   Correct.

12   Q.   And on any autopsy or death investigation?

13   A.   Correct.  Those are all components of the analysis.

14   Q.   As well as what was found on the scene.

15   A.   Correct.

16   Q.   Doctor, did you personally respond to any of these scenes?

17   A.   Of course not.

18   Q.   Did you personally interview anybody who observed the

19   victims shortly before their deaths?

20   A.   No.

21   Q.   Did you personally perform any examination of the bodies?

22   A.   No.

23   Q.   Do you have any actual knowledge that those bodies were --

24   that the position of those bodies had not been changed prior to

25   the photos being taken?

A.  Well, in the police statements, they make comments about
whether a victim had to be turned over for resuscitative
purposes or something like that.

Generally, they will say that they did not tamper with
a body or tamper with the scene.  But of course I was not
personally there.

Q.  You're just relying on what they told you.

A.  Yes.

Q.  Now, Doctor, again, I think you said that the level of
fentanyl detected in the blood was unimportant.

A.  I don't think I used the term "unimportant."  I think I
made the point that you don't look at that number in a vacuum.
You don't rely on whether that number is high or low or lethal.

I like the number because it tells me that it's not a
false positive.  And when you do an intoxication opinion,
whether it's intoxication for a drinking-while-driving case or
intoxication for a cause of death, that you need two pieces of
the puzzle, confirmation of the substance, which is what we
have.  And it has to be correlated with other data, including
everything we've talked about today but essentially perimortem
circumstances or behavior in an intoxication opinion.

Q.  Doctor, do you have any estimate with regards Julia
Ghahramani as regards to how much fentanyl she ingested?

A.  No.

Q.  Do you have any estimate as to how much cocaine she

1    ingested?

2    A.   No.

3    Q.   Do you have any estimate as to how long before her death

4    she ingested cocaine or fentanyl?

5    A.   No.

6    Q.   Doctor, you testified again as to all three scenes that

7    there was a straw of some kind found.

8          It would be possible, if a person snorted cocaine and

9    then later snorted fentanyl with the same straw, that you could

10   find a mixture of those substances.  Correct?

11   A.   Yes.

12   Q.   But you have no indication that Julia Ghahramani ingested

13   cocaine and fentanyl at the same time.

14   A.   Correct.

15   Q.   You do not have any indication as to when she ingested

16   cocaine.

17   A.   I can't tell you whether it was 5 minutes, 20 minutes, or

18   an hour.  But it would have been preceding her death.

19   Q.   But, again, you cannot say that it was at the same time

20   that she ingested fentanyl.

21   A.   Correct.

22   Q.   So it's possible that she ingested cocaine and then later

23   separately ingested fentanyl?

24   A.   Yes.  Or in the other order or at the same time.

25   Q.   Doctor, with regards to Julia Ghahramani, you stated that

1    part of your conclusion that it was not cocaine toxicity came

2    from a lack of not causing problems or acting in this delirious

3    way.

4            Correct?

5    A.  Correct, not having evidence of the sympathomimetic

6    toxidrome.

7    Q.  But, again, you didn't speak to anybody who observed

8    Ms. Ghahramani prior to her death.

9    A.  Correct.

10   Q.  So you do not have any actual knowledge as to if those

11   symptoms were not occurring.

12   A.  Correct.

13   Q.  Now, Doctor, you stated, with regards Ross Mtangi, that

14   there was something called Klonopin that was found in

15   Mr. Mtangi's blood.

16   A.  Yes.

17   Q.  And that's a benzodiazepine; correct?

18   A.  Correct.

19   Q.  Doctor, isn't it incredibly dangerous to mix alcohol and

20   benzodiazepines?

21   A.  You should not mix them.  That is not a recommendation.  If

22   we were prescribing a benzodiazepine, we would say not to mix

23   it with other substances.

24   Q.  Would it be possible for a person to die from mixing

25   alcohol and benzodiazepines?

 1  A.  Well, as they say, it's possible.  But it's not likely.

 2  Q.  Again, Doctor, with regards Mr. Mtangi, do you have any

 3  opinion as to when he ingested cocaine?  How long before his

 4  death?

 5  A.  No.

 6  Q.  Do you have any opinion as to when he ingested fentanyl?

 7  A.  No.

 8  Q.  You cannot say that those two substances were ingested at

 9  the same time?

10  A.  Correct.

11  Q.  Again, Doctor, for Ms. Scher, it's the same thing.

12          There is no way for you to say how long before her

13  death she ingested cocaine?

14  A.  Correct.

15  Q.  Or how long before her death she ingested fentanyl?

16  A.  Correct.

17  Q.  Or that she ingested both at the same time?

18  A.  Correct.

19  Q.  With regards Ms. Ghahramani, are you able to make any

20  conclusion as to how long before her body was found she died?

21  A.  No.  I don't think so.

22  Q.  What about for Mr. Mtangi?

23  A.  No.

24  Q.  And for Ms. Scher?

25  A.  No.

1    Q.  Dr. Hail, just one more thing.

2          All together in this case, isn't it true that you're

3    expecting to get paid about $15,000?

4    A.  It depends on how much longer we're sitting here I suppose.

5    Q.  But that's roughly within the range?

6    A.  That's probably more than I would expect.

7    Q.  But it's not outside the realm of reason?

8    A.  That's a little bit more for two days.

9    Q.  Nothing further for this witness, your Honor?

10          THE COURT:  Redirect?

11          MR. HERMAN:  No, your Honor.

12          THE COURT:  Okay.  Thank you.  You are excused.

13          THE WITNESS:  Thank you.

14          (Witness excused)

15          THE COURT:  Would it make sense for us to take our

16    short afternoon break here?

17          MS. FLORIO:  Yes, your Honor.

18          THE COURT:  Just remember.  Please don't discuss the

19    case and please keep an open mind.

20          (Continued on next page)

21

22

23

24

25

1                    (In open court; jury not present)

2              THE COURT:  I want to just put one thing on the

3     record, and then we can just take our short break.  And it's

4     with respect to the argument that we had at sidebar.  You're

5     welcome to be seated.

6              Federal Rule of Evidence 703 allows an expert to base

7     an opinion on "facts or data in the case that the expert has

8     been made aware of or personally observed."  If experts in the

9     field "would reasonably rely on those kinds of facts or data in

10    informing an opinion on the subject, they need not be

11    admissible for the opinion to be admitted."

12             Again, I'm quoting from Federal Rule of Evidence 703.

13    But if the facts or data would otherwise be inadmissible, then

14    they may only be disclosed to the jury "if their probative

15    value in helping the jury evaluate the opinion substantially

16    outweighs their prejudicial effect."

17             Here I find that even if the underlying reports were

18    not admissible through the testimony of witnesses the

19    government intends to call at the trial, the reports are

20    properly disclosed to the jury because their substantial

21    probative value, that is, pinpointing the substances found in

22    the victims' blood and the nature of their deaths substantially

23    outweighs any risk of unfair prejudice.

24             The government has further indicated that the defense

25    will have the opportunity to cross-examine the witnesses

1     responsible for producing the laboratory reports upon which the

2     expert relies.

3           To the extent that any of these reports are

4     testimonial within the meaning of the confrontation clause, the

5     defense will have the opportunity to confront the proponents of

6     the underlying reports on cross-examination.

7           So if the defense would like to further articulate any

8     objection to the admission of the reports following the

9     testimony of those witnesses, I'll hear you out at that time.

10    But I just wanted to note that for the record.  Let's be back

11    at 3:30, six minutes.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              MR. SEIDLER:  Your Honor, if Mr. Rainey is the next

 2   witness --

 3              THE COURT:  That's my understanding.

 4              MR. SEIDLER:  It might be helpful to the defense in

 5   terms of cross-examination as to learn whether or not the new

 6   witness, Whyte, I believe, will be able to testify in this

 7   proceeding, because it will go to what questions we would ask

 8   Rainey to lay a foundation for the potential witness.

 9              THE COURT:  All right.  So why don't you all be

10   seated.  This is one additional issue I was going to raise, but

11   I was going to do it at the end of the day.

12              Counsel for Ms. Whyte wrote yesterday about contact

13   that the defense counsel has had with Ms. Whyte and the letter

14   alleges in part that Mr. Murray was explicitly instructed not

15   to communicate with Ms. Whyte outside the presence of her

16   attorney.  Mr. Murray has evidently presented a letter to the

17   government purporting to be from Ms. Whyte waiving her right

18   to counsel.  That letter was apparently given to Mr. Murray by

19   the defendant who is not currently housed in the same unit.

20   So I think we need to -- if you feel like to you need to

21   know -- I think let me just stop and say will Rainey be on

22   direct for the rest of the day?

23              MR. FERGENSON:  Yes, your Honor.

24              THE COURT:  Okay.  So then why don't we talk about

25   this at the end of the day so we can keep moving, but the

1    kinds of questions I will let you know that I want to ask is

2    how you got the letter from Ms. Whyte indicating that she was

3    waiving her right to counsel and just about communications

4    with Ms. Whyte without her counsel present and just hear you

5    out on the motion to quash the subpoena.

6           I want to keep moving, so if we can -- I just want to

7    let you know, so you can think about it.  When we come back in

8    a few minutes, we will have the testimony, then talk about this

9    at the end of the day.  Okay?

10          (Recess)

11          THE COURT:  Why don't we put Mr. Rainey on the stand?

12          MR. SEIDLER:  Your Honor, I think we need a moment for

13   Ms. Florio.

14          THE COURT:  For a sidebar?

15          MR. SEIDLER:  For Ms. Florio.

16          THE COURT:  Of course.  We won't start without her.

17          (Pause)

18          THE COURT:  Now that Ms. Florio is back, are we ready

19   for the jury?  Okay.

20          (Continued on next page)

21

22

23

24

25

```
 1                    (Jury present).
 2                    THE COURT:  Everyone can be seated, and the government
 3    may call its next witness.
 4                    MR. FERGENSON:  Thank you, your Honor.  The government
 5    calls Kaylen Rainey.
 6     KAYLEN RAINEY,
 7          called as a witness by the government,
 8          having been duly sworn, testified as follows:
 9    DIRECT EXAMINATION
10    BY MR. FERGENSON:
11    Q.  Good afternoon, Mr. Rainey.
12    A.  Good afternoon.
13    Q.  How old are you?
14    A.  31.
15    Q.  Where did you grow up?
16    A.  Buffalo, New York.
17    Q.  How long did you live in Buffalo?
18    A.  20 years.
19    Q.  Who did you live with growing up?
20    A.  My parents, my brother, and my sister.
21    Q.  How far did you go in school?
22    A.  I completed three years in college.
23    Q.  And where did you move after Buffalo?
24    A.  New York City.
25    Q.  What year would that have been roughly?
```

```
 1   A.   2012.

 2   Q.   How old were you then?

 3   A.   I was 20.

 4   Q.   Now, generally, once you were living in New York City,

 5   what kind of work did you do?

 6   A.   I started working in hospitality and ended up in

 7   entertainment, fashion, working as a waiter, event planning,

 8   promoting, marketing.

 9   Q.   In addition to those legitimate jobs, how else did you make

10   money?

11   A.   I sold drugs for a drug dealer.

12   Q.   What kind of drugs did you deliver?

13   A.   Cocaine, Adderall, Molly, Ecstasy.

14   Q.   Did you ever knowingly deliver fentanyl?

15   A.   No.

16   Q.   I'm sorry, Mr. Rainey.  I couldn't hear you.

17   A.   No, I did not.

18   Q.   You may need to pull the microphone just a little closer to

19   you.

20        You knowingly never delivered fentanyl?

21   A.   I did not, no.

22   Q.   Did you learn later that some of the drugs you delivered

23   contained fentanyl?

24   A.   The day I was arrested, yes.

25   Q.   Mr. Rainey, where do you live now, that is, where did you
```

1    sleep last night?

