UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------x
                                       :
  UNITED STATES OF AMERICA             :
                                       :
            - v. -                     :        S4 22 Cr. 91 (RA)
                                       :
  BILLY ORTEGA,                        :
        a/k/a "Jason,"                 :
                                       :
            Defendant.                 :
------------------------------------------------------x
```

## THE GOVERNMENT'S OPPOSITION
## TO DEFENDANT'S POST-TRIAL MOTIONS

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Micah F. Fergenson
Michael R. Herman
Assistant United States Attorneys

- Of Counsel -

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................. 1

BACKGROUND .................................................................................................................... 1

I.      Factual and Procedural Background............................................................................ 1

II.     The Trial .................................................................................................................... 4

        A.   The Government's Case ..................................................................................... 4

        B.   The Defense Case .............................................................................................. 5

        C.   Ortega's Motion for Acquittal ........................................................................... 5

        D.   The Verdict........................................................................................................ 5

ARGUMENT ........................................................................................................................ 6

I.      Applicable Law .......................................................................................................... 6

        A.   Legal Standards for Rule 29 Motions................................................................. 6

        B.   Sufficiency of the Evidence ............................................................................... 7

        C.   Legal Standards for Rule 33 Motions................................................................. 8

II.     Discussion .................................................................................................................. 9

        A.   Ample Evidence Supported the Jury's Special Finding on Drug Weight................... 9

        B.   Ample Evidence Supported the Jury's Special Finding on Death Causation .......... 14

        C.   Evidence Regarding Rainey's Twitter Account Is Neither Newly Available Nor
             Material ........................................................................................................... 17

        D.   The Government's Summation Was Not Error ...................................................... 18

        1.   Relevant Facts ................................................................................................. 19

        2.   Discussion ....................................................................................................... 20

        E.   Precluding DeLaura's Testimony Was Proper ....................................................... 22

CONCLUSION.................................................................................................................... 23

## PRELIMINARY STATEMENT

On January 30, 2023, following a nine-day trial, the jury found defendant Billy Ortega guilty of all counts for which he was charged.  On February 13, 2023, Ortega filed post-trial motions seeking a judgment of acquittal or, in the alternative, a new trial, pursuant to Fed. R. Crim P. 29 and 33.  (Dkt. 142 ("Def. Br.").)  As explained below, Ortega's arguments are meritless and should be denied.

## BACKGROUND

### I.     Factual and Procedural Background

Superseding Indictment S4 21 Cr. 91 (RA) (the "Indictment") charged Billy Ortega with operating a narcotics delivery service that distributed drugs that killed three people, and with possessing a firearm in furtherance of that narcotics conspiracy.  (*See* Dkt. 70).  Count One charged narcotics conspiracy resulting in death, in violation of 21 U.S.C. § 846.  Specifically, Count One charged that the conspiracy Ortega operated was in effect from at least 2015 until February 2022, and involved the distribution and possession with intent to distribute: five kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of 21 U.S.C. § 841(b)(1)(A); and mixtures and substances containing fentanyl and acetylfentanyl, in violation of 21 U.S.C. § 841(b)(1)(C).  Count One further charged that the use of controlled substances distributed by Ortega on or about March 17, 2021, resulted in the deaths of Julia Ghahramani, Amanda Scher, and Ross Mtangi (collectively, the "Victims").  Counts Two, Three, and Four charged Ortega in separate substantive counts with distributing the drugs that resulted in the deaths of Ghahramani, Scher, and Mtangi, respectively, on or about March 17, 2021, each in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 18 U.S.C. § 2.  Count Five charged Ortega with use and carrying of a firearm during and in relation to, or possession of a firearm in furtherance of, the narcotics conspiracy charged in Count One, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2.

Ortega's trial began on January 18, 2023, and concluded on January 30, 2023, when the jury found Ortega guilty on all counts. The jury also found that the conspiracy charged in Count One involved five kilograms or more of cocaine, and found that the drugs Ortega distributed to each of the three Victims caused their deaths.

As the evidence at trial established, the charges arose from an investigation conducted by the New York City Police Department ("NYPD") and other agencies into the fatal fentanyl poisonings of Ghahramani, Scher, and Mtangi.  On March 18, 2021, NYPD officers and emergency medical personnel were called, separately, to Ghahramani's and Scher's Manhattan apartments and to a Manhattan hotel room where Mtangi was staying.  (GX 824, 826, 832, 834, 846, 848).  All three Victims were found unresponsive and pronounced dead on the scene. Responding officers found identical translucent black baggies containing a white powdery substance at all three locations.  (GX 824, 832, 848).  The white powdery substance in the recovered baggies at each of the scenes tested positive for the presence of fentanyl.  (GX 804, 808, 810).  Certified forensic toxicologists from the Office of the Chief Medical Examiner of the City of New York ("OCME") assessed biological specimens from each of the victims and determined that Scher and Mtangi's contained fentanyl and Ghahramani's contained fentanyl and acetylfentanyl (a fentanyl analog that is often "mixed in with fentanyl" as a "contaminant or part of the process of making" fentanyl).  (Trial Transcript ("Tr.") 484; GX 801, 802, 803).[1]  The Government's medical toxicology expert Dr. Stacey Hail opined that Ghahramani would not have died but for fentanyl and acetylfentanyl and that Scher and Mtangi would not have died but for fentanyl.  (Tr. 475).  The Government introduced numerous text messages between Scher and Ghahramani with the user of the cellphone 646-421-5555 (the "5555 Drug Dispatcher Phone"),

---

[1] The trial transcript occasionally incorrectly spells acetylfentanyl as "acetafentanyl."