2    A.   MDC Brooklyn.

3    Q.   What is the MDC Brooklyn?

4    A.   It's a jail.

5    Q.   Why are you in jail?

6    A.   For conspiracy to distribute narcotics resulting in death.

7    Q.   Have you pled guilty to any federal crimes?

8    A.   Yes.

9    Q.   Which crimes?

10   A.   Conspiracy to distribute resulting in death and also gun

11   possession.

12   Q.   As part of your guilty plea, did you enter into a

13   cooperation agreement with the government?

14   A.   I did.

15   Q.   We will come back to that agreement in a bit, but briefly

16   what do you have to do as part of your cooperation agreement

17   with the government?

18   A.   Tell the truth about my crimes and the crimes committed

19   with the people that I committed the crimes with, and to

20   testify if required.

21              MS. FLORIO:  I'm sorry.  I apologize.

22              (Indiscernible crosstalk)

23              MS. FLORIO:  I couldn't hear the last sentence.

24              THE COURT:  If you could repeat the answer, please,

25   and speak very slowly and clearly into the microphone.  Thank

1    you.

2    A.  To not commit anymore crimes and to also tell the truth

3    about my crimes, all the crimes that I committed and the

4    people who I committed those crimes with.

5    Q.  Are you testifying today pursuant to the requirements of

6    your cooperation agreement?

7    A.  Yes.

8    Q.  Now, you said you sold drugs for a drug dealer?

9    A.  Yes.

10   Q.  What, more specifically, did you do for that drug dealer?

11   A.  I delivered drugs for him.

12   Q.  Did you work by yourself or with others?

13   A.  With others.

14   Q.  Looking around the courtroom today, do you see anyone you

15   worked with delivering drugs?

16   A.  Yes.

17   Q.  Who?

18   A.  Billy Ortega.

19   Q.  And could you identify an article of clothing or some

20   other physical description?

21   A.  Blue blazer and a beard.

22          MR. FERGENSON:  Your Honor, I ask that the record

23   reflect the witness has identified the defendant, Billy

24   Ortega.

25          THE COURT:  Just why don't you indicate where he is

1    sitting in the courtroom.

2              THE WITNESS:  At the table to the right.

3              THE COURT:  Where is he at that table?

4              THE WITNESS:  In the middle in, between the lady and

5    the woman -- the lady and the man.

6              THE COURT:  The record shall so reflect.

7    BY MR. FERGENSON:

8    Q.  Mr. Rainey, you said you delivered drugs for a drug

9    dealer, right?

10   A.  Yes.

11   Q.  Was it a drug delivery service?

12   A.  Yes.

13   Q.  Who ran the drug delivery service?

14   A.  Billy.

15   Q.  In what years did you work for the defendant's drug

16   delivery service?

17   A.  2018 to 2022.

18   Q.  Why did you stop?

19   A.  I was arrested.

20   Q.  You said you worked with other people at the drug delivery

21   service.

22   A.  Yes.

23   Q.  Did people have different roles?

24   A.  Yes.

25   Q.  What was your role?

```
 1    A.  I was a delivery person.

 2    Q.  What did Billy call your role?

 3    A.  Just runners.

 4    Q.  What did a runner do?

 5    A.  A runner just delivered drugs and picked up the money from

 6    the customers.

 7    Q.  Mr. Rainey, who arranged the drug deliveries?

 8    A.  Billy.

 9    Q.  Who told you where to go?

10    A.  Billy.

11    Q.  Who told you which drugs to deliver?

12    A.  Billy.

13    Q.  Who told you how much money to collect?

14    A.  Billy.

15    Q.  Now, would Billy typically be with you in person when you

16    were making drug deliveries?

17    A.  No.

18    Q.  Where did Billy live?

19    A.  West Milford, New Jersey.

20    Q.  How far from the city is that?

21    A.  About an hour.

22    Q.  And how do you know that?

23    A.  I've been to his house before.

24    Q.  Now, where were you typically when you were making drug

25    deliveries for Billy?
```

```
 1   A.  In Manhattan, Lower Manhattan.

 2   Q.  How did Billy typically communicate the drug delivery

 3   information to you?

 4   A.  It was mostly through text.

 5   Q.  Now, if Billy was in New Jersey, who would typically give

 6   you the drugs?

 7   A.  Whoever had access to the safe, mostly Josefina Marine.

 8   Q.  You said Josefina Marine?

 9   A.  Yes.

10   Q.  What connection did Josefina Marine have to Billy?

11   A.  That's Billy's mom.

12   Q.  And where would -- if I call her Josefina, you know who I

13   am talking about?

14   A.  Yes.

15   Q.  Where would Josefina give you Billy's drugs?

16   A.  From the safe in the apartment where the drugs were kept.

17   Q.  What connection did you have to that apartment?

18   A.  I rented a room there.

19   Q.  You lived there?

20   A.  Yes.

21   Q.  Now, after you made the drug delivery, who would you

22   typically give Billy's customer's money to?

23   A.  Josefina.

24   Q.  Where would you do that?

25   A.  At the apartment.
```

1  Q.  Same apartment where you lived?

2  A.  Yes.

3  Q.  If I call that Josefina's apartment, will you know what I

4  am talking about?

5  A.  Yes.

6  Q.  Mr. Rainey, who owned the drugs you were delivering?

7  A.  Billy.

8  Q.  Who got most of the drug profits?

9  A.  Billy.

10  Q.  Now, you mentioned this, but where would the drugs

11  typically be kept in the apartment?

12  A.  In a closet in the hallway in a safe.

13  Q.  Where would the drug money typically be kept in the

14  apartment?

15  A.  In a safe in Josefina's bedroom closet.

16  Q.  Different safe?

17  A.  A different safe, yes.

18  Q.  Did some of the people involved in the drug delivery

19  service also have guns for protection?

20  A.  Yes.

21  Q.  Protection from what?

22  A.  Protection for the drugs and the money.

23  Q.  Who supplied the guns?

24  A.  Billy.

25  Q.  Mr. Rainey, roughly how many other people do you know of

 1   who worked for Billy's drug delivery service?

 2   A.  About seven or eight.

 3   Q.  Mr. Frenchman, can you please -- actually, just a moment,

 4   your Honor.

 5              THE COURT:  Yes.

 6              (Counsel confer)

 7              MR. FERGENSON:  Thank you, your Honor.

 8   BY MR. FERGENSON:

 9   Q.  Mr. Frenchman, can you please pull up what's in evidence as

10   Government Exhibit 2.

11              Mr. Rainey, who is this?

12   A.  That's Josefina.

13   Q.  Remind us, what connection does Josefina have to Billy?

14   A.  That's Billy's mom.

15   Q.  What was her role in Billy's drug dealing business?

16   A.  She was the person who took the money, kept the money and

17   the drugs in the drug safe, and she would give us the drugs

18   when we needed them.

19   Q.  And would you also bring her cash after the sale?

20   A.  Yes.

21   Q.  When was she involved in the drug delivery business?

22   A.  As long as I known about it.

23   Q.  Mr. Frenchman, can you please pull up Government Exhibit

24   3.

25              Mr. Rainey, who is this?

1    A.   That's Will.

2    Q.   Do you know his last name?

3    A.   Drayton.

4    Q.   What connection, if any, did Will have to Billy?

5    A.   They were friends.  They grew up together in The Fulton

6    Houses and Will was also a runner.

7         MS. FLORIO:  I'm so sorry, your Honor.  I'm just

8    having a little difficulty hearing the witness.

9         THE COURT:  Fine.  Could you just repeat the last

10   answer, please?

11        THE WITNESS:  They grew up together in The Fulton

12   Houses and Will was also a runner for Billy.

13        MS. FLORIO:  Thank you.

14   BY MR. FERGENSON:

15   Q.   Just before continuing with Will, you mentioned The Fulton

16   Houses.  What are The Fulton Houses?

17   A.   The Fulton Houses are the housing unit in Chelsea,

18   Manhattan.

19   Q.   And the apartment that you lived in, Josefina's apartment,

20   what connection did that have to The Fulton Houses?

21   A.   That was in The Fulton Houses.

22   Q.   Now, I believe you touched on this, Mr. Rainey, but what

23   was Will's role in Billy's drug delivery business?

24   A.   He was a courier.  Sometimes he would bag up drugs, as

25   well.

1    Q.  So a runner?

2    A.  Yes.

3    Q.  When was he involved in Billy's drug business?

4    A.  2020, 2021.

5    Q.  To your knowledge at least?

6    A.  To my knowledge, yes.

7    Q.  Mr. Frenchman, pull up Government Exhibit 4, please.

8           Mr. Rainey, who is this?

9    A.  That's me.

10   Q.  What was your role in Billy's drug business?

11   A.  I was a runner.

12   Q.  When were you involved in Billy's drug business?

13   A.  2018 to 2022.

14   Q.  Mr. Frenchman, can you please pull up Government Exhibit

15   5.

16          Who is this, Mr. Rainey?

17   A.  That's Kevin Quezada.

18   Q.  What connection did Kevin Quezada have to the defendant?

19   A.  That's Billy's younger brother.

20   Q.  Do you know why Kevin Quezada has a different last name

21   than Billy Ortega?

22   A.  They have different fathers.

23   Q.  Was Kevin -- and if I call him Kevin, you will know who I

24   am talking about?

25   A.  Yes.

1    Q.  Was Kevin involved in dealing drugs for Billy?

2    A.  Yes.

3    Q.  What was his role?

4    A.  He was a runner.

5    Q.  And to your knowledge, when was Kevin involved in Billy's

6    drug business?

7    A.  About 2015 to 2022.

8    Q.  Mr. Frenchman, can you please pull up Government Exhibit

9    6.

10             Who is this, Mr. Rainey?

11   A.  George.

12   Q.  Do you know his last name?

13   A.  I'm not sure.

14   Q.  What connection, if any, did George have to Billy?

15   A.  He was a runner and he also bagged up drugs.  He was a

16   friend in the neighborhood.

17   Q.  To your knowledge, when was George involved in Billy's drug

18   business?

19   A.  About 2018 to 2022.

20   Q.  Mr. Frenchman, can we pull up Government Exhibit 7,

21   please.

22             Who is this, Mr. Rainey?

23   A.  Michael.

24   Q.  Do you know his last name?

25   A.  No.

 1   Q.  What connection, if any, did Michael have to Billy?

 2   A.  He grew up in The Fulton Houses as well, neighborhood

 3   friend.  He also was a runner as well.

 4   Q.  To your knowledge did he bag up drugs, too?

 5   A.  Possibly.  I'm not sure.

 6   Q.  And to your knowledge, when was Michael involved in Billy's

 7   drug business?

 8   A.  About 2018 to 2022.

 9   Q.  Mr. Frenchman, let's pull up Government Exhibit 51,

10   actually just for the witness.  I'm sorry.

11          THE COURT:  All of these exhibits have already been

12   admitted, correct?

13          MR. FERGENSON:  Everyone that we have looked at thus

14   far, your Honor, and the next two I will show just the witness

15   at the start.