including on March 17, 2021, regarding drug deliveries.  The Government established that Ortega utilized the 5555 Drug Dispatcher Phone through an analysis of his iCloud accounts and communications on the 5555 Drug Dispatcher Phone, which was recovered from Ortega's home when law enforcement agents searched it incident to Ortega's arrest on February 1, 2022.  (GX S2; GX S4; GX 302-C; GX 111-127; GX 111-127A)  The defense conceded that Ortega was the user of the 5555 Drug Dispatcher Phone.  (Tr. 1246).

Also on February 1, 2022, law enforcement agents arrested one of Ortega's co-conspirators, Kaylen Rainey, who worked as a courier for Ortega's delivery service—*i.e.*, delivered Ortega's drugs to customers on behalf of Ortega for a small fee—and delivered the fatal drugs to the victims on March 17, 2021, on behalf of Ortega.  (Tr. 515-16, 655).  Subsequent to his arrest, Rainey became a cooperating witness with the Government.  (Tr. 513).  Rainey testified at trial—consistent with the contents of seized cellphones and iCloud accounts—that Ortega operated the narcotics delivery service for years, from at least approximately 2015 up until the time of the arrests.  (Tr. 525).  Rainey also explained that Ortega's mother—co-defendant Josefina Marine—was an active participant in the conspiracy who stored his drugs at her apartment in the Fulton Houses; provided those drugs to couriers, such as Rainey; and received money from the couriers, such as Rainey, which Marine stored in one of her safes and which were protected by guns supplied by Ortega.  (Tr. 517-19).  In addition, Ortega had several other runners who delivered his drugs and would break down and bag cocaine in Marine's apartment.  (Tr. 515, 519-25).  Cellphone evidence from the 5555 Drug Dispatcher Phone showed that Ortega and co-conspirator Jorge Ramos Cruz bagged up the drugs that Ortega then had Rainey distribute to the Victims, resulting in their deaths on March 17, 2021.  (*See generally* GX 1006).

II.     **The Trial**

A.     **The Government's Case**

At trial, the Government proved its case with testimonial, documentary, and electronic evidence. The Government called sixteen witnesses—three responding NYPD detectives, two civilian witnesses, three NYPD criminalists, three forensic toxicologists, an expert medical toxicologist, a narcotics trafficking expert, cooperating witness Kaylen Rainey, a United States Attorney's Office investigative analyst, and a summary witness. In total, more than 350 Government Exhibits were entered into evidence. In sum, the first civilian witness and responding NYPD detectives explained the discovery of the three Victims' bodies and law enforcement's response and initial investigation into the defendant's narcotics delivery service. The other civilian witness—Jason Ienner—described his long time use of the defendant's delivery service to purchase cocaine, and identified the defendant in Court as the person who was in charge of the delivery service. The Government also presented the testimony of three NYPD criminalists who examined and tested the drugs found at the three Victims' locations (all of which had black translucent ziplock bags that contained a powdery substance testing positive for fentanyl); three forensic toxicologists, who testified that the three Victims' blood tested positive for the presence of fentanyl; and Dr. Stacey Hail, a medical toxicologist, who opined that Julia Ghahramani would not have died but for fentanyl and acetylfentanyl while Amanda Scher and Ross Mtangi would not have died but for fentanyl. Kaylen Rainey provided a detailed explanation of how he started working for Ortega delivering his drugs, how Ortega stored his drugs and guns at his mother's apartment in Manhattan, and how the defendant paid him to deliver drugs to the defendant's customers, including on March 17, 2021, when he delivered the fatal drugs to the three Victims on behalf of Ortega. The Government also presented numerous electronic exhibits from (or showing messages with) Ortega's phones and iCloud accounts demonstrating his firearms possession and

4

use (GX 111-125A), his prolific narcotics trafficking (GX 101-14), and how he and a co-conspirator bagged up the drugs that he then sent Rainey to deliver to the Victims (GX 1006 at p. 1-5).   Finally, the Government's summary witness provided analysis and summary charts documenting the breath of the defendant's narcotics conspiracy and that it easily involved more than five kilograms of cocaine.  (GX 1007).

### B.    The Defense Case

The defense called Maurice (Reese) Whyte, Rainey's former cellmate at the Metropolitan Detention Center ("MDC"), who testified about alleged prior inconsistent statements Rainey was alleged to have told Whyte while they were cellmates.  (Tr. 1082-1151)  The Court admitted this evidence not for the truth of the matter asserted, but only for the "limited purpose of helping [the jury] decide whether to believe [Rainey's] trial testimony."  (Tr. 1105-06).  Ortega elected not to testify in his own defense.  (Tr. 1156).

### C.    Ortega's Motion for Acquittal

At the close of the evidence, the defense moved for a judgment of acquittal.  (Tr. 1169). The Court denied the motion.  (*Id.*).

### D.    The Verdict

On January 30, 2023, the jury returned its unanimous verdict, convicting Ortega on all five counts.  (Tr. 1389-1392).  The jury also found that the conspiracy charged in Count One involved five kilograms or more of cocaine, and found that the drugs Ortega distributed to each of the three Victims caused their deaths.  (*Id.*).

## ARGUMENT

As explained below, Ortega's motions seeking a judgment of acquittal or, in the alternative, a new trial, pursuant to Federal Rules of Criminal Procedure 29 and 33, are meritless and should be denied.