16          THE COURT:  Understood.  Thank you.

17   BY MR. FERGENSON:

18   Q.  Mr. Rainey, who is this a photo of?

19   A.  Edgar Castro.

20   Q.  Was he involved in Billy's drug business?

21   A.  Yes.

22          MR. FERGENSON:  Government offers Government Exhibit

23   51.

24          THE COURT:  Any objection?

25          MS. FLORIO:  No, your Honor.

 1          THE COURT:  Admitted.

 2          (Government's Exhibit 51 received in evidence)

 3  BY MR. FERGENSON:

 4  Q.  Mr. Rainey, you said this was Edgar Castro?

 5  A.  Yes.

 6  Q.  Do you know how Edgar knew Billy?

 7  A.  That was Billy's sister Melanie's boyfriend.

 8  Q.  And what role, if any, did Edgar have in Billy's drug

 9  business?

10  A.  He was a runner.

11  Q.  To your knowledge when was Edgar involved in Billy's drug

12  business?

13  A.  2018 to 2019.

14  Q.  Mr. Frenchman, can you please show the witness what's

15  marked as Government Exhibit 52.

16          Mr. Rainey, who is this?

17  A.  Lenny Adames.

18  Q.  Was he involved in Billy's drug business?

19  A.  Yes.

20          MR. FERGENSON:  Government offers Government Exhibit

21  52.

22          THE COURT:  Any objection?

23          MS. FLORIO:  No objection.

24          THE COURT:  Admitted.

25          (Government's Exhibit 52 received in evidence)

1    BY MR. FERGENSON:

2    Q.   Mr. Rainey, you said this was Lenny Adames?

3    A.   Yes.

4    Q.   Do you know what connection, if any, he had to Billy?

5    A.   That was Billy's cousin.  He was also a runner and he

6    bagged up drugs sometimes as well.

7    Q.   To your knowledge when was Lenny involved in Billy's drug

8    business?

9    A.   About 2015 to 2019.

10   Q.   Mr. Frenchman, can you please pull up Government Exhibit 1.

11   Who is this, Mr. Rainey?

12   A.   Billy Ortega.

13   Q.   He ran the drug delivery business?

14   A.   Yes.

15   Q.   Everyone we just looked at before this worked for Billy?

16   A.   Yes.

17   Q.   Selling drugs?

18   A.   Yes.

19   Q.   Mr. Rainey, I want to step back and I want to talk about

20   how you came to know and deliver drugs for Billy Ortega.

21   First, just some context, remind us, when did you first work

22   for Billy's drug business?

23   A.   2018.

24   Q.   You moved to New York you said earlier in 2012, right?

25   A.   Correct.

1    Q.  Where did you first work in New York City?

2    A.  LaGuardia Airport.

3    Q.  How long did you work at the airport?

4    A.  For about six, seven months.

5    Q.  What did you do there?

6    A.  I helped deplane people from planes, worked in baggage

7    claim, and escort people through the airport who needed

8    assistance.

9    Q.  Where did you work after doing those jobs at LaGuardia?

10   A.  I started working in restaurants.  My next job was Blue

11   Ribbon sushi, Izakaya, as a waiter.

12            MS. FLORIO:  I'm sorry, I couldn't hear.

13            THE WITNESS:  I worked at Blue Ribbon Izakaya.  I

14   worked as a waiter.

15   Q.  You said Blue Ribbon Izakaya.  Is that a restaurant?

16   A.  Yes.

17   Q.  Where is that restaurant?

18   A.  Lower East Side.

19   Q.  How long did you work as a waiter at Blue Ribbon?

20   A.  Two years.

21   Q.  So would that have been until around 2015?

22   A.  Yes.

23   Q.  Now, after working for two years as a waiter at Blue

24   Ribbon, where did you work next?

25   A.  I started working at Highline Ballroom.

1    Q.  Actually, Mr. Frenchman, if we could briefly pull up the

2    S4 stipulation.  And if we can scroll down to the second page,

3    please.  Thank you.

4            Mr. Rainey, do you see that 17A -- Government Exhibit

5    17-A and 17-B is the Highline Ballroom?

6    A.  Yes.

7    Q.  Mr. Frenchman, we can take that down.  And let's put up

8    Government Exhibit 17-B.

9            What's shown in this photograph, Mr. Rainey?

10   A.  The entrance to Highline Ballroom.

11   Q.  What was the Highline Ballroom?

12   A.  It was a music venue, event space, concert hall,

13   nightclub.

14   Q.  What kind of work did you do there?

15   A.  I started out as a host, ended up working in

16   administrative, event planning, marketing, did everything

17   there.

18   Q.  How long did you work at Highline Ballroom?

19   A.  Four years.

20   Q.  Where was Highline Ballroom located?

21   A.  In Chelsea, 431 West 16th Street.

22   Q.  And Mr. Frenchman, can we pull up Government Exhibit 17-A.

23           Mr. Rainey, let me just ask you, for context, how

24   close was the Highline Ballroom to Josefina's apartment?

25   A.  It was nextdoor.

1  Q.  All right.  Mr. Rainey, remind us when did you start work

2  at the Highline Ballroom?

3  A.  2015.

4  Q.  Mr. Frenchman -- actually, your Honor, at this time the

5  government would offer into evidence a stipulation between the

6  parties marked as Government Exhibit S3.

7            THE COURT:  It will be admitted.

8            (Government's Exhibit S3 received in evidence)

9            MR. HERMAN:  Mr. Frenchman can you pull that up?  If

10  you can go to page 2.  I'm just going to read starting at

11  paragraph 2.

12            "It is hereby stipulated and agreed between the

13  parties that Government Exhibits 611, 612, 613, 614, 615, 616,

14  and 617 are true and accurate copies of records maintained by

15  Bank of America for checking account number ending in 7425 (the

16  'Rainey checking account') the phone number and e-mail address

17  associated with the Rainey checking account are 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 and

18  princerain.k@gmail.com."

19            Pursuant to the stipulation, the government offers

20  Government Exhibits 611 through 617.

21            THE COURT:  They will be admitted.

22            (Government's Exhibits  611 through 617 received in

23  evidence)

24  BY MR. FERGENSON:

25  Q.  Mr. Frenchman, can you please pull up Government Exhibit

1    614.

2              Mr. Rainey, this is a check, right?

3    A.   Yes.

4    Q.   And directing your attention to the top left of the check,

5    do you see where it says Greenwich Village Entertainment

6    Group, LLC, and then beneath that Highline Ballroom?

7    A.   Yes.

8    Q.   Now, there is an address beneath that 131 West 3rd Street

9    in Manhattan.  Was that the address of the venue?

10   A.   No, that was our office address.

11   Q.   Who was this check made out to?

12   A.   To me.

13   Q.   And what's your address as listed on the check?

14   A.   638 West 160th Street, New York, New York.

15   Q.   And when did you live there?

16   A.   From the time I moved in 2012 to 2018.

17   Q.   Now, what's the -- directing your attention towards the

18   top right, what is the date of this check?

19   A.   February 27, 2015.

20   Q.   And is that around the time you started working at

21   Highline Ballroom?

22   A.   Yes.

23   Q.   Mr. Frenchman, we can take that down.

24              And, Mr. Frenchman, if you want to just put back up

25   Government Exhibit 17-B.

1    Now, Mr. Rainey, you said Highline Ballroom was a few

2    different things, a music space, an event space.  Was it a big

3    or a small space?

4    A.  It was a big space.  We had about a 900-person capacity.

5    Q.  What sorts of events or things would be held in Highline

6    Ballroom?

7    A.  We were a nightclub on weekends.  We did parties,

8    corporate events.  We had concerts very often.

9    Q.  Mr. Rainey, how common, if at all, was drug use in the

10   Highline Ballroom?

11   A.  It was pretty common.

12   Q.  Among employees or customers?

13   A.  Both.

14   Q.  What kind of drugs?

15   A.  Weed, cocaine, Molly, Ecstasy.

16   Q.  Did you use drugs?

17   A.  I have, marijuana.  I have done Molly before.

18   Q.  And you have said Molly I think now a few times.  What is

19   Molly?

20   A.  Molly is a party drug, it's like an upper, euphoric.

21   Q.  And was Molly common in the Highline Ballroom?

22   A.  Yes.

23   Q.  Common in the club scene generally?

24   A.  Yes.

25   Q.  What form did Molly come in?

```
 1   A.  Like a powder, crystal.

 2   Q.  And how would you ingest it?

 3   A.  You can ingest it by just putting it in your mouth or

 4   usually put people put it on food or drinks and take it that

 5   way.

 6   Q.  What about you?  How would you ingest it?

 7   A.  I usually put it in drinks.

 8   Q.  Would you use it while you were working?

 9   A.  Not while I was working, no.

10   Q.  How often would you use Molly?

11   A.  Once every few weeks.

12   Q.  And to give us a sense about how many times in total have

13   you used Molly?

14   A.  I would say about 20.

15   Q.  You also said you used marijuana, right?

16   A.  Yes.

17   Q.  Prior to being arrested, about how often were you using

18   marijuana?

19   A.  Pretty frequently.

20   Q.  In a week about how often?

21   A.  Every other day.

22   Q.  Now, has your prior use of Molly or marijuana affected your

23   memory as you testify today?

24   A.  No.

25   Q.  Mr. Rainey, I'm going to ask you about some people you
```

1    worked with at Highline Ballroom.

2          Mr. Frenchman, can you add on the right Government

3    Exhibit 5.

4          Mr. Rainey, when you were working at the Highline

5    Ballroom did there come a time when you met Kevin?

6    A.   Yeah, right when I started, that's how we met.

7    Q.   And how did you meet?

8    A.   He was working as a busser at the time.

9    Q.   And what was your role at that time?

10   A.   I was working as a host.

11   Q.   Now, remind us, just because we talked about a few people,

12   what was Kevin's connection to Billy?

13   A.   That's Billy's brother.

14   Q.   And I know we mentioned this before, but they had

15   different fathers, right?

16   A.   Yes.

17   Q.   Who was their mother?

18   A.   Josefina Marine.

19   Q.   Mr. Frenchman, can we add on the left Government Exhibit

20   52.

21         Mr. Rainey, remind us who is shown on the left side

22   of the screen now.

23   A.   Billy's cousin, Lenny Adames.

24   Q.   How did you meet Lenny.

25   A.   I met Lenny through Kevin.  He hung around a lot.

1  Q.  Now, when you met them were Kevin or Lenny involved in the

2  drug delivery service?

3  A.  To my knowledge, yes.

4  Q.  And how do you know that?

5  A.  They would talk about it like if they had to go and see a

6  person, make a delivery, they would say like they have to go

7  see one and go pick up drugs to go deliver to someone.

8  Q.  What kind of drugs were Kevin and Lenny selling to your

9  knowledge?

10  A.  Cocaine.

11  Q.  And did you have an understanding of who they were selling

12  drugs for?

13  A.  Yes.

14  Q.  Who?

15  A.  Billy.

16  Q.  At a later point did you work with both of these men

17  delivering drugs?

18  A.  Yes.

19  Q.  Thank you, Mr. Frenchman.  Let's take those down and let's

20  just put up Government Exhibit 3.

21      Mr. Rainey, remind us who this is?

22  A.  William Drayton.

23  Q.  How did you meet William Drayton?

24  A.  I met him at Highline Ballroom.  He was working as a busser

25  as well.

1    Q.  And when did you meet him at Highline Ballroom?

2    A.  2015 when I started.

3    Q.  And to your knowledge when you met Will in 2015, was he

4    working for the drug delivery service?