## I.      Applicable Law

### A.  Legal Standards for Rule 29 Motions

Federal Rule of Criminal Procedure 29 ("Rule 29") allows a district court, upon a defendant's motion, to set aside the verdict and enter a judgment of acquittal.  A court evaluating a Rule 29 motion must review the evidence presented at trial "in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government." *United States v. Walker*, 191 F.3d 326, 333 (2d Cir. 1999) (quotation marks omitted).  "A judgment of acquittal is warranted only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Jiau*, 734 F.3d 147, 152 (2d Cir. 2013) (quotation marks omitted).  The burden is on the defendant to make this showing, and the Second Circuit has repeatedly described that burden as "very heavy."  *United States v. Desena*, 287 F.3d 170, 177 (2d Cir. 2002); *see also United States v. Caracappa*, 614 F.3d 30, 43 (2d Cir. 2010) (same).

A defendant's burden is even heavier in the case of a conspiracy conviction, where "deference to a jury's findings is especially important . . . because a conspiracy is by its very nature a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court."  *United States v. Snow*, 462 F.3d 55, 68 (2d Cir. 2006) (quoting *United States v. Morgan*, 385 F.3d 196, 204 (2d Cir. 2004)). A defendant may be guilty of conspiracy "even if he knows only one other member of the conspiracy, and a single act may be sufficient for an inference of involvement in a criminal enterprise . . . if the act is of a nature justifying an inference of knowledge

of the broader conspiracy." *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008) (quoting *United States v. Tramunti*, 513 F.2d 1087, 1112 (2d Cir. 1975)).

### B. Sufficiency of the Evidence

A defendant making an insufficiency claim bears a heavy burden.  A jury verdict must be upheld on a Rule 29 challenge if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Persico*, 645 F.3d 85, 105 (2d Cir. 2011) (quotation marks omitted).  In a close case, where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (quotation marks and brackets omitted).

In considering the sufficiency of the evidence, the Court must view the evidence in the light most favorable to the Government. *United States v. Aleskerova*, 300 F.3d 286, 292 (2d Cir. 2002).  "[T]he task of choosing among competing, permissible inferences is for the [jury], not for the reviewing court." *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001).  Moreover, the Court must analyze the pieces of evidence "not in isolation but in conjunction," *United States v. Matthews*, 20 F.3d 538, 548 (2d Cir. 1994), and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others," *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999); *United States v. Reyes*, 302 F.3d 48, 53 (2d Cir. 2002) ("[W]e consider the evidence as a whole").  "These standards apply whether the evidence being reviewed is direct or circumstantial." *Persico*, 645 F.3d at 105.

As is relevant here, the Second Circuit has repeatedly held that "a federal conviction may be supported by the uncorroborated testimony of even a single accomplice witness if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt." *United States v. Florez*, 447 F.3d 145, 155 (2d Cir. 2006) (quotation marks omitted).  "Any lack of corroboration of an accomplice's or co-conspirator's testimony goes merely to the weight of the

7

evidence, not to its sufficiency, and a challenge to [t]he weight is a matter for argument to the jury, not a ground for reversal on appeal." *United States v. Diaz*, 176 F.3d 52, 92 (2d Cir. 1999) (quotation marks omitted). The credibility of a testifying witness is particularly within the province of the jury, not a reviewing court. *See United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011) ("It is the province of the jury and not of the court to determine whether a witness who may have been inaccurate, contradictory and even untruthful in some respects was nonetheless entirely credible in the essentials of his testimony." (quotation marks omitted)). For these reasons, the Second Circuit has emphasized that "the proper place for a challenge to a witness's credibility is 'in cross-examination and in subsequent argument to the jury.'" *United States v. Roman*, 870 F.2d 65, 71 (2d Cir. 1989) (quoting *United States v. Friedman*, 854 F.2d 535, 558 (2d Cir. 1988)). It is then for the jury to decide how those arguments bear on "the weight [it] should accord to the evidence." *United States v. Truman*, 688 F.3d 129, 140 (2d Cir. 2012).

### C.  Legal Standards for Rule 33 Motions

Federal Rule of Criminal Procedure 33 ("Rule 33") allows a trial court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim P. 33(a). Because "motions for a new trial are disfavored in the Second Circuit," *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), a court, after examining the totality of the evidence and considering objectively all of the facts and circumstances, should grant the motion only if it finds "a real concern that an innocent person may have been convicted," *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992). "It is only when it appears that an injustice has been done that there is a need for a new trial." *Id.*

"[A] district court may not grant a Rule 33 motion based on the weight of evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be a 'manifest injustice' to let the verdict stand." *United States v. Archer*, 977 F.3d 181, 187 (2d Cir.

2020).  Under this standard, the Second Circuit has "emphasized" that the remedy of a new trial should be granted "sparingly and in the most extraordinary circumstances." *Id*.  A district court "must be careful not to wholly usurp the role of the jury, and should defer to the jury's assessment of witnesses and resolution of conflicting evidence unless exceptional circumstances can be demonstrated." *Teman*, 465 F. Supp. 3d at 292.  Exceptional circumstances are limited to situations where, "for example, the evidence was patently incredible or defied physical realities, where an evidentiary or instructional error compromised the reliability of the verdict, or where the government's case depends upon strained inferences drawn from uncorroborated testimony." *United States v. Landesman*, 187 F.4th 298, 331 (2d Cir. 2021) (citing *Archer*, 977 F.3d at 187).

Finally, "a district court faced with a Rule 33 motion must be careful to consider any reliable trial evidence as a whole, rather than on a piecemeal basis." *Archer*, 977 F.3d at 189.