5    A.  No.

6    Q.  And did he later on work for the drug delivery service?

7    A.  Yes.

8    Q.  How do you know that?

9    A.  He started working in 2020 and me and him were working

10   together at the same time.  We had days.

11   Q.  What do you mean by "we had days"?

12   A.  We had certain days that we did deliveries on, so like he

13   did a couple of days out of the week and I did a couple of

14   days.

15   Q.  And when you and Will worked together trading days, who

16   were you working for?

17   A.  Billy.

18   Q.  And your work was delivering drugs?

19   A.  Yes.

20   Q.  Mr. Frenchman, we can take that down.

21           And Mr. Rainey let me ask you, what kind of

22   relationship did you develop with Kevin, Lenny, and Will?

23   A.  We were friends.

24   Q.  Did you socialize outside of work?

25   A.  Yes.

1    Q.  How -- I'm sorry?

2    A.  Working at Highline Ballroom, we socialized a lot outside

3    after work.

4    Q.  How often would you see them?

5    A.  Pretty frequently.  I would say like maybe three, four

6    times a week.

7    Q.  Fair to say you became close?

8    A.  Yes.

9    Q.  Now, did you learn -- did you ever learn whether Kevin and

10   Lenny and Will knew each other previously?

11   A.  Right away I knew that they all knew each other growing

12   up.

13   Q.  And you said growing up.  How did they know each other?

14   A.  Will grew up in The Fulton Houses with Kevin, and Lenny is

15   Kevin's family, so they were just always around each other from

16   young.

17   Q.  I think you said this before, but correct me if I am wrong,

18   you said The Fulton Houses and the Highline Ballroom were

19   basically next to each other?

20   A.  Yes.

21   Q.  And Josefina's apartment was in The Fulton Houses?

22   A.  Yes.

23   Q.  Did Kevin live at Josefina's apartment?

24   A.  Yes.

25   Q.  Mr. Rainey, did there come a time when you went for the

```
 1   first time to The Fulton Houses with them?

 2   A.  Yes, like 2015 I think or 2016.

 3   Q.  Relatively soon after you met?

 4   A.  Yes.

 5   Q.  Whose apartment did you go to?

 6   A.  Kevin's.

 7   Q.  And would that have also been Josefina's apartment?

 8   A.  Yes.

 9   Q.  They lived together?

10   A.  Yes.

11   Q.  Who else did Kevin live with in 2015?

12   A.  Kevin, Josefina, and Melanie, his sister.

13   Q.  What's Melanie's last name?

14   A.  Quezada.

15   Q.  Now, the apartment that you went to in 2015, where Kevin

16   and Josefina lived, was that apartment the same or different

17   from the one that you would eventually live in with Josefina?

18   A.  It was different.  It was across the street.

19   Q.  They moved apartments in The Fulton Houses?

20   A.  Yes.

21   Q.  Now, and do you know about when they moved apartments?

22   A.  2016.

23   Q.  Back when you first went to the Fulton Houses, why did you

24   go to the apartment?

25   A.  Me and Kevin were hanging out and I had to -- I was on my
```

```
 1   way home.  I had to use the bathroom, so he had let me come

 2   upstairs to use the bathroom real quick.

 3   Q.  And you said you and Kevin were hanging out.  Around what

 4   time was it?

 5   A.  It was late, I think like 2 in the morning.

 6   Q.  Why were you with Kevin at 2 in the morning?

 7   A.  We were hanging out after work with some coworkers.

 8   Q.  And what had you been doing?

 9   A.  We were out at some bars, me and Kevin also took Molly.

10   Q.  When you went to the apartment around 2 a.m. to use the

11   bathroom, who was at the apartment at that time?

12   A.  Josefina, Melanie, and then Billy had stopped by.

13   Q.  Is that the first time you met Billy?

14   A.  Yes.

15   Q.  Now, in the apartment back then, when you first meet Billy,

16   what was your impression of him?

17   A.  He had money, arrogant.

18   Q.  Why did you think he had money?

19   A.  He had nice clothes on, like designer, some designer

20   sneakers, shirt, clothes.  I believe he had on a couple of

21   pieces of jewelry.

22   Q.  I'm sorry, Mr. Rainey.  I couldn't hear the last thing you

23   said.

24   A.  I believe he had on a couple of pieces of jewelry, like a

25   watch, chain.
```

1    Q.  What, if anything, was said about drugs at that first

2    meeting?

3    A.  Me and Kevin were high, like I said.  We took Molly.  It

4    was pretty obvious.  And we were trying to lie about it at

5    first, and Billy was asking us what we did.  And I ended up

6    telling him that we had did Molly.

7    Q.  Who got the Molly that you took?

8    A.  Kevin.

9    Q.  Where did Kevin get it from?

10   A.  He got it from Billy.

11   Q.  Did Kevin pay for the Molly from Billy?

12   A.  No.

13   Q.  Did you have to pay for the Molly from Billy?

14   A.  No.

15   Q.  Mr. Rainey, you said this was around 2015 or 2016, right?

16   A.  Yes.

17   Q.  And you said earlier you didn't start working for Billy's

18   drug business until around 2018?

19   A.  Yes.

20   Q.  So, you know, between those two times, how often would you

21   see Billy?

22   A.  I've seen him like somewhere between five to ten times if I

23   was in the city, if he had stopped by.  I've been to his house

24   in Jersey a couple of times in between that time, too.

25   Q.  Is that the house in Jersey in West Milford or a different

1    house?

2    A.   It was a different house.

3    Q.   Do you know roughly when he moved to West Milford?

4    A.   I believe 2020 or '21.

5    Q.   Now, were you still close with Kevin, Will, and Lenny in

6    those years?

7    A.   Yes.

8    Q.   Who was working for Billy in the time period, you know,

9    2016 to 2018?

10   A.   Lenny, Edgar, Kevin, myself, Will, George and Michael.

11   Q.   Doing what role in Billy's drug business, to your

12   knowledge?

13   A.   Runners or bagging up drugs.

14   Q.   Did there come a time when Kevin stopped working for

15   Billy's drug business?

16   A.   Kevin was on and off over the years.  He would steal from

17   Billy, and Billy knew about it so he would cut him off and

18   then --

19          MS. FLORIO:  Objection.

20   A.   -- sometimes if he needed --

21          THE COURT:  Hold on.  Just please just don't answer

22   for a second.

23          I'm going to sustain that.  I'm going to strike that

24   last answer, but you can ask the question again if you want

25   to.

1          I think the question was -- you go ahead.

2    BY MR. FERGENSON:

3    Q.  Mr. Rainey, what was your understanding of why Kevin

4    stopped working for Billy's drug business?

5          MS. FLORIO:  Objection.

6          THE COURT:  I mean, why is it not hearsay?

7          MR. FERGENSON:  May I be heard, your Honor?

8          THE COURT:  Sure.  Let's meet at sidebar.

9          (Continued on next page)

1                    (At the sidebar)

2              THE COURT:  Is it in furtherance of the conspiracy, so

3    it's not hearsay?

4              MR. FERGENSON:  It is coconspirator statements, not

5    hearsay.

6              THE COURT:  Coconspirator statements in furtherance of

7    the conspiracy.

8              MR. FERGENSON:  Yes, your Honor.  We are going to

9    look at text messages where Billy is directing him to put the

10   drugs away because Kevin is on his way home.  We are going to

11   look at texts where they talk about it.  I can't remember the

12   exact year that they do, but certainly it is coconspirator

13   statement in furtherance of the conspiracy is how he knows that

14   Kevin stole and eventually got cut out by Billy.

15             THE COURT:  And there are going to be statements by

16   whom?

17             MR. FERGENSON:  By Billy.

18             THE COURT:  So the basis of the objection, I'm sorry,

19   I can't remember who objected.

20             MS. FLORIO:  I objected.

21             THE COURT:  So the basis of the objection, they are

22   statements by Billy, then they are statements of the defendant

23   that come in, admissions, party statements, but beyond that, to

24   the extent that there are statements in furtherance of the

25   conspiracy, they are not made by Billy, do you still have an

1    objection?

2              MS. FLORIO:  No.

3              THE COURT:  All right.  Thank you.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                    (In open court)

 2                    THE COURT:  Whenever you are ready, Mr. Fergenson.

 3                    MR. FERGENSON:  Thank you, your Honor.

 4   BY MR. FERGENSON:

 5   Q.  Mr. Rainey, I want to -- we will come back to Kevin in

 6   just a moment.  But I had asked you earlier about a particular

 7   time period between -- around 2016 until you started working.

 8   A.  Yes.

 9   Q.  And I just wanted to clarify who did you understand to be

10   the principal runners working in that time period?

11   A.  2016 and 2018, it was Lenny, Kevin, Edgar.

12   Q.  And we had talked about Kevin stopping working eventually,

13   right?

14   A.  Yes.

15   Q.  And how did you know Kevin eventually stopped working?

16   A.  He had told me.

17   Q.  And did you learn why Billy stopped employing Kevin?

18   A.  Yes.

19   Q.  Why was that?

20   A.  Kevin was stealing drugs and seeing his own customers with

21   Billy's product.

22   Q.  And Billy stopped using him as a runner?

23   A.  Yes.

24   Q.  I want to turn now to the time period when you started

25   delivering the defendant's drugs, okay.

1          Did there come a time when you began living in

2    Josefina's apartment?

3    A.   Summer of 2018.

4    Q.   And --

5          MS. FLORIO:  I'm sorry.  Did you say the summer?

6          THE WITNESS:  Yes.

7    BY MR. FERGENSON:

8    Q.   And where were you living before that?

9    A.   Uptown Manhattan in Washington Heights.

10   Q.   Is that the same address we had looked at earlier on the

11   check?

12   A.   Yes.

13   Q.   How did it come about that you moved in to Josefina's

14   apartment?

15   A.   Melanie and Edgar had moved out, so an extra room had

16   opened up, and Josefina asked me if I could -- if I wanted to

17   move in.  I worked nextdoor, it was convenient, so -- and they

18   were offering me the same rent that I pay uptown, so I moved

19   in.

20   Q.   How much rent was that?

21   A.   $600.

22   Q.   And how would you pay rent?

23   A.   Through cash or Zelle.

24   Q.   Mr. Rainey, by the time you moved into the apartment, what

25   did you know about how that apartment fit into Billy's drug

1   dealing business?

2   A.  Can you repeat the question?

3   Q.  You know, when you moved into the apartment, what did you

4   know about Billy's drug dealing business?

5   A.  I knew how it worked.  I knew where the things were kept.

6   Like I said, I was around the house a little bit before I

7   moved in, so I kind of already had a sense of what was going

8   on.

9   Q.  After you moved in, who was living in the apartment?

10  A.  It was just me, Josefina, and Kevin.

11  Q.  We talked a little bit about Kevin being a runner for a

12  time, right?

13  A.  Yes.

14  Q.  We talked about Josefina earlier but just remind us, what

15  was Josefina's role?

16  A.  She was the middleman for the courier.  She collected the

17  money and she distributed the drugs.

18          MR. SEIDLER:  This is the third time the same

19  question has been asked of this witness.

20          THE COURT:  Overruled.

21          MR. FERGENSON:  Your Honor, we would just

22  respectfully request that there be one lawyer at a time making

23  objections.

24          THE COURT:  That's fine, but also let's not ask the

25  same question more than once, so we will do both.