## II.    Discussion

Ortega offers several arguments for a judgment of acquittal or new trial.  (Def. Br.).  For the reasons set forth below, Ortega's arguments are meritless and the Court should deny his motions.

### A.  Ample Evidence Supported the Jury's Special Finding on Drug Weight

Ortega's argument for a Rule 29 vacatur related to drug weight (Def. Br. 2) is meritless.  In particular, Ortega's characterization of the testimony and analysis of the Government's summary witness as "conclusory statements" that were "totally unsupported" is baseless.  (Def. Br. 2). As described below, the summary witness's testimony and charts were simply summaries of admitted exhibits, and the accuracy of the summary charts were not even impeached or challenged at trial.  The Government's summary charts and the underlying evidence upon which they were based, along with other substantial evidence of drug weight, were more than sufficient to support the jury's special finding that the conspiracy charged in Count One involved 5 kilograms

or more of cocaine.  With respect to the summary witness, in particular, that witness simply counted the quantities of "will" reflected in Ortega's drug ledger and in Ortega's text messages, while other evidence established that "will" meant at least one-gram of cocaine.  Thus, the more than 5,000 "will" counted by the summary witness reflected cocaine sales by Ortega exceeding 5 kilograms.  The jury was on firm ground in reaching that straightforward conclusion, and Ortega has set forth no valid basis to disturb the jury's finding as to drug weight.

For background, and as noted, the Government's summary witness, Intelligence Analyst Rosanna Corrado, calculated the number of "will" reflected in a drug ledger on Ortega's phone. (Tr. 1021-1035; GX S2; GX 101-14).  The drug ledger was entered into iPhone notes that were organized by month, and each month's note contained line items for drug deliveries on a given day—tracking drug deliveries in a format similar to the delivery information Ortega texted to his runners to make the drug deliveries.  (GX 101-14).  For example, the first note was created in November 2020 and titled "November 1 earnings"; the first line item in that note was "4:00 pm p 200$ 2will."  (GX 101-14 at entry 1).  As the foregoing example illustrates, the vast majority of line items were for "will" and specified the quantity of "will" that was being delivered.  (Tr. 1023-24; GX 101-14).  Certain line items, however, merely listed a dollar amount, without specifying that it referred to "will."  (Tr. 1024-25).  Where a quantity of "will" was specified in the ledger, Corrado included that specified amount in her sum.  (Tr. 1022).  With respect to line items where only a dollar amount was listed, Corrado's calculation treated that line item as only 1 "will," even if the dollar amount listed was "$200 or $300 or $600."  (Tr. 1024-25).  Corrado did that even though the line items indicated that 1 "will" cost $100.  (Tr. 1025).  Taking that "conservative approach," (Tr. 1024), yielded 4,205 "will" in Ortega's drug ledger.  (GX 1007, at 1).  Corrado then supplemented her calculation by analyzing, with the same methodology, Government exhibits

10

containing Ortega's text messages about drug deliveries for months that were not included in the drug ledger—specifically, text messages from April 2020, September 2020, and December 2020 through December 2021.  (Tr. 1026-29; GX 1007, at 2-3).  In total, Corrado counted 5,506 "will" using a conservative methodology, and with respect to only a portion of the roughly seven-year cocaine conspiracy charged and proven in Count One.[2]  (Tr. 1035; GX 1007, at 3).

Faced with Corrado's analysis and chart, Ortega appears simply to assert in his post-trial motion there was no evidence showing that $100 of "will" referred to a $100, one-gram baggie of cocaine.[3]  But ample evidence established beyond a reasonable doubt that $100 of will was one gram of cocaine—and thus that Ortega's own drug ledger and text messages established that the conspiracy involved, at a minimum, 5,506 grams of cocaine.  First, the evidence established that "will" was code for a baggie of cocaine.  Indeed, the defense did not dispute that Ortega was a drug dealer who sold cocaine (*e.g.*, Tr. 45), and cooperating witness Rainey testified explicitly that "[t]he code for cocaine was 'will.'"  (Tr. 558).  The Government's case included hundreds of pages of Ortega's text messages with co-conspirators—from only a fraction of the time period during which Ortega was dealing cocaine—where Ortega conveyed the delivery information for cocaine deliveries using the word "will" as code for cocaine.  For example, when Ortega texted his runner, "37 Warren Street, 12 Will 1k," that message meant that "37 Warren Street is the address" for delivery, "'12 Will' means that they [the customer] were getting 12 baggies of cocaine" and "1k"

---

[2] Moreover, the Government exhibits containing Ortega's text messages that Corrado used to supplement the drug ledger did not encompass all of Ortega's drug dealing in those months, as Ortega started using a new cellphone, the contents of which the Government was unable to access, after the three victims' deaths in March 2021.  (Tr. 683-84; GX S2 ¶ 7).

[3] Ortega's argument appears to suggest that Corrado treated every $100 as 1 gram of cocaine. (Def. Br. 2 ("This was based on a totally unsupported conclusion that every mention of $100 related to "will" corresponded to 1 gram of cocaine.")).  As described above, however, that is not the methodology that Corrado followed.