1          MR. FERGENSON:  Understood, your Honor.

2          THE COURT:  Let me actually ask defense table who is

3    going to do the cross-examination?

4          MS. FLORIO:  I am, your Honor.

5          THE COURT:  Okay.  So you will do the objections as

6    well.  Thank you.

7    BY MR. FERGENSON:

8    Q.  Mr. Rainey, after you moved into the apartment, did you

9    start making drug deliveries for Billy?

10   A.  Yes.

11   Q.  How did it come about that you started delivering drugs for

12   Billy?

13   A.  He had asked me if I can go and see a person for him and he

14   told me what it was and how to do it and I told him I could.

15         MS. FLORIO:  I'm so sorry.  I just can't hear.  What

16   was the last thing?

17         THE COURT:  Would you repeat the last answer, please.

18   A.  He had asked me if I could go and see a person for him.

19   He showed me how to do it and what I was going to be giving

20   them and how it worked, and I told him I could.

21         MR. FERGENSON:  Your Honor, I now offer -- actually

22   Mr. Frenchman, can we pull up the stipulation in evidence S2.

23         THE COURT:  If it's a stipulation it will be admitted

24   and you can read it.

25         MR. FERGENSON:  Thank you, your Honor.

1          Let's go to page 3, please.  And can you zoom on

2   paragraph 9, please.

3          "Government Exhibit 111 is an iPhone 11 Pro Max

4   assigned phone number 347-989-5039 that was lawfully seized

5   from Kaylen Rainey outside of 431 West 17th Street, New York,

6   New York.  Government Exhibit 111-0, and its subparts, are true

7   and accurate copies of the contents extracted from the cell

8   phone that is marked as Government Exhibit 111.  For example,

9   Government Exhibit 111-1 is a subpart of Government Exhibit

10  111-0."

11         And I have a lengthy list, your Honor.  Pursuant to

12  the stipulation, the government offers Government Exhibits

13  111-1 through 111-7, 11-7A, 11-8 through 111-10, 111-10A

14  through B, 111-11, 111-11A, 111-12 through 111-14, 111-14A,

15  111-15 through 111-29, 111-29A through B, 111-30 through

16  111-32, 111-32A through B, 111-33, 111-34, 111-34A, 111-35

17  through 111-39, 111-39A, 111-40 through 111-49, 111-49A, 111-50

18  through 111-54, 111-54A, 111-55 through 111-69, 111-69A, 111-70

19  through 111-121, 111-121A, 111-122, 111-122A through B, and

20  111-123, 111-123A through B, 111-124, 111-124A through B,

21  111-125, 111-125A, 111-126, 111-127 and 111-127A.

22         THE COURT:  They will all be admitted in one

23  stipulation.

24         MR. FERGENSON:  Thank you, your Honor.

25         (Government's Exhibits 111-1 through 111-7, 11-7A,

1    11-8 through 111-10, 111-10A through B, 111-11, 111-11A, 111-12

2    through 111-14, 111-14A, 111-15 through 111-29, 111-29A through

3    B, 111-30 through 111-32, 111-32A through B, 111-33, 111-34,

4    111-34A, 111-35 through 111-39, 111-39A, 111-40 through 111-49,

5    111-49A, 111-50 through 111-54, 111-54A, 111-55 through 111-69,

6    111-69A, 111-70 through 111-121, 111-121A, 111-122, 111-122A

7    through B, 111-123, 111-123A through B, 111-124, 111-124A

8    through B, 111-125, 111-125A, 111-126, 111-127 and 111-127A

9    received in evidence)

10   BY MR. FERGENSON:

11   Q.  Mr. Frenchman, can we please pull up Government Exhibit

12   111-127.

13   BY MR. FERGENSON:

14   Q.  Mr. Frenchman, can you please zoom on the very top left

15   corner where it says "contacts."

16          Now, Mr. Rainey, I just read that stipulation.  This

17   is from your phone, right?

18   A.  Yes.

19   Q.  These are contacts?

20   A.  Yes.

21   Q.  We can zoom out.  Let's please go to page 4.  And,

22   Mr. Frenchman, can you please zoom on row 23.

23          Now, Mr. Rainey, I want to direct your attention to

24   the second column from the left that starts with "name."

25   What's the name?

1    A.  Billz.

2    Q.  Let me direct your attention to the third column, the one

3    that starts "user ID."  It may be the fourth column, excuse me.

4    And underneath "phone" at the bottom, whose phone number is

5    listed there?

6    A.  646-421-5555.

7    Q.  What's the home address?

8    A.  95 Wooley Road, West Milford, New Jersey.

9    Q.  And Mr. Rainey, could you actually read the number above

10   the 5555 number as well?

11   A.  646-957-3247.

12   Q.  Now, Mr. Frenchman, can you zoom out.  Actually, I'm sorry,

13   can you zoom one more time?  I apologize.

14          Now, Mr. Rainey, do you see this contact in the

15   second from left column underneath the name Billz, there is

16   actually a photo.  It says "photos."  Do you see that?

17   A.  Yes.

18   Q.  And then it says billz.jpg?

19   A.  Yes.

20   Q.  And Mr. Frenchman, can you please add on the right

21   Government Exhibit 111-127A.

22          Mr. Rainey, who is that on the right?

23   A.  On the left?

24   Q.  On the right.

25   A.  That's Billy.

1   Q.  Who else is with him?

2   A.  That's his girlfriend Hope.

3   Q.  Do you know her last name?

4   A.  No.

5   Q.  Now, Mr. Rainey, 111-127A, is that the Billz.jpg photo for

6   the Billz contact there?

7   A.  Yes.

8   Q.  That's the contact photo for the 5555 number?

9   A.  Yes.

10  Q.  Now, Mr. Rainey, there are actually two phone numbers in

11  that contact, right?

12  A.  Yes.

13  Q.  Did Billy change his phone number often?

14  A.  Yes, sometimes.

15  Q.  Did Billy tell you why he did that?

16  A.  No.

17  Q.  Now, Mr. Rainey, there was an address in that contact as

18  well, right?

19  A.  Yes.

20  Q.  It was 95 Wooley Road, West Milford, New Jersey?

21  A.  Yes.

22  Q.  What address was that?

23  A.  That was Billy's address.

24  Q.  Have you been there?

25  A.  Yes.

1    Q.   What's it like?

2    A.   It's a big house in the woods, it has like three stables, a

3    shed in the back, a lot of land.

4    Q.   You said stables.  What kind of stables?

5    A.   Horse stables.

6    Q.   How far away from New York was it?

7    A.   About an hour outside the city.

8    Q.   Now, we are going to turn to a new exhibit, but that -- I

9    want to focus on that second phone number listed here, the one

10   ending in 2347.  Okay?  And I want to go back to that time

11   period when you first moved into the apartment in the summer

12   of 2018.

13          Now, Mr. Frenchman, can you please now pull up

14   Government Exhibit 111-123.  Now, Mr. Frenchman, can you zoom

15   on the participants here, please.

16          This is another chat from your phone, Mr. Rainey?

17   A.   Yes.

18   Q.   Is that your phone number listed above "Kaylen (owner)"?

19   A.   Yes.

20   Q.   Can you read the other participant's phone number?

21   A.   646-957-3247.

22   Q.   And that is one of the two numbers we just looked at in

23   the Billz contact?

24   A.   Yes.

25   Q.   Whose phone number was that?

1    A.  Billy's.

2    Q.  Now, Mr. Frenchman, can you zoom out, please.  Now -- and

3    Mr. Frenchman, maybe you can quickly blow up that first

4    message.

5           All right, Mr. Rainey, what's the date of this

6    message?

7    A.  August 30, 2018.

8    Q.  And this is from that 3247 number?

9    A.  Yes.

10   Q.  From Billy?

11   A.  Yes.

12   Q.  And August 30, 2018, you know, how does that relate to

13   when you moved into the apartment?

14   A.  I had moved in like a few weeks prior.

15   Q.  All right.  Now, do you see this first message Billy sends

16   is a picture?

17   A.  Yes.

18   Q.  And that picture is marked as 111-123A.  Do you see that?

19   A.  Yes.

20   Q.  Mr. Frenchman, can you please add 111-123A on the right so

21   we can see it.

22           Mr. Rainey, what kind of picture is this?

23   A.  This is from an app called Juno.  It's a ride share app

24   similar to Uber and Lyft.

25   Q.  Does this look like a screenshot from a phone?

 1    A.  Yes.

 2    Q.  All right.  And do you see Highline Ballroom indicated on

 3    that map?

 4    A.  Yes.

 5    Q.  And where does it appear -- roughly where does it appear

 6    this car is going?

 7    A.  Nextdoor.

 8    Q.  And where in -- where is Josefina's apartment in relation

 9    to where it was going?

10    A.  It was right there in The Fulton Houses.

11    Q.  Mr. Frenchman, let's -- we can take down -- we can just go

12    back to the messages, please.  All right.  Let's scroll down to

13    the next page, please.

14            Mr. Rainey, what do you write back in response to that

15    screenshot?

16    A.  "Aight."

17    Q.  And that's the same day also, August 30, 2018?

18    A.  Yes.

19    Q.  And then Billy responds "cab is there."  What did you

20    understand him to be saying?

21    A.  That he had called me a cab to take to make a delivery.

22    Q.  And cab, did that mean the Juno?

23    A.  Yes.

24    Q.  Mr. Frenchman, let's scroll, please.

25            Two minutes later what did you write?

1   A.  "I'm in."

2   Q.  Scroll, Mr. Frenchman, please.  If we can go up.

3          Your next text is at 12:58.  What was the text before

4   that?  Scroll up, please.  12:37 you say, "I'm in."  Then keep

5   scrolling down, please, and then at 12:58 you say, "I'm done."

6   A.  Yes.

7   Q.  What were you saying by saying "I'm done"?

8   A.  That I was done seeing the person who was getting drugs.

9   Q.  Billy responds with another screenshot.  Do you see that?

10  A.  Yes.

11  Q.  Mr. Frenchman, can you add on the right 111-123B.

12         And this is another screenshot of a Juno ride?

13  A.  Yes.

14  Q.  And -- sorry.  Just a moment.  All right.  Now,

15  Mr. Frenchman, now that we see that, take it down.  Let's just

16  zoom in on the text.

17         Now, what do you write back in response?

18  A.  "$1100."

19  Q.  What were you asking him there?

20  A.  If that's how much the person was supposed to be giving

21  me.

22  Q.  Mr. Frenchman, can you scroll, please.

23         And Billy writes back "yeah."  And then there is a

24  blank message.  And then Billy says "cab is there."

25  A.  Yes.

1    Q.  What do you understand that to mean?

2    A.  That the cab to go to the next place was there.

3    Q.  The cab, the Juno?

4    A.  Yes.

5    Q.  Scroll down.  And what do you write back?

6    A.  "I don't see it."

7    Q.  Billy says "LOL you in buddy?"

8        Scroll please.  what did you say?

9    A.  "On God, I'm not, bro.  LOL."

10   Q.  "Call me."

11       And then what do you ask Billy at about 1:33 p.m. on

12   that day?

13   A.  "Take the $50 out of this?"

14   Q.  Billy writes back, "Yeah, bro."

15       What were you asking when you said "take the $50 out

16   of this?"

17   A.  If he wanted me to take the $50 out of the money, the

18   profits that I just received from the customer I had seen.