meant the customer was "giving [the runner] $1,000" in exchange.  (Tr. 566).  Notably, with respect to the foregoing example, the 37 Warren Street address was the address of another Government witness, Jason Ienner, who testified to being a longstanding customer of Ortega's delivery service who ordered *cocaine* from Ortega for years.[4]  (Tr. 249, 254-55).  Second, the evidence established that the defendant typically charged $100 per gram of cocaine.  Rainey testified, as also reflected in Ortega's text messages and Ortega's drug ledger, that Ortega's baggies of cocaine cost $100 or $200, depending on the quantity in the baggie.  (Tr. 559).  Rainey also testified that when he bagged up cocaine for Ortega, the baggies contained one gram of cocaine. (Tr. 626).  That testimony aligned with the testimony from narcotics trafficking expert Alfred Hernandez, who explained that high-end delivery services charge up to $100 per gram of cocaine. (Tr. 301).  That Ortega at times sold two-gram baggies of cocaine for $200—as reflected in Rainey's testimony—was also corroborated by text messages.  For example, on March 17, 2021, Ortega instructed Rainey to deliver "10 will"—i.e., 10 grams of cocaine—to Ienner in exchange for $1,000.  (GX 1006, at 11).  Rainey asked Ortega if "this pack" was "100s or 200s," and Ortega responded, "200$ 5 of the blacks"—that is, 5 two-gram black baggies of cocaine.[5]  (GX 1006 at 12).  Accordingly, the evidence at trial—which was overwhelming and only certain examples of which are cited here—established that Ortega used 1 "will" to refer to 1 gram of cocaine, for which he typically charged $100.  As a result, the testimony and charts from the Government's summary witness—which conservatively identified more than 5,000 "will" in Ortega's drug ledger and

---

[4] Ienner had even met Ortega in person previously and identified him from the witness stand.  (Tr. 241-42).

[5] Of course, the drugs delivered on March 17, 2021, contained fentanyl.

Ortega's drug delivery text messages—decisively established that Ortega's cocaine conspiracy involved 5 kilograms or more of cocaine.

Lastly, ample other evidence established that Ortega dealt at least 5 kilograms of cocaine in the course of the conspiracy. For example, Rainey testified that he had witnessed Ortega and his co-conspirators bagging up a "block" of cocaine on over 30 occasions. (Tr. 626). Rainey compared the size and shape of the cocaine "block" to a cantaloupe. (Tr. 626). If each "block" weighed just 200 grams,[6] that would still yield six kilograms of cocaine in total—more than enough to sustain the jury's weight finding. Thus, even if Rainey's testimony were entirely uncorroborated, it would be a sufficient basis for the jury's special finding on weight. *See Florez*, 447 F.3d at 155 ("[A] federal conviction may be supported by the uncorroborated testimony of even a single accomplice witness if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt.").

Of course, Rainey's testimony was extensively corroborated. Indeed, the drug ledger and text message exhibits, and the accompanying summaries of that voluminous evidence, supply an entirely independent basis for the jury to have concluded that Ortega's years-long drug conspiracy involved at least five kilograms of cocaine. Accordingly, there is no question that a "rational trier of fact could have found" the five-kilogram drug weight proven beyond a reasonable doubt based on this ample evidence. *Persico*, 645 F.3d at 105.

---

[6] Text message evidence, for example, evidenced occasions where Ortega and his co-conspirators bagged up 200 grams. (*See* Tr. 1204). Notably, Ortega had a video of a pressed kilogram of cocaine on one of his cellphones that was seized from his residence. (Tr. 299-300, 320; GX 101-21B).

**B. Ample Evidence Supported the Jury's Special Finding on Death Causation**

The jury was presented with ample evidence to conclude that the drugs Ortega distributed or caused to be distributed—via Rainey—resulted in the Victims' deaths.  In arguing otherwise, Ortega asserts that the jury should not have believed the Government medical toxicology expert Dr. Stacey Hail because she had "no expertise in forensic pathology"; she referred to "excited delirium" syndrome when discussing the symptoms of the sympathomimetic toxidrome, which the defense labels "not a legitimate diagnosis"; and, according to Ortega, Dr. Hail's testimony allegedly "contradicted her conclusions."  (Def. Br. 2-3).  Ortega is not only wrong about the inferences the jury could reasonably draw from the testimony of Dr. Hail (and the Government's other evidence establishing causation) but he also fails to address numerous additional pieces of evidence establishing that Ortega distributed or caused to be distributed the drugs that caused the Victims' deaths.

With respect to Ortega's attacks on Dr. Hail's testimony, in essence, his argument is that the jury should not have credited Dr. Hail's opinions that each of the three Victims would not have died but for fentanyl or, in the case of Ghahramani, fentanyl and acetylfentanyl.  This is not a valid basis for overturning Ortega's conviction or ordering a new trial.  *See United States v. Glenn*, 312 F.3d 58, 64 (2d Cir. 2002) (noting that "it is well-settled that when reviewing the sufficiency of the evidence we defer to the jury's assessment of witness credibility."); *Roman*, 870 F.2d at 71 (The appropriate "place for a challenge to a witness's credibility is in cross-examination and in subsequent argument to the jury.").  "Moreover, the jury remained free to accept or reject [Dr. Hail's opinion] based on its assessment of the sufficiency of the data and experience informing the proffered opinion, [Dr. Hail's] credibility generally, and the jury's own evaluation of the [evidence]." *United States v. Felder*, 993 F.3d 57, 74 (2d Cir.), *cert. denied*, 142 S. Ct. 597 (2021).  Indeed, the Court specifically instructed the jury of its right to "disregard" expert opinion "entirely

14

or in part." (Tr. at 1329-30); *see, e.g.*, *United States v. Feliciano*, 223 F.3d 102, 121 (2d Cir. 2000) (finding no error in jury's reliance on expert witness's opinion where defense counsel had "opportunity" to cross examine the witness and the "district court advised the jurors that they were free to give opinion testimony whatever weight they thought it deserved").