19   Q.  What was the $50?

20   A.  I believe it was pay.

21   Q.  That's how much you got paid?

22   A.  Not regularly, no.

23   Q.  But in this instance?

24   A.  Yes.

25   Q.  How much would you normally get paid?

1    A.   It was $100 a day.

2    Q.   Did it vary depending on how busy you were?

3    A.   No.

4    Q.   So $100 flat?

5    A.   Yes.

6    Q.   Mr. Rainey and Mr. Frenchman, you can take that down.   In

7    2018, roughly how many drug deliveries do you think you did

8    for Billy?

9    A.   About five.

10   Q.   And before moving in to Josefina's apartment, had you ever

11   delivered drugs?

12   A.   Not to my knowledge, no.

13   Q.   Had you ever sold drugs?

14   A.   No.

15   Q.   Did you have a drug supplier?

16   A.   No.

17   Q.   Besides Billy, how many drug suppliers did you know?

18   A.   None.

19   Q.   Anyone?

20   A.   No.

21   Q.   Mr. Rainey, did there come a time where you delivered drugs

22   for Billy more regularly?

23   A.   In 20 -- in summer 2019.

24   Q.   To be clear, did you work kind of on and off for Billy from

25   when you moved in to when you got arrested?

1   A.  Yes, sometimes I did days, sometimes it was just like

2   one-offs or two-offs.

3   Q.  Now, you said you started working more regularly in the

4   summer of 2019?

5   A.  Yes.

6   Q.  What, if anything, happened with Highline Ballroom prior to

7   that time?

8   A.  Highline Ballroom, we had closed down in February, so

9   that -- I was working freelance, so I had more time on my

10  hands.

11  Q.  And Mr. Rainey, when you started working for Billy more

12  regularly in 2019, which days did you work?

13  A.  I did every day at first.

14  Q.  And did you cover the full day or just a portion of the

15  day?

16  A.  At that time the days were split up.  It was a day and a

17  night shift, so it was two people per day.

18  Q.  And which drug delivery shift did you cover?

19  A.  At that time I did nights.

20  Q.  And who typically covered the day shift?

21  A.  It was Lenny.

22  Q.  I'm sorry, Mr. Rainey, I couldn't hear you.

23  A.  Lenny.

24  Q.  Lenny.

25          And for roughly how long did you deliver drugs on that

1   schedule?

2   A.  About two months.

3   Q.  And for that time period, was Lenny the person you were

4   typically delivering drugs with?

5   A.  Yes.

6   Q.  We will turn back to Lenny a little bit later on, but

7   let's just go step by step through the typical process of a

8   drug delivery.

9       Why don't you just imagine you are working today or

10  you are on call.  How would you learn there is a customer?

11  A.  Billy would send you a text with an address, letting you

12  know how much the person was giving you and what they were

13  getting.

14  Q.  Would he say "cocaine" or would he use code?

15  A.  It was code.  The code for cocaine was "will."

16  Q.  "Will"?

17  A.  Yes.

18  Q.  Do you know where the name "will" came from?

19  A.  No.

20  Q.  How were the drugs packaged?

21  A.  They were packaged in small Ziploc baggies, small baggies

22  and each pack contained ten baggies of cocaine.

23  Q.  So there were small Ziploc baggies, right?

24  A.  Yes.

25  Q.  And you said a pack contained ten.  A pack contained ten

1    what?

2    A.   Ten baggies of cocaine.

3    Q.   Ten of the small Ziploc baggies?

4    A.   Yes.

5    Q.   How much did a baggy of cocaine cost?

6    A.   $100 or $200.

7    Q.   Do you know why some were more expensive than others?

8    A.   I assume that it was just different quantities.

9              MS. FLORIO:  Objection to "I assume."

10             THE COURT:  Sustained.

11   BY MR. FERGENSON:

12   Q.   Mr. Rainey, what's your understanding of why there were

13   different prices?

14   A.   Different quantities.

15   Q.   After you got the text with the customer order from Billy,

16   how would you get the drugs?

17   A.   Whoever had access to the safe at the time, he would have

18   to let them know to give you what you needed to go see the

19   person.

20   Q.   And were the drugs in one safe or more than one safe?

21   A.   They were in one safe.

22   Q.   And what was the other safe used for?

23   A.   The money.

24   Q.   Where were the safes kept?

25   A.   The money safe was kept in Josefina's bedroom closet and

1    the drug safe was kept in the hallway to the apartment closet.

2    Q.   How big were they?

3    A.   They were small.  They weren't too big.

4    Q.   Mr. Frenchman, can you please show the witness what's

5    marked as government Exhibit 415.

6            Mr. Rainey, what's shown here?

7    A.   That was the safe for the money.

8            MR. FERGENSON:  The government offers Government

9    Exhibit 415.

10            THE COURT:  Any objection?

11            MS. FLORIO:  No objection.

12            THE COURT:  Admitted.

13            (Government's Exhibit 415 received in evidence)

14    BY MR. FERGENSON:

15    Q.   And Mr. Rainey, you said this safe, the money safe, was

16    kept in Josefina's bedroom?

17    A.   Yes.

18            (Continued on next page)

19    BY MR. FERGENSON:

20    Q.   Did you have access to this safe?

21    A.   No.

22    Q.   Who did?

23    A.   Josefina.

24    Q.   Did you have the code to this safe?

25    A.   No.

1              MR. FERGENSON:  Mr. Frenchman, we can take this down.

2    Q.  Mr. Rainey, what about the drug safe?  Did you have access

3    to that safe at times?

4    A.  At one or two occasions.

5    Q.  And how did you get access?

6    A.  Billy had gave me access.

7    Q.  And why did Billy give you access?

8    A.  It was an emergency, and no one was around who had access,

9    and he needed me to grab something to make a delivery.  So he

10   had gave me the code.

11   Q.  And did that happen one time?  More than one time?

12   A.  One time that I can recall.

13   Q.  When Billy texted you about the drug delivery, would he

14   include an address?

15   A.  Yes.

16   Q.  So once you got this drug delivery information from Billy

17   and you got the drugs from the person who had access to the

18   safe, what would you do next?

19   A.  We would talk a cab to the delivery address.

20   Q.  What would you do once you got to the address?

21   A.  Once you got to the address, you would contact Billy, let

22   him know that you're there.  He would contact the person and

23   let them know that you're there.  And they would either come

24   downstairs or you would go upstairs sometimes.

25   Q.  How would you and the customer recognize one another?

1  A.  Sometimes we would give Billy a description of what you

2  have on or they would give him a description of what they have

3  on.

4  Q.  Where were most of the customers?  As in what borough?

5  A.  The borough of Manhattan.

6  Q.  What would a customer typically order?

7  A.  Typically one or two baggies.

8  Q.  One or two baggies of what?

9  A.  Cocaine.

10 Q.  Would it be sometimes more than one or two baggies of

11 cocaine?

12 A.  On some occasions, yes.

13 Q.  How many customers could you see in a day?

14 A.  It depended on what days you did.  If you were doing like

15 later in the week, like weekends, you could see somewhere like

16 ten, maybe more/maybe less.  Earlier in the week, maybe one or

17 two.

18 Q.  Sometimes you took cabs or Juno ride outs; right?

19 A.  Yes.

20 Q.  Who paid for the cabs?

21 A.  Billy.

22 Q.  How would Billy pay for the cabs?

23 A.  Billy used the iPhone from the profits.  When we would go

24 make a delivery and the people would give us the iPhone, we

25 would use that iPhone to pay for the cabs.

1  Q.  So after doing the exchange of the cocaine and getting the

2  client's iPhone, what did you do with the iPhone at the end of

3  your shift?

4  A.  We would give it to Josefina.

5  Q.  In addition to deducting cab expenses, did you deduct

6  anything else?

7  A.  We would deduct our pay.

8  Q.  What was that?

9  A.  $100.

10  Q.  Are you familiar with the phrase the "count"?

11  A.  Yes.  That was the profits was referred to.

12  Q.  At the end of your shift, what would you do with respect to

13  your count?

14  A.  We would deduct the cab fare and deduct our pay, count it,

15  and give it to Josefina.  She would count it and then put it in

16  the safe.

17  Q.  Who, if anyone else, would you tell the count?

18  A.  Billy.

19  Q.  How would you do that?

20  A.  We would text it to him.

21  Q.  Now, Mr. Rainey, you mentioned a pack earlier that was 10

22  baggies.

23          When you were given drugs to deliver, how would you be

24  given the drugs?

25  A.  Can you repeat the question.

1    Q.  Sure.  It's a bad question.

2         You talked earlier about a pack.

3    A.  Yes.

4    Q.  When you were given drugs, what amount would you be given

5    typically?

6    A.  We were given a pack at a time.

7    Q.  Now, if you had left over drugs at the end of your shift,

8    what would you do with them?

9    A.  If you were doing days, if you had to do a next-day, you

10   would just keep it and use it for the next day.  Otherwise, you

11   would give it to whoever is working that next day or give them

12   to Josefina to put back in the safe.

13   Q.  Did you ever use left-over drugs?

14   A.  If I had them, yeah.

15   Q.  I mean, did you ever ingest them yourself?

16   A.  No.

17   Q.  Why not?

18   A.  I don't do cocaine.

19   Q.  Did you ever sell it to your own customers if you had

20   left-over drugs?

21   A.  I didn't have any drug customers of my own.

22   Q.  Now, what would Josefina do with any iPhone or drugs at the

23   end of your shift?

24   A.  She would put them back in the safe.

25   Q.  I'm going to turn back to some more messages now.

 1             Mr. Frenchman, can we please pull up Government

 2    Exhibit 111-11.  Mr. Frenchman, can we zoom on the

 3    participants.

 4             Now, Mr. Rainey, you see it says "participants" here

 5    in the top left hand; right?

 6    A.  Yes.

 7    Q.  And the first participant listed says Kay and owner.

 8             Who is that?

 9    A.  That's me.

10    Q.  Above that, that's your phone number?

11    A.  Yes.

12    Q.  Do you see it says after that @laststopwhatsApp.net?

13    A.  Yes.

14    Q.  What's WhatsApp?

15    A.  WhatsApp is a phone messaging app.

16    Q.  Now, the second participant listed here is the 5555 number

17    we looked at earlier; right?

18    A.  Yes --

19    Q.  What's the contact name for that number?

20    A.  Billz.

21    Q.  Who is that?

22    A.  That was Billy.

23    Q.  And he was also a WhatsApp participant; right?

24    A.  Yes.

25             MR. FERGENSON:  Mr. Frenchman, let's zoom out.

1   Q.  Mr. Rainey, do you see that the very first message here?

2   Do you see that the date is June 5, 2019?

3   A.  Yes.

4   Q.  And the blue bubbles, those are from Billz?

5   A.  Yes.

6   Q.  Okay.

7           Mr. Frenchman, let's scroll down.  Let's go to page 2,

8   please.

9           All right.  The green messages on the right, who's

10  sending those?

11  A.  That's me.

12          MR. FERGENSON:  Can you scroll down, Mr. Frenchman,

13  please.  Okay.

14  Q.  Now, Mr. Rainey, I want to focus you only blue bubble in

15  the top left.

16          Send date, and Billy sends you a text that says, "37

17  Warren Street, 12 Will 1k."

18          Can you explain what's happening there.

19  A.  37 Warren Street is the address.  "12 Will" means that they

20  were getting 12 baggies of cocaine.  And 1k, they were giving

21  me $1,000 for it.

22  Q.  And 12 Will, so the "Will" is cocaine?

23  A.  Yes.

24  Q.  And the address, 37 Warren Street, that's the address of

25  the customer?