In any event, Ortega's arguments fail to demonstrate the jury was wrong to credit Dr. Hail's opinions as a matter of law warranting a new trial or a judgment of acquittal. Indeed, Ortega made many of the same arguments he now makes in his motion to the jury in cross examination of Dr. Hail and in summation. (*See, e.g.* Tr. 500 (cross-examination as to acceptability in the medical community of an "excited delirium" diagnosis); 1241 (attacking Dr. Hail's opinions because she "did not examine the victims. She did not pronounce them dead. She did not perform any autopsy or examination.")). Accordingly, such information was before the jury when the jury made its credibility determination and its assessment of the reliability of Dr. Hail's opinions. *See Roman*, 870 F.2d at 71 ("[T]he proper place for a challenge to a witness's credibility is in cross-examination and in subsequent argument to the jury. . . ."). Given that the jury was well-informed of Ortega's arguments attacking Dr. Hail's opinions—but nevertheless appears to have credited her testimony anyway—it would be improper for the Court to substitute its own credibility assessment for the jury's on a sufficiency of the evidence challenge. *See, e.g., United States v. Baker*, 899 F.3d 123, 130 (2d Cir. 2018) ("We will not attempt to second-guess a jury's credibility determination on a sufficiency challenge, particularly when, as is the case here, trial counsel already presented these same credibility arguments to the jury.").

Even putting aside Dr. Hail's opinions, there was more than sufficient evidence that Ortega caused the Victims' deaths. Most notably, the Government presented undisputed evidence that each of the three Victims ordered cocaine from Ortega, that Ortega dispatched Rainey to deliver

drugs to the Victims, that Rainey in fact delivered them drugs, and that the Victims' bodies were all found the following day. (*See* GX 1006 at pp. 9-15 (citing admitted electronic evidence exhibits); Tr. 60-61; 76-77 79; 662-675). That timeline of events proves and, at the very least, strongly supports the inference that Ortega's drugs—delivered by Rainey—caused the Victims' deaths. Then there were the NYPD narcotics lab results establishing that fentanyl was found in the bags Rainey delivered at all three of the Victims' locations. (*See* GX 804 (Ghahramani); 808 (Mtangi); 810 (Scher)). And all three victims had fentanyl in their blood when they died. (*See* GX 801 (Ghahramani – fentanyl and acetylfentanyl); 802 (Mtangi – fentanyl); 803 (Scher – fentanyl)).[7] In short, the Government presented overwhelming evidence that the drugs Ortega distributed caused each of the three Victims to die.

Lastly, Ortega appears to argue that the scope of the conspiracy charged in Count One of the Superseding Indictment did not properly encompass the Victims' deaths, and that the Government's proof constructively amended the Indictment. (Def. Br. 3-4). Putting aside that this argument does nothing to disturb the substantive death-resulting convictions in Counts Two through Four, Ortega's argument on this point is incorrect.

During trial, the Court correctly denied essentially this same argument Ortega now makes, ruling "the defense's narrow reading of the conspiracy count is not a reasonable one" and that there

---

[7] Ortega's claim that "there was no evidence that there was a mixture of fentanyl and cocaine in the bags" of drugs found at the Victims' locations (Def. Br. 3) misapprehends the applicable legal standard. The Government was not required to prove that Ortega distributed *both* fentanyl and cocaine and that *both* substances caused the Victims' deaths. Rather, as the Court properly instructed the jury (without objection from the defense), to convict Ortega on the "death-resulting" special interrogatory, the jury was required to find that Scher and Mtangi's deaths were caused by "cocaine *and/or* fentanyl" and Ghahramani's death was caused by "cocaine *and/or* fentanyl *and/or* acetylfentanyl" that had been "distributed by the defendant." (Tr. 1357 (emphasis added)).

"was neither prejudicial variance nor constructive amendment from the conspiracy c[ount]." (Tr. 1165-1168). The Court should adhere to that ruling.

A "constructive amendment occurs when the charge upon which the defendant is tried differs significantly from the charge upon which the grand jury voted." *United States v. Khalupsky*, 5 F.4th 279, 293 (2d Cir. 2021), *cert. denied sub nom. Korchevsky v. United States*, 142 S. Ct. 761 (2022). In support of his argument that there was a constructive amendment, Ortega primarily relies on the Eleventh Circuit's decision in *United States v. Keller*, 916 F.2d 628 (11th Cir. 1990) (Def. Br. at 3). That case is inapposite. In *Keller*, the Eleventh Circuit held that the indictment was constructively amended where the district "court's instructions had the effect of adding the phrase "with other named and unnamed conspirators" to a conspiracy charge. *Id*. at 636. "The grand jury could have included a similar phrase in the indictment, but it did not." *Id*. Here, of course, the grand jury *did* include such language in the Superseding Indictment: "BILLY ORTEGA, a/k/a 'Jason,' the defendant, *and others known and unknown*, intentionally did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States." (Dkt. No. 70 ¶ 1). Accordingly, the Court should reject Ortega's constructive amendment argument.[8]

### C.  Evidence Regarding Rainey's Twitter Account Is Neither Newly Available Nor Material

Ortega asserts a new trial should be granted based on six Tweets from Rainey's Twitter account. (Def. Br. 5). Ortega's argument is meritless. As an initial matter, the six Tweets Ortega

---

[8] Ortega's citation to *United States v. Sadler*, 24 F.4th 515 (6th Cir. 2022), for the proposition that the Indictment must allege "acts committed by other conspirators" is also misplaced, as that case does not stand for the proposition that the quoted phrase must appear in any particular part of the conspiracy indictment. And, as discussed, the Indictment here *did* include the allegation that Ortega "*and others known and unknown*" were members of the conspiracy.