1    A.  Yes.

2          MR. FERGENSON:  Now, Mr. Frenchman, we can zoom out.

3    We can just start scrolling, please.

4    Q.  Mr. Rainey, this exhibit is several pages.  Right?

5    A.  Yes.

6    Q.  Have you reviewed this before?

7    A.  Yes.

8    Q.  Is this just back-and-forth about Billy's telling you to

9    deliver drugs?

10   A.  Yes.

11   Q.  And these messages -- this is just June 5, 2019.  Right?

12   A.  Yes.

13         MR. FERGENSON:  Mr. Frenchman, why don't we just skip

14   ahead to page 31 of the PDF.  Why don't you zoom on that blue

15   bubble.

16   Q.  This is one text from the next day, just one text, June 6,

17   2019.  Right?

18   A.  Yes.

19   Q.  How many customer deliveries are in this one text?

20   A.  Three.

21   Q.  The first one says 2 Will.  The second one says 3 Will.

22   The third one says 2 Will.

23         How many bags of cocaine would you be delivering with

24   this one text?

25   A.  Seven.

1          MR. FERGENSON:  Mr. Frenchman, we can take that down.

2          Let's go to Government Exhibit 111-13.  We'll go to

3    page 34, Mr. Frenchman.  Now, Mr. Frenchman, if you can blow up

4    two messages at a time.  Can you scroll down, please.

5    Q.  Mr. Rainey, I'll start reading with the blue text.  This is

6    June 9, 2019.  And Billy texts you:

7          "Hey, bro.  Do yesterday's count."

8          How do you respond?

9    A.  "1210."

10   Q.  What did that mean?

11   A.  That was how much money I had received from the day before

12   from the deliveries, drug deliveries.

13   Q.  Those were the profits?

14   A.  Yes.

15   Q.  And then Billy responds back --

16         Keep scrolling down.

17         And you write -- what did you write back to Billy?

18   A.  "Do I take my cut out of that?"

19         MR. FERGENSON:  Mr. Frenchman, keep scrolling down.

20   Billy wrote back:  "When you make today, you take your cut."

21   Q.  What did you write back?

22   A.  "Lght."

23   Q.  Scroll down, please.

24         And Billy wrote:  "In total, you have 3800."

25         What did you understand him to be asking?

1   A.  If 3,800 was what I had in total from the profits from the

2   days that I had done.

3   Q.  $3,800?

4   A.  Yes.

5   Q.  What did you write back?

6   A.  "I gave ma all the other bread."

7   Q.  Who is ma?

8   A.  Josefina, Billy's mom.

9   Q.  What is "bread"?

10  A.  Money.

11  Q.  Sorry?

12  A.  Money.

13  Q.  So what were you telling Billy in that message?

14  A.  I had gave Josefina all of the money that I had made.

15  Q.  All the drug money?

16  A.  Yes.

17          MR. FERGENSON:  Mr. Frenchman, let's go to Government

18  Exhibit 111-16.  We can go to page 32.  Let's blow up the top

19  half, those two messages, please.

20  Q.  Mr. Rainey, this is June 13, 2019.

21          And Billy texts you:  "Yo.  Make sure the safe is

22  locked, closet is locked, and whatever you have put it away."

23          What did you write back?

24  A.  "Yeah.  I just heard him come in the crib."

25  Q.  Now, in Billy's text, what did you understand him to be

1    saying?

2    A.  He wanted to make sure that the safe was locked, the closet

3    was locked, and any drugs that I had left over from the day

4    that I was doing, to hide it.

5    Q.  You said earlier the drug safe was kept in a closet?

6    A.  Yes.

7    Q.  Now, you responded:  "Yeah.  I just heard him come in the

8    crib."

9         Who are you referring to?

10   A.  Kevin.

11   Q.  Why did you respond that way referring to Kevin?

12   A.  Because Billy had texted me that because Kevin was

13   stealing.  He was known for stealing.  He wanted to make sure

14   nothing was out so Kevin couldn't have access to it.

15        MR. FERGENSON:  Your Honor, the government offers

16   another stipulation marked as S9.

17        THE COURT:  It will be admitted.  You can read it.

18        (Government's Exhibit S9 received in evidence)

19        MR. FERGENSON:  This is marked Government Exhibit S9

20   "It is hereby stipulated and agreed by the parties that

21   Government Exhibits 901, 902, 903, 904, 905, 906, 907, and 908

22   are true and accurate copies of housing rental leases and

23   related documents maintained by the New York City Housing

24   Authority or NYCHA and were made at or near the time by or from

25   information transmitted by a person with knowledge and were

 1    kept in the course of a regularly conducted business activity

 2    of NYCHA, it being the regular practice of that business

 3    activity to make such records."

 4              For now, the government only offers Government Exhibit

 5    908.

 6              THE COURT:  All right.  That will be admit the as

 7    well.

 8              (Government's Exhibit 908 received in evidence)

 9              MR. FERGENSON:  Mr. Frenchman, can you please pull up

10    Government Exhibit 908.  Let's zoom on that.  Thank you.

11    Q.  Mr. Rainey, what was the address of Josefina's apartment?

12    A.  431 West 17th Street.

13    Q.  And what was her apartment number?

14    A.  4E.

15    Q.  Is this a blueprint of the apartment?

16    A.  Yes.

17    Q.  Now, why don't we go from left to right.

18              Could you just describe what each room is.

19              Mr. Rainey, you can actually mark the screen with your

20    finger to indicate which room you're talking about, if it's

21    helpful.  You typically can.  That's fine.  Don't worry about

22    it.

23              Why don't I just direct you through.

24    A.  Okay.

25    Q.  So the one on the far left that says K&D, what room is

1    that?

2    A.   That's the kitchen.

3    Q.   And to the right of that, it says LR.

4          What's that living?

5    A.   That's the living room.

6    Q.   Okay.  Now, then on the right side, there are three rooms

7    with BR, BR1, 2, 3.

8          Do you see those?

9    A.   Yes.

10   Q.   What are those?

11   A.   BR1 is Josefina's bedroom.  BR2 was Kevin's bedroom.  BR3

12   was my bedroom.

13   Q.   To get from the kitchen or living room back to the bedroom

14   area, did you have to walk through a closet?