describes all predate Rainey's arrest and cooperation—and two of the Tweets, according to Ortega's motion, are from over a decade ago, in 2011.  As a result, they are minimally probative of Rainey's truthfulness as a cooperating witness and certainly would not have led to an acquittal. *See United States v. Owen*, 500 F.3d 83, 87 (2d Cir. 2007) ("A new trial pursuant to Rule 33 based on newly discovered evidence may be granted 'only upon a showing that the evidence could not with due diligence have been discovered before or during trial, that the evidence is material, not cumulative, and that admission of the evidence would probably lead to an acquittal.'" (quoting *United States v. Alessi,* 638 F.2d 466, 479 (2d Cir. 1980))).  In any event, Ortega was well aware, at the time of trial, of Rainey's Twitter account and the Tweets sent from that account, so this purported "new" evidence is not "new" in the sense relevant under Rule 33.  *See Owen*, 500 F.3d 83 at 89 ("We have never before held that a new trial may be granted pursuant to Rule 33 on the basis of evidence that was known by the defendant prior to trial . . . and we decline to do so here."). Indeed, the defense cross-examined Rainey, specifically, about his Twitter account and a particular Tweet posted from that account in May 2022, after Rainey's arrest.  (Tr. 715, 870-71).  The fact that the defense made the strategic decision to focus their Twitter-related cross examination of Rainey on a Tweet postdating his arrest and cooperation—rather than Tweets like the ones cited in their motion that predate his arrest and cooperation—is not a basis for a new trial.  And for good reason.  Were it otherwise, any defendant could simply point to evidence that the defense was aware of but strategically *chose* not to use for cross examination in arguing for a new trial.  For all of the foregoing reasons, Ortega's argument has no merit and should be rejected.

### D.  The Government's Summation Was Not Error

Ortega argues that statements in the Government's summation misstated the law and require that the Court grant him a new trial.  (Def. Br. at 5-6).  This claim is baseless.  The challenged statements were correct statements of law and there was nothing improper about them.

### 1.  Relevant Facts

During the Government's summation, the Government stated:

Now let me say something about the law in this case. Later today, Judge Abrams will give you detailed instructions on the law.  Her instructions govern. And if anything I say is different from what Judge Abrams tells you, you must follow what she says.

…

You don't have to make a finding that it was the defendant's drugs.  As I said before, all you have to find is that he intended to distribute drugs.  But if you look closely and you read the text messages, you'll see not only did he intend to distribute drugs of any kind, these were his.  He bagged them up.

…

[W]hat I expect Judge Abrams is going to instruct you is that it doesn't matter where the fentanyl came from that killed the victims or even whether the defendant knew that he was distributing fentanyl.  As I said, if you look closely, you'll see the evidence shows that the defendant and Jorge bagged up the drugs that killed the victims on March [1]5, 2021, two days before their deaths, right at the stash house.

(Tr. 1176, 1191, 1192).

After the Government's summation, the defense objected, claiming that "any reference to the jury instructions was inappropriate."  (Tr. 1213).  The Court swiftly rejected that objection, explaining:

I will instruct the jury that they are to follow my instructions on the law.  But part of the reason that I ensure that we have a charge conference before summations is so that you can use the language in the charge.  And I think [the prosecutor] was clear to say that they are to follow my instructions on the law but this is what he anticipates I'll say.  So that objection is overruled.

(Tr. 1213-14).  The parties then engaged in a lengthy colloquy with the Court in which the defense, for the first time, articulated a completely different defense than what was argued in their opening statement, and moved for a mistrial based on the above-quoted sections of the Government's summation.  (Tr. 1213-1230).  While during their opening statement, the defense argued that after being dispatched by Ortega, Rainey obtained fentanyl from a different supplier, and he then

19

"served" those drugs to the Victims which killed them (Tr. 46-47), the defense instead claimed, for the first time, that the Victims had "two different drug dealers" and that the drugs Ortega distributed to the Victims were not the drugs that caused their deaths. (Tr. 1223). The Government explained that "[t]his is the first time we are ever hearing this theory" but that, to the extent the defense was still arguing that Ortega did not know that Rainey delivered the fatal doses or that Rainey was delivering fentanyl (as opposed to cocaine or another drug), the jury did not have to find that Ortega knew that Rainey was delivering fentanyl or where Rainey got the drugs from. (Tr. 1228-30).

After a recess, the Court denied the defendant's motion for a mistrial. (Tr. 1230). The Court ultimately gave a brief instruction prior to the defense summation, explaining that it would give the jury detailed legal instructions after closing arguments, and that:

> [I]n the context of making a particular argument, the government made a statement in passing to the effect that it doesn't matter whether these drugs were the defendant's drugs. Among other things, I'm going to instruct you that in order to be found guilty of distributing controlled substances, you must find that the defendant distributed controlled substances or caused them to be distributed and I am going to explain what that instruction entails further later today.

(Tr. 1236).

The defense then gave its summation, during which counsel argued, for the first time to the jury, that the fentanyl that killed the three victims "was not distributed by Billy Ortega or Kaylen Rainey" but rather came from an entirely different unnamed drug dealer. (Tr. 1248).