15   A.   No.  You can walk through the hallway.

16   Q.   Excuse me.  The hallway.

17   A.   Yes.

18   Q.   Were there closets in the hallway?

19   A.   Yes.  There was four.

20   Q.   Which one was the drug safe closet?

21   A.   The last closet to the left-hand side, the bigger one.

22   Yes.

23   Q.   Was it the closet closest to the bathroom entrance?

24   A.   Yes.

25   Q.   The one opposite the bathroom entrance?

```
 1    A.  Yes.

 2              THE COURT:  Mr. Fergenson, it's a little past 5:00.

 3    So let us know when it's a good time to stop for the day.

 4              MR. FERGENSON:  I think this is a good time, your

 5    Honor.  Thank you.

 6              THE COURT:  All right, folks.  Thank you for your

 7    attention today.  I'll see you tomorrow morning at the same

 8    time.  We'll start promptly at 10:00.  So if you could be here

 9    at 9:45.  So just remember don't discuss the case.  Don't

10    research anything.  Keep an open mind, and have a nice evening.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              (In open court; jury not present)

2              (Witness temporarily excused)

3              THE COURT:  Everyone can be seated.  Thanks.

4              All right.  First I just wanted to get a sense of the

5     timing and scheduling.

6              Do you have any sense of when you anticipate the

7     government's thinks it will rest?

8              MR. FERGENSON:  Your Honor, I think we still hope to

9     rest by the end of Wednesday.

10             THE COURT:  And I know from the defense perspective --

11    you've at least indicated in opening that you intend to call

12    Mr. Ortega.  So that would be on Thursday presumably.  If you

13    don't know, you don't have to answer it.

14             Do you know if you're going to be putting on any other

15    kind of case?  Again, I'm just trying to figure out scheduling

16    so we can talk about when we should have the charge conference.

17             MS. FLORIO:  Your Honor, I think it's up to you

18    because you had told us that after Mr. Rainey testifies, you

19    would give is a ruling about DeLaura, and then we also need to

20    discuss the other witnesses, Ms. Whyte.

21             THE COURT:  Yes.  So as I've said, I'm going to wait

22    to rule on DeLaura after the Rainey cross, after Rainey's

23    cross.  But why don't we talk for a minute about Ms. Whyte.  If

24    you can tell me what you anticipate her testimony will consist

25    of.

1          It's not clear that the government has an objection to

2     this witness but anything we can flesh out now.  Her attorney

3     is on trial right now.  If we need her to be here for a

4     proceeding, we can try to figure that out maybe during the

5     lunch hour tomorrow.

6          Mr. Murray.

7          MR. MURRAY:  Your Honor, the testimony of Ms. Whyte

8     and the notes from my meeting were sent over to the government.

9     In sum and substance, Ms. Whyte was Kaylen Rainey's cellmate

10    from approximately January of 2022 through December of 2022 and

11    that on numerous occasions, they discussed Mr. Rainey's case.

12    Mr. Rainey was open, starting after about two weeks of them

13    being celled together, about the fact that Mr. Rainey was a

14    cooperator and stated, most importantly, that on numerous

15    occasions, that it was Mr. Rainey's intention to tell the

16    government and to tell the jury that the drugs he distributed,

17    Mr. Rainey distributed, on March 17, 2021 -- that date was not

18    used.  It was referred to in terms of like "the day those

19    people died."

20         But the drugs distributed on that date were drugs that

21    belonged to Billy Ortega but that that was untrue.  They

22    belonged to a different supplier that Billy Ortega had

23    explicitly told Kaylen Rainey not to use and Mr. Ortega had no

24    idea that supplier was used by Mr. Rainey until after the fact.

25    But again, most importantly, that Kaylen Rainey intended to get

1    on the stand and say that those drugs belonged to Billy Ortega

2    when that was not the case.

3              THE COURT:  All right.  So is this -- it's extrinsic

4    evidence that you're seeking to admit pursuant to Rule 613(b),

5    namely:  "Extrinsic evidence of a witness' prior inconsistent

6    statement -- and I'll read the rest of the rule "-- is

7    admissible only if a witness is given an opportunity to explain

8    or deny the statement and the adverse party has opportunity to

9    examine the witness about it."

10             Is that the rule that you're seeking to admit it

11   under?  Is it 608(b)?  Just walk me through the evidentiary

12   basis.

13             MR. MURRAY:  Your Honor, I think that there is a very

14   good argument under Rule 613(b), specifically that an

15   inconsistent statement is admissible only if the witness is

16   given an opportunity to explain or deny the statement and an

17   adverse party is given an opportunity to examine the witness

18   about it.

19             It would be our intention to cross Mr. Rainey, most

20   likely cross Mr. Rainey on it.  Obviously if we presented a

21   witness, the government would be able to cross-examine that

22   witness.

23             Or, if justice so requires, which I don't think would

24   apply here, but I think it's more simple than that in that it's

25   a 402/403 issue because this is not going to the idea that

1    Mr. Rainey has some character for truthfulness or

2    untruthfulness.

3           It is that Kaylen Rainey, it is our understanding, is

4    going to make a statement on the stand and has stated that the

5    drugs he distributed were always Billy Ortega's and that that

6    statement made to the jury is not true and was made with the

7    knowledge that it was not true.  It goes simply to -- it's just

8    rebutting the testimony of a witness.

9           If a witness were to testify that they'd never been to

10   Topeka, Kansas, it would imminently appropriate to call a

11   witness who says, no.  They visited me in Topeka every two

12   weeks.  It's just a 402/403 issue.

13          It's not an argument that Mr. Rainey lacks some

14   character for truthfulness based on this extrinsic statement.

15   It's a statement that Kaylen Rainey made statements on the

16   stand that were not true which is an entirely different issue.

17   It's not about character.  It's about lying to the jury.

18          THE COURT:  Rule 613 is about a witness' prior

19   statement, which is what I asked you initially, and not about

20   character for truthfulness which is Rule 608.

21          MR. MURRAY:  Your Honor, I believe you mentioned 608.

22          THE COURT:  I initially said, is it 613(b)?

23          And you said it's simpler than that I think.

24          And I said, are you talking about Rule 608?  So I'm

25   just trying to flush out what the evidentiary basis is to

1  introduce extrinsic evidence in the form of a witness.  So I'm

2  just trying to flush out your argument.

3          MR. MURRAY:  Your Honor, it would absolutely I think

4  be admissible under Rule 613(b).  But I just think the evidence

5  of the fact, if believed, that a witness was untruthful on the

6  stand is material.  It is relevant under 401.

7          And Rule 402 states:  "Relevant evidence," which this

8  would be, "is admissible unless, any of the following provides

9  otherwise," the United States Constitution, a federal statute,

10  these rules or other rules prescribed by the Supreme Court.

11          THE COURT:  Does the government have objection to this

12  testimony?

13          MR. FERGENSON:  Your Honor, given that this came to

14  light last night, we haven't had a chance to really digest and

15  discuss it internally.  So, if your Honor is willing, we would

16  propose that we send the Court a letter, after we've had time

17  to discuss it.

18          THE COURT:  So why don't we plan to meet early

19  tomorrow because I know the defendant was at least asking if I

20  could rule on this prior to the cross.

21          I also don't know if we'll be able to get Ms. Whyte's

22  attorney here because she's trying another case in the district

23  now which I think -- they may be summing up now.  I'm not

24  exactly sure.

25          MR. FERGENSON:  I think that's right, your Honor.  I

1  think they may have finished summations today.

2          THE COURT:  Is that right?

3          MR. FERGENSON:  They did, your Honor.  Yes.

4          THE COURT:  So I can reach out to her and see if she's

5  available, even at 9:00 a.m. tomorrow, depending on when

6  Judge Berman is sitting.  So we'll email you as soon as we can

7  figure this out, and we'll discuss this first thing tomorrow.

8          But I do want to give her, because her lawyer

9  submitted a letter, an opportunity to be heard.  I don't know

10  if you want to be heard on the issues raised in the letter now

11  or if you'd rather do it tomorrow, but I'm happy to hear you

12  out now.

13          MR. MURRAY:  I do, your Honor.  The statement made

14  that the letter was given to us by Billy Ortega is flatly not

15  the case.  It was transmitted by another client of ours,

16  Mr. Oladokun, who has a sentencing and *Fatico* hearing on

17  February 1.

18          While in the MDC, I called him down just to have a

19  brief discussion about that.  And he brought to me a letter

20  from Ms. Whyte stating that they wished to speak to me, to

21  Billy's attorneys, without their lawyers present.

22          The statement made by Attorney Von Dornum was that

23  this is a violation of Rule 4.2.  That is not the case.

24  Rule 4.2 states that the "a lawyer shall not communicate or

25  cause another to communicate about the subject of

1    representation."

2             I did not ask any questions about Ms. Whyte's case.  I
3    did not get into it.  Ms. Whyte indicated that they wanted to
4    speak with us.  I pulled them down.  I began that meeting by
5    stating they did not have to speak to me.  Ms. Whyte did not
6    have to speak to me if she did not want to; that I represent
7    Billy Ortega and Billy Ortega's interests; that if at any time
8    they wanted to speak to an attorney or end that meeting, even
9    though they are not represented the -- the communications were
10   not about the subject of the representation -- I would have
11   ended that meeting.

12            I reached out to Attorney Von Dornum.  At the outset
13   of this case, there was a preliminary discussion wherein they
14   indicated they would be okay with it but solely mentioned that
15   Ms. Whyte had some mental health issues and it might have been
16   easier if, from my recollection, communication, if there was
17   someone from their office present.

18            There was no discussion of not allowing me to speak to
19   them, if that was not the case.  That was not what was said.  I
20   read out via email again, via phone, on a number of occasions.
21   Attorney Von Dornum is not a sole a practitioner.  They work
22   for the Federal Defenders, a large practice with a number of
23   staff.

24            This Court would, I submit, your Honor, would not have
25   allowed us to just adjourn the case indefinitely until that

1  trial concluded.  This individual indicated that they wish to

2  speak to Mr. Ortega's counsel, to do so without counsel

3  present.

4          And it was indicated by them clearly that if they

5  wanted to end that meeting for any reason or to speak to a

6  lawyer, that would have happened.  I acted within my ethical

7  responsibilities under Rule 4.2.

8          If there was a violation of the ethical rules, which

9  there was not, if there was, the requested relief that

10  Ms. Whyte be barred from testifying would be, frankly, your

11  Honor, perverse.

12          Again, I acted within my ethical responsibilities.  I

13  acted within the rules and the law.  But if this Court or

14  anyone concludes that was not the case, then the person who

15  should suffer for that should be myself, not Billy Ortega.

16          The idea that he should be prohibited from calling a

17  witness who I believe is dispositive in this case where he

18  faces life in prison because of an alleged error by counsel,

19  which, again, did not occur, would just not be appropriate for

20  him to be the individual to suffer.

21          But, again, Mr. Ortega did not pass that letter.  It

22  was someone who was housed with Ms. Whyte.  Again, Billy Ortega

23  could not have passed me that letter as he's not in the same

24  housing area as Ms. Whyte.

25          Again, I acted within my ethical responsibilities

1    within the Rules of Professional Conduct, 4.2, specifically if

2    you look at comments 2, 4, and 8.  I made it clear to Ms. Whyte

3    again that they did not have to speak to me or anybody if they

4    did not want to; that I would end that meeting at any time for

5    any reason; that I represent Mr. Ortega and his interests, not

6    them.  And they decided to speak with me.

7            We had not yet had a ruling at that point that

8    Ms. Whyte would be allowed to testify -- we made the government

9    aware of that possibility -- and it was put on the list of

10   people mentioned and provided them with the notes of that

11   meeting, which I don't think we were required under the

12   discovery laws to do, until we know for sure that that person

13   was actually allowed to be called.  So I think, again, I've

14   acted within my ethical responsibilities here.

15           But if there was someone to conclude that it was not

16   the case, then the person who should be punished for that

17   should be myself and not Mr. Ortega.

18           THE COURT:  All right.  Thank you.  I will get back to

19   you tonight.  You should all check your emails.  And we'll let

20   you know what time we plan to meet tomorrow morning.  But we'll

21   work around Ms. Von Dornum's schedule.  But hopefully, she can

22   meet before we resume tomorrow morning.

23           The other thing that I wanted to raise now is that I

24   just received a letter from the government on the issue of the

25   defense's legal theory in this action.  The government writes

1     that it does not believe it is productive to attempt to

2     harmonize what it terms "three versions" of the defense theory

3     articulated by defense counsel at this time.

4             Instead, it suggests that the Court revisit this issue

5     after the defendant testifies, at which time his account of

6     what purportedly occurred will be able to be ascertained with

7     greater clarity.

8             I'm happy to wait on this.  But what would be helpful

9     is, Mr. Seidler, had indicated that you may want to supplement

10    the proposed jury charge.  And we may be prepared to have our

11    charging conference I think as soon as Thursday.

12            So I'd like to get that supplemental charge or

13    charges, whatever it is you want to submit, by Wednesday.

14    Okay?

15            MR. SEIDLER:  Your Honor, I've rethought this issue.

16    I would not request multiple conspiracies.  The indictment

17    speaks for itself.  It alleges a conspiracy, and it alleges

18    individual conduct by Billy Ortega acting alone.  They're not

19    charging him with engaging in conspiratorial conduct on

20    March 17.

21            THE COURT:  So you're not requesting any additional

22    charges, other than what's been submitted thus far?

23            MR. SEIDLER:  I'm going to object to any charge of

24    vicarious liability to Billy Ortega based on the indictment --

25    charged in the indictment.  But based on the charges in the

1   indictment, yes.

2               THE COURT:  I'm having trouble hearing you.  So I'm

3   just looking at the transcript.

4               You said you're going to object to any charge of

5   vicarious liability.

6               MR. SEIDLER:  Yes.  That he's responsible as a member

7   of the conspiracy for anything that happened in that

8   conspiracy, despite the wording of this indictment.

9               THE COURT:  All right.  Is there anything else?  It

10  seems like you're not submitting any additional charges you

11  want me to consider.

12              Is there anything else that you have proposed that you

13  no longer want me to include in the charge?  To the extent I'm

14  willing to do so.

15              MR. SEIDLER:  No.

16              THE COURT:  All right.  So we will be in touch about

17  what time we are meeting tomorrow morning.  Thank you and have

18  a nice evening.

19              (Adjourned)

20

21

22

23

24

25

1                          INDEX OF EXAMINATION

2   Examination of:                                  Page

3    ENRIQUE SANTOS

4   Direct By Mr. Herman . . . . . . . . . . . . 377
    Cross By Mr. Murray . . . . . . . . . . . . 440
5   Redirect By Mr. Herman . . . . . . . . . . . 443

6    STACEY HAIL

7   Direct By Mr. Herman . . . . . . . . . . . . 444
    Cross By Mr. Murray . . . . . . . . . . . . 501
8    KAYLEN RAINEY

9   Direct By Mr. Fergenson . . . . . . . . . . 513

10                        GOVERNMENT EXHIBITS

11  Exhibit No.                                  Received

12   101-16L, 101-19, 102A, 102D, 102E, . . . . . 380
                103-2, 103-3, 103-2A, 103-3A
13   207-B  . . . . . . . . . . . . . . . . . . . 380

14   103-2AT, 103-3AT . . . . . . . . . . . . . . 396

15   852  . . . . . . . . . . . . . . . . . . . . 458

16   801 through 803  . . . . . . . . . . . . . . 478

17   51  . . . . . . . . . . . . . . . . . . . . . 526

18   52  . . . . . . . . . . . . . . . . . . . . . 526

19   S3  . . . . . . . . . . . . . . . . . . . . . 530

20    611 through 617  . . . . . . . . . . . . . . 530
     111-1 through 111-7, 11-7A, 11-8 . . . . . . 549
21             through 111-10, 111-10A
               through B, 111-11, 111-11A,
22             111-12 through 111-14,
               111-14A, 111-15 through
23             111-29, 111-29A through B,
               111-30 through 111-32, 111-32A
24             through B, 111-33, 111-34,
               111-34A, 111-35 through
25             111-39, 111-39A, 111-40
               through 111-49, 111-49A,

111-50 through 111-54,
111-54A, 111-55 through
111-69, 111-69A, 111-70
through 111-121, 111-121A,
111-122, 111-122A through B,
111-123, 111-123A through B,
111-124, 111-124A through B,
111-125, 111-125A, 111-126,
111-127 and 111-127A

415   . . . . . . . . . . . . . . . . . . . 562

S9    . . . . . . . . . . . . . . . . . . . 572

908   . . . . . . . . . . . . . . . . . . . 573