## 2. Discussion

Ortega is not entitled to a new trial based on the wholly proper arguments in the Government's summation. In seeking a new trial based on allegations of improper arguments in a Government summation, a defendant bears "a heavy burden, because the misconduct alleged must be so severe and significant as to result in the denial of [his] right to a fair trial." *United*

*States v. Banki*, 685 F.3d 99, 120 (2d Cir. 2011) (quoting *United States v. Locascio*, 6 F.3d 924, 945 (2d Cir. 1993)). Thus, "[f]laws in the government's summation will require a new trial only in the rare case in which improper statements—viewed against the entire argument to the jury—can be said to have deprived the defendant of a fair trial." *United States v. Caracappa*, 614 F.3d 30, 41 (2d Cir. 2010); *see also United States v. Coriaty*, 300 F.3d 244, 255 (2d Cir. 2002). Such cases are "rare." *United States v. Rodriguez*, 968 F.2d 130, 142 (2d Cir. 1992) (internal quotation marks and citation omitted).

In the context of the entire trial, the Government's statements in summation that "it doesn't matter where the fentanyl came from that killed the victims or even whether the defendant knew that he was distributing fentanyl" were not improper.  (Tr. 1192).  The Government was responding to the defendant's articulated defense in his opening statement that, even if Ortega intended to sell drugs to the Victims, after being dispatched by Ortega, Rainey then obtained the drugs that killed the victims from a supplier other than Ortega.  (Tr. 46-47; *see also* Dkt. No. 95 at 1 (defense letter stating "Ortega's defense is that . . . Rainey was specifically told never to obtain narcotics from the subject specific cocaine supplier with Mexican connections because her cocaine was laced with deadly amounts of fentanyl.  Rainey specifically agreed he would not do so, but approximately 1 month later Rainey violated said agreement.  Unknown to Ortega[,] Rainey went to said supplier, obtained cocaine which Rainey knew to be laced with fentanyl, and sold that cocaine on the same night to [the Victims]")).

The Government was merely responding to this proffered defense, and consistent with the Court's legal instructions that:  "[T]he law permits a defendant to be found guilty of a narcotics offense, including a narcotics offense causing death, assuming all the elements of the crime are proven beyond a reasonable doubt[,] where the defendant intended to distribute one drug, such as

21

cocaine, but actually distributed or caused another individual to distribute another drug or another drug containing a mixture such as fentanyl." (Tr. 124-25); *see, e.g. United States v. King*, 345 F.3d 149, 153 (2d Cir. 2003) (recognizing that "drug dealers convicted under § 841(a) need not know the type and quantity of drugs" and that *mens rea* required referred only to knowingly distributing a controlled substance)).[9]  Accordingly, the Government's statements in summation were accurate statements of the law, consistent with the Court's instructions to the jury, caused the defendant no prejudice, and certainly did not rise to the level of "a rare case in which improper comments in a prosecutor's summation are so prejudicial that a new trial is required." *Rodriguez*, 968 F.2d at 142 (internal quotation marks omitted).

### E.  Precluding DeLaura's Testimony Was Proper

Ortega argues that a new trial is warranted because the Court precluded the testimony of proposed defense witness Jonathan DeLaura, which "would have directly contradicted that of Kaylen Rainey." (Def. Br. 6).[10]  Ortega's argument—summarily asserted, without a single citation to any legal authority, the extensive briefing by the parties on this issue (Dkt. 87, at 1-2; Dkt. 90, at 1-5; Dkt. 95; Dkt. 98; Dkt. 104), or the Court's actual ruling (Tr. 999-1004)—is baseless.  This Court's ruling excluding DeLaura's testimony—but allowing the defense to cross-examine Rainey on the allegations in DeLaura's proposed testimony as described by the defense—was correct for at least three reasons.  First, because DeLaura's testimony would have constituted extrinsic evidence seeking to impeach Rainey on "collateral" matters related to Rainey's supposed conduct while incarcerated after arrest, DeLaura's testimony was impermissible.  (*See* Tr. 1000 (the Court

---

[9] The Court also mitigated any minor discrepancies in the Government's jury address by correctly instructing the jury that it was obligated to follow the Court's legal instructions, and "not any of the lawyers'" statements as to the law.  (Tr. 1236).

[10] Ortega mistakenly refers to the witness as "William" DeLaura in his motion.  (Def. Br. 6).

reasoning that "in *United States v. Purdy*, the Second Circuit explained that '[e]xtrinsic evidence offered for impeachment on a collateral issue is properly excluded.' 144 F.3d 241, 245–46 (2d Cir. 1998).")).  Second, the defense's theory of admissibility of DeLaura's testimony under Rule 404(b) was confused, as the defense sought to offer DeLaura's testimony as propensity evidence—exactly what Rule 404(b) prohibits.  (*See* Tr. 1002).  Third, the Court properly excluded DeLaura's testimony under Rule 403.  Among other things, DeLaura's testimony would have created "a so-called 'trial within a trial,' with the government calling rebuttal witnesses to attack DeLaura's testimony about Rainey's alleged post-conspiracy crimes and so forth," which was "simply . . . not justified by the limited probative value of Rainey's alleged unrelated crimes."  (Tr. 1003).  Accordingly, there was no error in excluding DeLaura's inadmissible testimony while allowing the defense to cross-examine Rainey regarding the allegations in DeLaura's proposed testimony.

## **CONCLUSION**

For the foregoing reasons, Ortega's post-trial motions should be denied.

Dated:  New York, New York
February 27, 2023

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:     /s/
Micah F. Fergenson
Michael R. Herman
Assistant United States Attorneys
(212) 637-2190/2221