UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

       - *v.* -

BILLY ORTEGA,
     a/k/a "Jason,"

           Defendant.

S4 22 Cr. 91 (RA)

## THE GOVERNMENT'S SENTENCING MEMORANDUM

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Micah F. Fergenson
Michael R. Herman
Assistant United States Attorneys
    - *Of Counsel* -

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................. 1

I.     Offense Conduct ................................................................................................................ 2

      A.   Ortega Led the Drug Conspiracy for At Least Seven Years ...................................... 2

      B.   Ortega's Use of Guns in Furtherance of the Drug Conspiracy ................................. 7

      C.   Ortega Caused Three Fentanyl-Poisoning Deaths on a Single Day ........................... 9

      D.   Witness Tampering .................................................................................................. 17

II.    The Applicable Guidelines Range .................................................................................... 18

DISCUSSION ....................................................................................................................... 19

I.     The Sentencing Guidelines ............................................................................................. 20

II.    A Sentence of Life Imprisonment Is Appropriate ........................................................... 21

      A.   The Seriousness of the Offense and Just Punishment .............................................. 22

      B.   Respect for the Law and Specific Deterrence .......................................................... 28

      C.   General Deterrence .................................................................................................. 30

      D.   Relative Culpability ................................................................................................ 32

III.   The Defendant's Arguments for Leniency Are Unpersuasive ......................................... 35

CONCLUSION ...................................................................................................................... 37

## PRELIMINARY STATEMENT[1]

Ortega was the leader of a major drug trafficking conspiracy, distributing dangerous drugs in this community via a crew of workers, for at least seven years.  He used friends and family members to run his stash house and delivery operation out of a public housing unit.  He carried guns, supplied guns to his workers, and stored guns in the stash house to protect his drugs and drug money.  With his drug money, he purchased luxury clothing and jewelry.  While he was always the leader, Ortega used a fake name with customers, burner phones, and lower-level workers to elude law enforcement for years.

In March 2021, he mixed fentanyl into a weak batch of cocaine and sold it to at least five customers, who had no idea that they were receiving fentanyl.  Three of those victims—Julia Ghahramani, Amanda Scher, and Ross Mtangi—were killed.  Ortega knew what he was doing, and bears full responsibility for those deaths.  He "bagged up" the deadly batch of drugs himself.  He deliberately and personally introduced fentanyl into his cocaine, and then willingly distributed it to his customers.  Worse still, the first customer to use the deadly batch warned Ortega it was poison—that it sent someone to hospital, who had to be revived with emergency anti-opioid medication.  Ortega read that first customer's warning, but went ahead and sold the same poison to four other customers anyway, killing Ghahramani, Scher, and Mtangi, and would in all likelihood have killed Jason Ienner too had he not fortuitously abstained from using the drugs that day.  Even when the victims were unresponsive to Ortega's hours-later texts and calls, Ortega never called for help.  Instead, he told another drug dealer that he had a batch of drugs that was too strong so the other dealer should give it to "some girls" and see what happens.  And when it

---

[1] The Government respectfully submits this sentencing memorandum in advance of the sentencing of the defendant, Billy Ortega, scheduled for October 4, 2023, at 2:30 p.m.  On January 30, 2023, following a nine-day trial, the jury found Ortega guilty on all counts for which he was charged.

became clear that Ortega had killed his customers, Ortega did not change course and stop selling dangerous drugs.  He just changed cellphones, and continued selling poison every day until he was arrested nearly a year later.  And even after his arrest and detention, he tried to obstruct justice by threatening a cooperating witness in advance of trial.

In light of the seriousness of the defendant's offense, the need for general and specific deterrence, and in order to achieve just punishment, the Court should impose the term of imprisonment recommended by the United States Sentencing Guidelines—that is, life imprisonment.  The Government does not make this recommendation lightly.  But the defendant's callous disregard for human life and the devastating consequences of his actions call for such a sentence.

## **BACKGROUND**

### I.    **Offense Conduct**

#### A.  **Ortega Led the Drug Conspiracy for At Least Seven Years**

The evidence at Ortega's trial proved that for at least seven years—starting in at least 2015 and continuing nonstop until his arrest in February 2022—Ortega was the leader of a drug delivery service.  (May 5, 2023 Final Presentence Investigation Report ("PSR") ¶ 14).  Ortega received orders from customers for cocaine and other drugs by text message and dispatched "runners" he paid to deliver his drugs throughout the New York City area to fulfill those orders.  Ortega paid a crew of trusted family and friends to deal his drugs—conspirators who made drug deliveries, helped package Ortega's drugs, or managed the flow of drugs and drug money into and out of Ortega's stash house.  These co-conspirators included co-defendants Josefina Marine, William Drayton, and Kaylen Rainey.  Ortega used an apartment in a New York City Housing Authority ("NYCHA") development in Manhattan—leased to his mother, Marine—as a stash house and base of operations for his drug trafficking.  Ortega carried guns, supplied guns to his co-conspirators,

and stored guns at the stash house—all to protect his drugs and his drug money.  And, on March 15, 2021, Ortega and one of his workers prepared the deadly fentanyl-ridden batch of drugs that killed the three victims on March 17, 2021, for delivery.  (PSR ¶ 36).  *See United States v. Billy Ortega*, No. 22-CR-91 (RA), 2023 WL 6140929, at *1 (S.D.N.Y. Sept. 20, 2023)  (Ortega "personally bagged the fentanyl-laced cocaine which killed the victims").

Ortega's drug dealing was prolific.  Ortega kept a "Menu" of the drugs he delivered in the Notes application on one of his iPhones, which listed the narcotics that Ortega would deliver to customers:



(GX 101-14).  At trial, the Government called as an expert witness narcotics trafficking expert Inspector Alfred Hernandez.  Inspector Hernandez then testified to the meaning of the terms in Ortega's delivery menu, including that "Christina" is cocaine, "Molly World" is MDMA, "Tabs" are LSD, and "Perk" is Percocet (a pill containing oxycodone and acetaminophen).  While he supplied a variety of powerful drugs, Ortega principally distributed cocaine.  (Trial Transcript ("Tr.") 311-12).  As documented in a "drug ledger" in the Notes application on one of Ortega's iPhones, as well as voluminous text messages Ortega exchanged with drug runners and customers, Ortega delivered well in excess of five kilograms of cocaine during just a small fraction of the at-

least-seven-year drug trafficking conspiracy.  (*See* GX 101-14 (drug ledger); GX 1007 (summary

chart)); *Ortega*, 2023 WL 6140929, at *3.  Ortega's cellphone included chats with Ortega's large

volume suppliers, including a video of a pressed kilogram of cocaine, as depicted in the screenshot

below:



(GX 101-21B; Tr. 320-21).  Beyond what was documented in available ledgers or texts, witness

testimony established that Ortega was dealing drugs every day, of every week, for years.  (*E.g.* Tr.

557 (Rainey testifying that when he began working for Ortega, he worked "every day")).

Ortega made substantial sums of money from this drug trafficking.  He typically charged

$100 per gram of cocaine.[2]  The sales reflected in Ortega's drug ledger for just 17 months (and

---

[2] As Inspector Hernandez testified, from 2015 through 2022, typically drug dealers would charge between $32 to $38 per gram of cocaine, but a "delivery service" delivering drugs to "high-end clientele" can charge "up to $100 a gram"—as was the case for Ortega's delivery service.  (Tr. 301).

which may not be complete records for these months) show that Ortega's revenue for his drug trafficking in just those 17 months was at least $588,768. Ortega did not file taxes on that income. In fact, he has never filed a tax return. (PSR ¶ 14). That is because he has yet to hold a job aside from drug dealing. (PSR ¶ 135). Indeed, despite making such substantial sums of money from his drug dealing—all while Ortega co-opted a public housing apartment for use as a stash house—Ortega was also receiving supplemental social security ("SSI") benefits every month.[3] (PSR ¶ 123). And in spite of all of the foregoing, highlighting Ortega's access to significant wealth, Ortega still owes over $85,000 in child support. (PSR ¶ 139).

Ortega instead spent his money on a horse ranch in New Jersey, on ferocious dogs (including one named "Killer"), and on luxury goods. (GX 603, 603-T; Tr. 899 (Det. Cabrera noting that Ortega had "four large dogs" each of a breed that "weigh[] approximately 180 pounds" at his horse ranch)). He accumulated designer clothes and purchased expensive jewelry (Tr. 537), like a large diamond-encrusted neckless of the words "King Billy" as shown in the below photograph of Ortega:

---

[3] Ortega claims that he received SSI benefits due to dyslexia, but the PSR notes that "to date, the probation office has not received any documents outlining the specifics of the defendant's disability that warranted the approval of SSI benefits." (PSR ¶ 123).



(GX 103-1). During Ortega's arrest at his New Jersey horse ranch, that same necklace was found inside of a Gucci "go bag," alongside U.S. and Mexican currency and passports:



(GX 401).

Ortega took calculated steps to hide his identity and his involvement in, much less his leadership of, his drug delivery conspiracy. Although his drug business was run principally via text message, Ortega changed cellphones regularly. (PSR ¶ 14; *e.g.*, Tr. 238-42 (customer Jason

Ienner describing receiving cocaine from Ortega after placing an order via text message)).  Over the years, Ortega would change his dispatcher number and then alert his customers to the new phone number; during the time period that he distributed fentanyl to the victims, his dispatcher number was 646-421-5555 (the "5555 Drug Dispatcher Phone"). At his arrest, law enforcement recovered eight phones from Ortega's horse ranch.  Ortega used a fake name, "Jason," when communicating with customers, and the phones he used to communicate were "burner" phones that would not trace back to Ortega.  As further precaution, even the iCloud accounts associated with Ortega's phone numbers were in names other than his own and did not trace back to his true identity in any direct way.  Ortega concealed his role in the drug conspiracy in other ways.  For example, Ortega had runners like Rainey pick up drugs and deliver cash payments from Ortega's associates, like Ortega's cousin "Murder." (Tr. 621-22).  Ortega had his workers, like Rainey and Jorge Ramos Cruz, pay the phone bill for Ortega's burner phones (typically with cash) on his behalf. (*E.g.* Tr. 615-16).  Ortega planned to put the insurance for his car in Rainey's name.  (Tr. 623).  And Ortega used intermediaries, including Rainey, when he needed to make electronic transfers of funds to his associates, including incarcerated inmates.  (Tr. 618-20).  Ortega also had his own mother manage his stash and paid a stable of runners, like Rainey, to actually deliver his drugs, while Ortega lived in a remote compound in New Jersey.

### B.  Ortega's Use of Guns in Furtherance of the Drug Conspiracy

Ortega protected his drug business with guns, which he carried, provided to his workers, and stored in his stash house.  (*See* PSR ¶ 50).  Ortega stored his drugs and money in safes in his mother's apartment, where his co-conspirators would also break down and bag up the cocaine, and where Ortega stored firearms for protection.  (Tr. 515, 517-25).  Ortega's phones—including the 5555 Drug Dispatcher Phone—along with his iCloud accounts included several text messages, photographs, and other evidence demonstrating his firearms possession and use in furtherance of

his drug delivery service. For example, Ortega sent co-conspirators Cruz and Michael Novoa instructions that they needed to "grip up for real" (*i.e.*, carry a firearm when working for Ortega), to which Cruz responded that Ortega had his gun ("You got my toy").[4]  (GX 101-5 at 44).   And Ortega sent text messages seeking to obtain firearms, such as:

- "Yo ask Jon about the 9 [millimeter handgun] I want it" (GX 102-D at 1), and

- "What type of Glock it was [/] Yeah I want OT [it]" (GX 102-D at 3)).

Consistent with the foregoing, Ortega's search history showed a photograph of a Glock 30:



(GX 101-16F).

Rainey testified directly about gun use within the conspiracy—that several drug runners used guns for "protection for the drugs and the money," and that the guns were supplied by Ortega. (Tr. 518).  Rainey described two guns that were kept in Marine's apartment "to protect the drugs

---

[4] The Government's narcotics trafficking expert Inspector Hernandez testified that the term "toy" is a common code word for a firearm, the phrase "grip up" refers to carrying a firearm, a "9" refers to a handgun capable of firing 9 millimeter ammunition, and a Glock is a type of semiautomatic pistol.  (Tr. 315-16).

and the drug money." (Tr. 632). And Rainey testified that he personally observed Ortega carrying a gun. At times, Ortega kept a black pistol in Rainey's dresser drawer, as reflected in the below photograph:



(Tr. 630–33; GX 111-124B). On one occasion, Rainey texted Ortega that someone had taken his "toy" (*i.e.*, Ortega's gun that was kept in Rainey's room), and Ortega responded to Rainey with an audio message that stated: "I had to make two runs, and where I was going I needed it." (GX 111-125, 111-125A). As Rainey explained during his testimony, Ortega was referring to "the gun," and Ortega was stating that he was "making two [drug] runs and—where he felt like he needed to take the gun with him." (Tr. 640–41).

### C. Ortega Caused Three Fentanyl-Poisoning Deaths on a Single Day

In March 2021, Ortega bagged and distributed fentanyl-laced cocaine that killed three people—Julia Ghahramani, Amanda Scher, and Ross Mtangi—on a single day.

  

On March 18, 2021, NYPD officers and emergency medical personnel were called, separately, to Ghahramani's and Scher's Manhattan apartments and to a Manhattan hotel room where Mtangi was staying.  (GX 824, 826, 832, 834, 846, 848).  All three Victims were found unresponsive and pronounced dead.  Responding officers found identical translucent black baggies containing a white powdery substance at all three locations.  (GX 824, 832, 848).

  

The white powdery substance contained fentanyl, and that fentanyl (and/or acetylfentanyl in the case of Ghahramani[5]) took the lives of Ghahramani, Scher, and Mtangi.  (GX 801, 802, 803, 804, 808, 810; Tr. 475-98).  Ortega's fatal distribution began days before March 17, 2021, as he attempted to sell cocaine that had turned out to be "weak," and, therefore, of limited value.

---

[5] Acetylfentanyl is a fentanyl analog that is often "mixed in with fentanyl" as a "contaminant or part of the process of making" fentanyl.  (Tr. 484).

On March 14, 2021, Ortega—through his drug runner Rainey—distributed cocaine to several customers, including to Scher.  (GX 1006 at Rows 8-14).  However, that batch of cocaine was "bad"—that is, from the perspective of the user, it was a weak or ineffective product.  For example, on March 17, 2021, Scher told Ortega that the March 14 batch was "not good . . . had to get rid of it" and that "you know it's not good if you toss it."  (GX 1006 at Rows 196, 199, 203).  Ortega, faced with a cocaine inventory that customers were discarding for lack of interest, decided to make a new batch of drugs that was stronger.  What Ortega chose to do, unbeknownst to his customers, was to add fentanyl to his cocaine.

As Inspector Hernandez testified, drug dealers often use fentanyl to mix or "cut" their drugs as a quick and cheap way to make their drugs more potent:

> fentanyl is less expensive in bulk quantity than the other drugs . . . [a]nd it is significantly more potent. . . . . So it's a marketing [ ]ploy.  It's a way to sell your product and make more money and have the word go out that you have a very good product on the street.

(Tr. 304).

By March 14, 2021, Ortega had made the decision that would later turn deadly.  He texted his bagger, Cruz, to help him read over the instructions provided by Ortega's fentanyl supplier.  (GX 1006 at Row 19 ("Yo bro need you to call me so you can Read over what my boy Wrote")).  The following morning, on March 15, 2021, Ortega asked Cruz to come over to the stash house to bag up the fentanyl.  By 9:30 a.m., Cruz was on his way.  (GX 1006 at Rows 37, 43).  Ortega, knowing the dangers inherent to handling deadly fentanyl, took extra precautions.  He asked Cruz to make sure no one was around when they bagged it up, and personally drove in from his rural New Jersey home to supervise the cut of fentanyl into the cocaine.  (GX 1006 at Rows 48 ("Make sure nobody's around when you do it"), 59 ("I'm almost there"), 64 ("Don't have it out")).

11

Approximately three and a half hours later, on March 14, at 4:52 p.m., Ortega's customers began placing their orders for cocaine.  They did not know that Ortega would try to pass off bad cocaine that he had supplemented with fentanyl, which he and Cruz had just bagged, to protect his profits.  Ortega's deadly mix began filtering through his network of loyal customers.  First, a customer saved in Ortega's phone as "Matt Rob Friend" ordered $200 of cocaine from Ortega. (GX 1006 at Row 65).  At Ortega's direction, Rainey delivered the drugs to Matt Rob Friend.  (GX 1006 at Rows 70-71).  The following day, March 16, 2021—the day prior to Ortega distributing the deadly doses to the three victims—Ortega requested feedback from Matt Rob Friend, as Ortega wanted to know if the fentanyl-laced batch was potent.  Ortega first asked to confirm that Matt Rob Friend received the batch that Ortega and Cruz double bagged (*i.e.*, the batch that contained fentanyl): "Good afternoon brother just want to confirm [w]as the bag double and sealed".  (GX 1006 at Row 82-85).[6]  Matt Rob Friend confirmed that it was and said, initially, that the batch was "pretty good."  (GX 1006 at Row 85).

The following day, March 17, 2021, Ortega received orders from four customers: the three victims and Jason Ienner (who survived because he did not use Ortega's drugs, and who testified as a Government witness at trial).  Importantly, before distributing *any* of the "cocaine" to these four customers, Ortega received a warning.  Specifically, Matt Rob Friend sent Ortega the following text:

> Hey man.  Just on a follow up from yesterday – I gave most of my last bag to my buddy and he just called me this second to say he ended up in hospital last night. . . . He had to get a Narcan shot and was released in the early hours.  Just letting you know.

---

[6] Indeed, the bags containing fentanyl found at Ghahramani and Mtangi's locations were also double bagged.  (GX 832, 824; *see also* Tr. 226 (NYPD Chemist Lauren Furman testifying that she examined a "bag inside a bag"))).

(GX 1006 at Row 145).  Narcan reverses opioid intoxication and can save people's lives if they've

been exposed to fentanyl (not cocaine, which is not an opioid).  (Tr. 72; 128-29, 306).  As reflected

in the 5555 Drug Dispatcher Phone that was seized at Ortega's arrest, Ortega read that message a

few seconds after it was sent, at 2:29 p.m.



(GX 101-10 at pg. 336).  Even that warning did not stop Ortega.  Ortega waited seven minutes

between reading the warning from Matt Rob Friend—about how Ortega's new batch of drugs had

nearly killed someone, sending that person to the hospital where he or she was able to be revived—

and continuing to coordinate that day's first delivery of the deadly batch of drugs.  At 2:36 p.m.,

after texting with Rainey (the drug runner working for Ortega that day) about his whereabouts,

Ortega texted Ghahramani: "10min." (GX 1006 at Rows 146-149).

After sending the deadly batch to Ghahramani, Ortega sent the deadly batch to Scher and

Mtangi, and also to Ienner.  Ortega even confirmed with Scher that he was sending her a "new . . .

batch."  (GX 1006 at Rows 197-98).  Hours after having received the warning from Matt Rob

Friend that the fentanyl-laced batch could be deadly, at 8:14 p.m., Ortega texted Scher: "Hey how's

this batch."  (GX 1006 at Row 222).  At the time Ortega sent that text, Ortega was aware his laced

batch of cocaine nearly killed one user already, but feigned ignorance in following up with his customer. One minute after Ortega's text, at 8:15 p.m., Scher responded: "HAvnt tried yet, let you know in a few!" (*Id.* at Row 223). Six minutes later, Ortega texted Scher: "Hey try not to do too much because it's really strong." (*Id.* at Row 227). Ortega's misleading warning was too little, too late. Even though Ortega texted another time at 8:46 p.m. ("Hey boss lady you heard [/] Lol"), Scher never again responded. After trying "this batch" Ortega sent her, Scher died.

The duplicitous warnings continued. Another minute later, at 8:22pm, Ortega texted Ienner "Hey bro this Batch is really Strong do Small Amounts pls." (*Id.* at Row 228). Ienner responded that he was working late and not going to use the drugs that night. (*Id.* at Row 234-45).

Nine minutes after texting Ienner, at 8:31pm, Ortega texted Ghahramani merely, "Hey," followed by a text at 8:46 p.m. stating, "Hey you there." Ghahramani never responded. She had died after using Ortega's fentanyl-ridden "cocaine."

Ortega did not send a text to Mtangi.[7] Mtangi died after using Ortega's deadly batch.

In between Ortega sending the deadly batch to the three victims and Ienner, and his sending halfhearted warnings to (some of) those four customers, Ortega had responded to Matt Rob Friend's request for "any of the older batch" that did not contain fentanyl, telling him "new one only and yeh it's to[o] Strong someone els[e] just told me".[8] (GX 1006 at Rows 156, 225). That Ortega said "someone els[e]" had warned him only further demonstrates that—hours earlier, prior to *any* of the deadly batch being delivered on March 17—Ortega knew that the new batch, laced with fentanyl, was too strong and had already hospitalized at least one user. In the midst of

---

[7] Call records indicate that Mtangi called Ortega, who using the 5555 Drug Dispatcher Phone, at approximately 8:02 p.m., and the call lasted approximately 109 seconds. (GX 206A). There are no subsequent calls between Mtangi and Ortega. (*Id.*).

[8] This may be a reference to the phone call with Mtangi described in the previous footnote.

Ortega's inconsistent and noncommittal warnings, at 8:35 p.m., Matt Rob Friend responded to Ortega that "the new stuff" was "weird – it doesn't feel like a high, it's more of an opiate nod." (*Id.* at Row 232).

Even after all of this—even after Scher and Ghahramani were unresponsive to repeated texts—Ortega did not stop seeking to distribute the deadly batch. Starting at 10:18 p.m., Ortega had the following exchange with "Karim":

| | |
|---|---|
| Karim: | you back |
| Ortega: | Yes sir<br>What you up to bro |
| Karim: | Long day just up from a nap |
| Ortega: | If your going to be around way let me know have some every one is saying it's to Strong .. Give it to some girls and you let me know lol bro |
| Karim: | welcome back. I got do some research so I'm gonna make some coffee and settle in...<br>tomorrow? |
| Ortega: | Yeah cool let me know |
| Karim: | everyone like new goodies so I'll be happy to spread the word when i'm in the mix |
| Ortega: |  |

(GX 101-9 at pg. 1-5; GX 101-9A). In the very same text where Ortega acknowledged "everyone is saying it's to[o] Strong," Ortega suggested that Karim give the deadly batch to "some girls" and "let [Ortega] know" what happens. (GX 1006 at Row 253; Tr. 1201). In other words, Ortega proposed that Karim experiment on unsuspecting drug users to determine the effect of the drugs, which he already knew had sent a user to the hospital. Indeed, Ortega, by these messages, was

15

explicitly advising one of his distributors and drug promoters that the drug was potent, but that such fact should be concealed from users.  Moreover, Ortega did not even make it fully clear to Karim how dangerous the drugs were; although he was using coded language, Ortega plainly avoided representing how dangerous the drugs really were in an apparent effort to continue making money from the batch he had created.  At the end of this depraved exchange, Ortega sent an image of a comedic movie character fist-pumping in celebration in reaction to Karim's news that "everyone like new goodies" and that he would "spread the word" about these powerful narcotics.

The next morning, Ortega requested that Rainey and Cruz obtain drug testing kits for him, presumably to test the remainder of the new batch.  (GX 101-19 at pg. 427; GX 101-7B at pg. 31-32).

Ortega's customers remained unresponsive, and there is no doubt Ortega knew what happened: his fentanyl-laced drugs had killed three people in a single day.  Beginning the evening of March 17 and continuing into the afternoon of March 18, Ortega placed at least 9 unanswered calls to Ghahramani and Scher, which followed his unanswered, repeated texts to them both.[9]  (GX 203A (Ghahramani); 204A (Scher)).  Specifically:

- On March 17, Ortega called Ghahramani at 8:29 p.m.  No answer.

- Ortega called Ghahramani again approximately 45 minutes later, at 9:14 p.m.  No answer.

- Two minutes after that, at 9:16 p.m., Ortega called Scher.  No answer.

- The following day, on March 18, Ortega first called Ghahramani at 11:03 a.m.  No answer.

- Eight seconds later, Ortega called Ghahramani again.  No answer.

- Approximately 30 minutes later, at 11:36 a.m., Ortega called Ghahramani again.  No answer.

---

[9] The call records in fact show 14 calls, but there appear to duplicates of each call.

- Shortly after noon, at 12:02 p.m., Ortega called Ghahramani again.  No answer.

- At 12:26 p.m., he called Ghahramani a final time.  No answer.

- Then, at 2:03 p.m., Ortega called Scher a final time.  No answer.

(GX 203A, 204A).  Ortega stopped trying to contact the victims, because it was clearly too late. He knew what had happened: he had killed them.

In response, Ortega did not stop dealing drugs.  He just stopped using his cellphone.  To cover his tracks, Ortega ceased using the 5555 Drug Dispatcher Phone, and began using a new cellphone and phone number on March 19, 2021.

Ortega then just continued his drug delivery service as if nothing happened—as if he had not just killed three people and almost killed two others.  He sent Rainey to obtain new cocaine in bulk and then bring it back to the stash house where, at Ortega's direction, Cruz bagged up the new batch of cocaine.  (PSR ¶ 49).  Ortega then directed Rainey and his other couriers to deliver the new batch of cocaine to a group of waiting customers.  (*Id.*; GX 1006 at Rows 381, 385).

Ortega did not stop selling dangerous drugs to his customers until he was arrested and detained on February 1, 2022.

### D.  Witness Tampering

Like Ortega, Rainey was arrested and detained on February 1, 2022.  Thereafter, Rainey began cooperating with the Government.  On the two occasions following the start of Rainey's cooperation when Rainey and Ortega were transported to or from court together, Ortega threatened and attempted to intimidate Rainey each time, seeking to tamper with a cooperating witness.  (Tr. 706-10).

The first threat took place when Rainey and Ortega were being brought to the courtroom. Ortega was next to Rainey in a crowded elevator, and told Rainey that his lawyer had informed

17

Ortega that Rainey was cooperating.  Ortega was angry.  With his face "[r]ight next to" Rainey's face, Ortega told Rainey that if Rainey talked "then he won't be able to protect [Rainey]."  Rainey understood that to be a threat to his safety while in jail.  (Tr. 707).

The second threat occurred when Rainey and Ortega were transported back to the Metropolitan Detention Center from court on the same van.  Ortega turned towards Rainey and said loudly and aggressively: "you should have kept your mouth shut."  (Tr. 708-09).  Other inmates were in the van, and one of them asked Rainey if he was cooperating against Ortega. Rainey denied doing so, "[b]ecause cooperating in jail isn't a good reputation. People get hurt for that. And if I were to say yes, I could have gotten hurt." (Tr. 709).

## II.    **The Applicable Guidelines Range**

The Government agrees with the Guidelines calculation contained in the PSR.  For Counts One through Four, for each of the three offense groups, corresponding to each of the three fentanyl deaths, the base offense level is 38, pursuant to U.S.S.G. § 2D1.1(a)(2), because the offense of conviction establishes that death resulted from the use of the drugs that Ortega distributed.  (PSR ¶¶ 73, 80, 87).  Indeed, the base offense level would be 38 even if Ortega's drug dealing resulted in only one death (or even just "serious bodily injury" to one person), rather than killing three people.  Two levels are added pursuant § 2D1.1(b)(12) because Ortega maintained a premises for the purpose of distributed a controlled substance, that is, the stash house apartment described above.  (PSR ¶¶ 75, 82, 89).  Four additional levels are added pursuant to § 3B1.2(a) because Ortega was an organizer or leader of the criminal activity that involved five or more participants. (PSR ¶¶ 77, 84, 91).  As a result of the grouping analysis, for which three additional levels are added, pursuant to § 3D1.4, the combined adjusted offense level is 47.  (PSR ¶¶ 94-97).  An offense level of 47, however, is above the highest Guidelines offense level, which is 43.  Accordingly, pursuant to Chapter Five, Application Note 2, an offense level of more 43 is to be treated as an

18

offense level of 43.[10]  (PSR ¶ 100).  An offense level of 43 results in a Guidelines recommended sentence of life imprisonment for Counts One through Four to be followed by a mandatory and consecutive term of 60 months' imprisonment on Count Five.  (PSR ¶¶ 69-100, 143). Ortega has not disputed this Guidelines calculation.  (*See* Dkt. No. 171 at 4).[11]

## DISCUSSION

For more than seven years, Ortega was the leader of a large-scale drug delivery service, where he employed sophisticated methods to elude law enforcement, while ruling over a crew of loyal family and friends and distributing poison day in and day out.  In March 2021, he deliberately introduced fentanyl to his cocaine mix, which he personally packaged, and then distributed to at least five customers who thought it was Ortega's typical brand of cocaine.   Three of those victims—Julia Ghahramani, Amanda Scher, and Ross Mtangi—died from Ortega's drugs.  Before Ortega sent drugs to the victims, he knew that the batch had already caused one opioid poisoning, resulting in hospitalization, but Ortega still sold that deadly batch to the victims (and others).  Afterwards, when the victims were not responding, Ortega did not call for help, instead choosing to retrieve the fentanyl-laced drugs from the one customer who didn't use them, Ienner, and then telling another drug dealer that they were too strong so he should give them "to some girls" who would also be unaware of the true risks of the cocaine he was distributing, all in a likely attempt to further distance himself from his brutal creation.  (GX 1006 at Row 253; Tr. 1201).  After killing

---

[10] While the Government believes that an enhancement for obstruction of justice applies based on Ortega's attempts to tamper with the Government's cooperating witness, that enhancement would not ultimately affect the applicable Guidelines sentence, which remains life imprisonment either way.

[11] Like Ortega, Probation recommends a sentence of 25 years' imprisonment, the mandatory minimum term.  (PSR at pg. 32).  For the reasons stated herein, the Government believes that sentence to be wholly inadequate.

three people with his drugs, Ortega simply changed his phone number and continued selling drugs on a daily basis until he was arrested.

Ortega's conduct caused unimaginable pain and suffering to the victims' families, as they expressed in their victim impact statements to the Court. His callous and remarkably evil conduct deserves the gravest of punishments. In light of the seriousness of Ortega's offense, the need for general and specific deterrence, and in order to achieve just punishment, the Court should sentence Ortega to what the Guidelines recommend: life imprisonment.

## I.      The Sentencing Guidelines

The Sentencing Guidelines still provide important guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby,* 397 F.3d 103 (2d Cir. 2005). Indeed, although *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7). *See also Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)     to afford adequate deterrence to criminal conduct;
>
> (C)     to protect the public from further crimes of the defendant; and
>
> (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

## II.     A Sentence of Life Imprisonment Is Appropriate

Application of the 3553(a) factors calls for a Guidelines sentence of life imprisonment. First, to account for the seriousness of Ortega's offenses and to provide just punishment, a sentence of life imprisonment is warranted.  Ortega's drug and gun crimes were extremely serious in their own right.  Viewed in light of the three lives that Ortega cut short through his wanton and deliberate conduct, as well as the continuing harm to the victims' families and loved ones, a life sentence is just punishment.  Second, much like Ortega's callous disregard for the lives of others, so too has Ortega demonstrated a flagrant lack of respect for the law.  A life sentence is appropriate to punish such naked contempt for the law, and in so doing, promote respect for the laws designed to safeguard our citizenry.  Third, such a punishment would also meet the goal of specific deterrence by incapacitating the defendant, who has demonstrated, for over seven years and by his conduct in ending three lives with little afterthought, that he will not be bound by the law of the land or be prevented from endangering society.  Fourth, general deterrence in a case such as this one should be afforded significant weight, as members of our community are being poisoned to death every single day by fentanyl.  A life sentence in this case would send a powerful message to others considering using fentanyl to strengthen their drug supply and endanger more lives, and certainly

21

to those distributing fentanyl in other forms.  Finally, in terms of relative culpability, Ortega is effectively as culpable as someone convicted of drug-poisoning deaths can be.  Separately, and in combination, these factors favor an extraordinarily substantial sentence: life imprisonment.

### A.  The Seriousness of the Offense and Just Punishment

1.  <u>Seriousness of the Narcotics Trafficking and Firearms Offenses</u>

Even without the three fentanyl poisonings, Ortega's crimes involved serious narcotics and firearms offenses, for which he would have been subject to a 15-year mandatory minimum sentence and a maximum sentence of life imprisonment.  For years, Ortega led a narcotics conspiracy that used guns and trafficked significant amounts of drugs, particularly cocaine.  While cocaine is not nearly as deadly as fentanyl—the substance that Ortega mixed in with his cocaine, killing the three victims—it is nevertheless a highly addictive substance that destroys lives, destabilizes communities, and funds criminal organizations like Ortega's delivery service.

Cocaine use leads to, among other things, paranoia, psychosis, stroke, seizures, respiratory failure, organ damage, and, at times, even death.[12]   Cocaine harms not just its users, but also their family and friends and the broader communities to which they belong.[13]

The harms posed by cocaine have only increased over time.  Empirical data shows, for example, that while fentanyl poisonings are clearly the top killer among controlled substances, the

---

[12] *See* National Institute on Drug Abuse, What Are the Long-Term Effects of Cocaine Use? (May 2016), *available at* https://www.drugabuse.gov/publications/research-reports/cocaine/what-are-long-term-effects-cocaine-use.

[13] *See, e.g.*, *United States v. Colon*, No. 10 Cr. 197 (CM), 2020 WL 4496761, at *2 (S.D.N.Y. Aug. 4, 2020) (describing cocaine as "a highly addictive drug that destroys lives, families, and communities"); *United States v. Qayyem*, No. 10 Cr. 19 (KMW), 2012 WL 92287, at *4 (S.D.N.Y. Jan. 11, 2012) (describing study in preeminent medical journal in which cocaine was found to have "second-highest mean harm score of all twenty drugs [under study], after heroin").

total number of deaths from drug poisonings involving cocaine have also increased dramatically over the last two decades:



Figure 21. Total Number of Deaths from Drug Poisoning Involving Cocaine in the United States and the District of Columbia, 2010 – 2018

DEA, 2020 National Drug Threat Assessment (Mar. 2021), at 30.[14]

### 2.  Ortega's Personal Responsibility for Three Fentanyl-Poisoning Deaths

In addition to his role as the longtime leader of the drug and gun conspiracy, Ortega is also personally responsible for three-fentanyl poisoning deaths.  That personal responsibility is not simply by virtue of Ortega's role or position in the drug organization.  Ortega personally bagged up the deadly fentanyl-laced cocaine.  Ortega chose to mix fentanyl into his cocaine for one reason: greed. He feared he would be unable to recoup normal profits from a batch of cocaine that customers found unsatisfactory and, instead of accepting that monetary loss, he decided to gamble with his customers' lives.  Every single person living in New York City—let alone drug dealers peddling poison—knows the dangers of fentanyl and the risk of overdose and death.  Moreover, those dangers were exacerbated by Ortega who included fentanyl, a synthetic opioid created in a lab, in his weak cocaine, a stimulant. Such a mix all but guaranteed that at least some of his

---

[14]    Available    at    https://www.dea.gov/sites/default/files/2021-02/DIR-008-21%202020%20National%20Drug%20Threat%20Assessment_WEB.pdf.

customers would be using a drug they did not intend to order and possibly had no experience with, ensuring a lower drug tolerance and higher risk of death.  Ortega didn't care; he just wanted to recoup his money.

With Ortega, however, the risk of death from the inclusion of fentanyl in his cocaine was not merely hypothetical.  Ortega knew, from reading the text from Matt Rob Friend, that batch had already caused an opioid hospitalization—*before* choosing to continue to deliver that deadly batch to the victims.  This fact, in the Government's view, dramatically increases the defendant's culpability.  Of course, Ortega would be guilty of the same offense if he did not even realize the cocaine contained fentanyl.  But here, the defendant intentionally mixed fentanyl into his drug supply, distributed it, learned it caused a customer's hospitalization and emergency treatment, and then chose to sell more of it.  Ortega thus bears personal responsibility for ending three lives, and the punishment should fit the wanton manner by which he caused those deaths   Indeed, given Ortega's text exchange with Karim about giving those deadly drugs to "some girls" to see what happens to them, we do not know if there were other victims from this batch, but Ortega was, at a minimum, advising Karim to push the deadly envelope further, risking more human lives for money.

Ortega's hours-later "warnings" to the victims only underscore how little Ortega cared.  He easily could, and obviously should, have stopped the deliveries outright.  Or he could have at least warned his victims that it was too strong *while he was texting with them to coordinate the deliveries*, not hours later when it was too late.  Or he could have at least tried to get help once the victims were not responding.  Instead, Ortega just dropped the cellphone he had used, made another batch of drugs, activated a new drug dispatcher cellphone, and continued selling dangerous drugs until he was finally arrested.

Indifference to human suffering may be the defining characteristic of a drug dealer. But Ortega's actions in this case evince a disregard for human life that is particularly abhorrent and tragic. It would have cost Ortega virtually nothing to stop the deliveries to the victims—a negligible monetary loss amid the hundreds of thousands of dollars in drug revenue Ortega enjoyed annually. It cost his victims their lives. And the avoidable tragedy of each victim's death continues for the people that loved Julia Ghahramani, Amanda Scher, and Ross Mtangi.

### 3.   The Harms to the Victims' Families Will Continue For Life

The facts of this case make abundantly clear the "absurdity" of the claim that drug offenses are non-violent and victimless. *See Harmelin v. Michigan*, 501 U.S. 957, 1002 (1991) (Kennedy, J. concurring). The victims in this case are not just Julia Ghahramani, Amanda Scher, and Ross Mtangi, who lost their lives consuming what they thought was Ortega's cocaine, but was in fact fentanyl, but also their families, who are victims in both fact and law. *See* 18 U.S.C. § 3771(e). Ortega, by bagging up and distributing fentanyl to his unsuspecting victims, did violence to Ghahramani, Scher, and Mtangi's family, friends, and loved ones. They will suffer from the loss of their family member, their friend, their loved one for the rest of their lives.

The Government has previously provided the Court and defense counsel with letters from family and friends of these victims, which convey in stark and deeply moving terms the suffering of the victims in this case. Those statements provide a glimpse of the poignant loss felt across multiple communities due to Ortega's callous conduct. Amanda Scher's father, ███ wrote:

> The phrase "Victim Impact Statement" does not describe the loss of Amanda. Her death is a tragedy that not only ended her young life, her dreams, her aspirations . . . [and] her love of life, but has profoundly affected me now and for all the time I have left to live. . . . I will mourn her death every day of my life. Heartbroken is now a very real, every day phrase for me.

Her mother, ███████ wrote about how her daughter Amanda "made a party for so many holidays, and always invited her friends, who were so diverse, who would all come together with her" but that, now her family and friends come together "at her grave to lay her footstone and to note her 40th birthday" this past year.

The executive director of the synagogue the Scher family had long attended, wrote of the incalculable grief suffered by the Scher family at the ends of Ortega, and of the need to ensure that justice is done at sentencing:

> SHATTERED! Broken into thousands of tiny pieces that can never be put back together again. Picture a car windshield that has been struck by a large rock, or worse, a pedestrian. There are tiny shards of all shapes and sizes going in all different directions. This is how I see ███ and ████ Scher since their daughter Amanda was so cruelly taken from them.
>
> [. . .]
>
> Now we are at a juncture where those responsible have been caught and need to pay for their crime. Speaking for myself, we do not seek vengeance. But we do seek justice. Nothing can bring Amanda back. Those responsible should be sentenced to pay in a way that will at least give them an inkling of what it means to have taken away that which is irreplaceable. They should be sentenced in a way that will help them to understand some of the pain that they have brought to Amanda's family, friends and the greater community. They should be sentenced in a way that gives testament to the value of even one human life. And they should be sentenced in a way that gives ███ and ████ Scher even the smallest measure of comfort knowing that those responsible for Amanda's death are being held accountable.

(Statement of ██████████████). And Amanda's friends wrote of her "caring smile, her infectious laughter and just the incredible sweet personality [that] was forever taken away from us" (Statement of ████████████); of the "painful hole in my heart" (statement of ████ ██████ how Amanda "was always there" for her friends "ALWAYS" (statement of ████████ ██████); that Amanda "always had a smile on her face that brightened a room" (statement of

████████); and "I am not sure if one recovers from this kind of loss.  I would say that clearly

the impact is beyond description."  (Statement of ████████).

    Julia Ghahramani's family wrote a lengthy victim impact statement signed by her father

████ of the "impact of losing Julia on me, my family, her friends, classmates, and colleagues,

has been devastating beyond words."  Mr. Ghahramani's statement is one of such searing grief and

love of their daughter Julia, that it cannot truly be summarized in this submission.  Mr. Ghahramani

ended his submission as follows:

> This is my Victim's Impact Statement for the trial and sentencing of those
> responsible for the death of my daughter, Julia.
>
> It has been an attempt to convey something that is impossible to convey, Julia's
> beautiful 26 years on this earth, what she meant and means to me and my family,
> and what we all lost when her life was cut short by a group of callous, vile drug
> dealers.
>
> The impact of losing Julia on me, my family, her friends, classmates, and
> colleagues, has been devastating beyond words.
>
> Thank you for allowing me to share my love for Julia with you. I miss her so very
> much.

Mr. Ghahramani urged the Court to "send a loud and clear warning to fentanyl dealers that they

will face the ultimate consequence for taking innocent lives, callously, for the sake of an extra

dollar, and in this case without even a shred of remorse."  (Statement of ████████).  And

Julia's aunt ████ wrote that "In the two years since" Julia's death, "the pain hasn't subsided, the

grief is no less acute."  She also spoke of Julia as "Brilliant, funny, and full of love, the air filled

with her presence as soon as she walked into a room. When she walked out, the energy level in the

room would revert from highly charged to neutral. She was so charismatic and smart, she could win anyone over." (Statement of ███████████).

Ross Mtangi's mother ███████████ emphasized the fact that three weeks after Mtangi's death, his son was born, a son who would never know his father:

> My beautiful grandson was born less than 3 weeks after burying my beloved son. My grandson will never know his father. He'll never hear his contagious laugh or enjoy his hilarious sense of humor. █ will not know his father's strong work ethic and brilliant mind. I was fatherless, so I know how it can affect a child's sense of self. This breaks my heart for █

(Statement of ███████████).

These are but some of the many poignant expressions of both love and loss in the victim impact statements before the Court, and the Government expects that several of the victims' family members will address the Court directly at sentencing.

## B. Respect for the Law and Specific Deterrence

Ortega has long displayed a lack of respect for the law and, therefore, specific deterrence is especially warranted here. He ran his drug business for at least seven years, making hundreds of thousands of dollars in illegal profits if not more, never held a job other than selling drugs, coopted a NYCHA apartment as his stash house, and still applied and accepted SSI benefits from taxpayers. Ortega had numerous opportunities to live a law-abiding life and failed to do so.

Ortega's operation was also sophisticated, involving several layers of remove from customers to keep his identity private and enabling him to sell drugs year after year unimpeded. Substantial planning and coordination was required between Ortega and his co-conspirators to manage the drug enterprise. While customers doubtless enjoyed the relative anonymity and convenience Ortega's business model provided, Ortega took advantage of that remove to betray his customers and dupe them into using poison. Ortega then hid behind the model he had created to attempt to avoid responsibility for the deaths of his customers. A significant sentence is required

28

in this case because Ortega plainly did not commit a mere crime of opportunity, but rather invested years and resources into building a sophisticated operation designed to evade law enforcement and foster a robust drug clientele.  Incapacitation is particularly important in a case involving a drug distribution conspiracy of this length and complexity; there will be little to prevent or dissuade the defendant from launching a new drug enterprise if released from prison, and there the defendant has demonstrated his commitment to placing money before humanity and displayed his ability to elude law enforcement in so doing.

A life sentence will also reinforce respect for the law, for which Ortega has only, and brazenly, shown contempt.  Aside from his offense conduct, which, as discussed, was specifically calibrated to evade law enforcement and enrich Ortega while risking the lives of his customers, Ortega's conduct after his arrest further evinces utter disregard for the judicial process.  Ortega even went so far as to harass and intimidate the Government's cooperating witness in this case, in an obvious attempt to influence the outcome of the case and obstruct justice.  Such conduct is an undeniably aggravating factor, and demonstrates further why the maximum possible specific deterrence is required in this case.

Indeed, it is especially telling that even after Ortega knew that the victims had died, he continued selling drugs on a daily basis until he was arrested.  Killing three customers and hospitalizing another should have served as a wake-up call for Ortega, the impetus he needed to reform his life and end his longtime commitment to drug dealing.  It had the opposite effect.  As described above, Ortega merely changed his phone, got more drugs, and resumed his dangerous drug business for months until he was arrested.  Under these circumstances, the Court should have no confidence that Ortega will not continue his criminal conduct if released from prison, further distributing poison into our community, and potentially causing the deaths of others.

### C. General Deterrence

General deterrence is exceptionally important in this case—especially so, as this city and the country at large are experiencing a full-blown crisis of fentanyl poisonings.  Indeed, fentanyl trafficking has led to numerous fentanyl poisoning deaths and injuries in recent years which increased during the COVID-19 pandemic to unprecedented levels as drug dealers such as Ortega have taken advantage of users' social isolation to push ever more dangerous drugs.[15]  It is now estimated that 196 Americans die every day from fentanyl poisonings.[16]  The CDC's death toll for fentanyl poisoning deaths in 2021—the year that the three victims in this case died—is 107,622, two-thirds of which are attributed to fentanyl.[17]  In the 12-month period ending in March 2023, the numbers have remained that high—110,469.[18]  In New York City, drug poisoning deaths have reached the highest levels since the city's health department began tracking such deaths more than 20 years ago.[19]  Fentanyl was detected in 80 percent of those overdose deaths.[20]

The National Institutes of Health ("NIH") has long documented the rise in fentanyl poisoning deaths.  In 2021, which is the most recent year per-drug data is available, fentanyl was caused the most drug poisoning deaths in the United States, with approximately 70,601 such

---

[15] *See, e.g.*, Abby Goodnough, "Overdose Deaths Have Surged During the Pandemic, C.D.C. Data Shows," N.Y. Times, (April 14, 2021), available at: https://nyti.ms/3pyYkyT.

[16] Nick Miroff, "Cause of Death:  Washington Faltered as Fentanyl Gripped America," Washington Post (Dec. 12, 2022), available at: https://wapo.st/3xOX1zb

[17] *Id*.

[18] Statement of the Office of National Drug Control Policy (ONDCP) Director Dr. Rahul Gupta (Aug 17, 2023) Available at: https://www.whitehouse.gov/ondcp/briefing-room/2023/08/17/white-house-ondcp-director-statement-on-flattening-overdose-death-rate-over-the-past-year/

[19] *See* Joseph Goldstein and Joshua Needelman, "Fentanyl Helps Push Overdose Deaths to Record Level in New York City," N.Y. Times (Jan. 13, 2023), vailable at: https://nyti.ms/3HK24Hd

[20] *Id*.

deaths documented that year.[21]   The following chart documents the extraordinary rise in deaths

attributed to fentanyl in recent years:



Figure 2. National Drug-Involved Overdose Deaths*,
Number Among All Ages, 1999-2021

Fentanyl is so dangerous that as little as two *milligrams* can be fatal—and Ortega was selling his

fentanyl to the victims in two-gram bags.[23]

There is, therefore, an urgent need for general deterrence.   As the Court explained at co-

defendant Drayton's sentencing:

> The CDC reports that there were more than 3,000 fatal overdoses in New York City
> last year, and that approximately eight in ten were due to fentanyl.  While it doesn't
> matter from a legal standpoint, as I instructed the jury at the trial, whether someone
> knows the cocaine they sold is laced with fentanyl, it matters to me at sentencing if
> someone deliberately sold fentanyl, which is nothing short of poison.  I . . .

---

[21] Available at: https://nida.nih.gov/drug-topics/trends-statistics/overdose-death-rates

[22] *Id.*

[23] *See* Drug Enforcement Administration, Facts About Fentanyl, available at
https://www.dea.gov/resources/facts-about-fentanyl

> specifically want the public to know that if you are caught selling fentanyl,
> especially if you knowingly do it . . . your sentence will be especially harsh.

(Drayton Sent. Tr. (Dkt. No. 154) at 19).  Indeed, as this Court also recognized when it sentenced

a defendant in another case involving a fentanyl poisoning death, "fentanyl is literally killing

people in this city every day, including many who never intended to buy or to use it."  *United*

*States v. Carlos Macci*, 22 Cr. 92 (RA), July 25, 2023 Sent Tr. (Dkt. No. 62), at 20.  This fact was

made so painfully clear just this month when four young children were poisoned, one fatally, by

fentanyl at a daycare that was used as a front by a group of drug dealers for fentanyl trafficking in

the Bronx.  *See United States v. Mendez and Brito*, 23 Mag. 6444; *United States v. Paredes*, 23

Mag. 6533.  The Court's sentence in this case must send the message to fentanyl traffickers that

the most serious punishment awaits them.

### D.  Relative Culpability

In assessing Ortega's culpability, the Government has considered any potential mitigating

factors for Ortega.  According to the PSR, Ortega appears to have had an upbringing with a number

of challenges.  But there are innumerable individuals in this community who have had challenging

upbringings.  And even if a difficult upbringing might help mitigate involvement with drugs in

some way, it cannot justify, explain, or mitigate Ortega's conduct in this case, relating to firearms

use, fentanyl-poisoning deaths, or his attempts to obstruct justice.  While separation from family

is a factor relevant to Ortega, his interests do not outweigh those of the families his conduct directly

harmed.  Ortega's fentanyl-laced cocaine killed three people, all with families, and they cannot be

visited, heard on the phone everyday, or emailed on a daily basis as Ortega can.  Indeed, Ross

Mtangi's son, born less than three weeks after his father was killed by Ortega's drugs, will never

once meet his father.

The Government has also considered Ortega's culpability relative to the other defendants in this case, and relative to defendants in other cases involving drug poisoning deaths.  In this case, Ortega is unquestionably the most culpable defendant.  Among the several participants in the conspiracy, Ortega led the conspiracy, supplied the drugs, supplied the guns, and personally arranged the sales.  He is also personally responsible for distributing the deadly fentanyl-laced cocaine.  Ortega bagged the deadly fentanyl-laced batch of cocaine and knew there was fentanyl in it.  Ortega was told the batch was deadly prior to selling it to the victims, and could have personally (indeed, easily) stopped the sales.  Ortega knew that his drugs killed three people in one day, yet continued dealing dangerous drugs until he was arrested.  Ortega has never accepted responsibility for his actions.  Instead, he went to trial and attempted to obstruct justice by threatening a cooperating witness.

Ortega's conduct is also substantially more egregious than the conduct of defendants in other drug poisoning cases.  Cases where the evidence proves that the dealer of the deadly drugs knew those drugs contained fentanyl, much less that the dealer added the fentanyl himself or that the dealer had been warned that the batch was too strong and could be deadly, require commensurately stronger sentences.  For comparison, in another case before this Court, relating to the fentanyl-poisoning death of Michael K. Williams, this Court sentenced Irvin Cartagena—the lead defendant in that case, who personally handed the deadly drugs to Williams—to ten years' imprisonment.  *See United States v. Cartagena*, No. 22 Cr. 92 (RA) (S.D.N.Y. Aug. 18, 2023), Dkt. 65.  Ortega's case is a world apart.  Cartagena was a street-level dealer of heroin and also an addict, who used the same fentanyl-laced heroin he was selling.  Importantly, there was no evidence that Cartagena knew, in advance of the sale to Williams, that the drugs contained fentanyl, or that he had received any warning about the potency and potential lethality of the drugs.

33

Moreover, Cartagena accepted responsibility for his crimes and did not try to obstruct justice. None of these things can be said of Ortega, as already described above. Ortega was the leader of the conspiracy, with a stable of runners and workers. Far from being an addict and using the fentanyl-laced cocaine he was selling, Ortega took extra precautions when handling and bagging the fentanyl he then sold. He bears personal responsibility for selling cocaine laced with deadly fentanyl, and thereby killing three young adults in a matter of hours on March 17, 2021.

This case is more similar to that of Dennis Sica, a heroin and fentanyl dealer who Judge Siebel sentenced to 420 months' incarceration, after he pled guilty to distributing the drugs that caused three deaths. *See United States v. Sica*, 14 Cr. 462 (CS). Like Ortega, Dennis Sica distributed a potent mix of drugs containing fentanyl, which killed three people. And Sica knew that his drugs killed the first victim, but he kept selling drugs, resulting in the other two victims' deaths. *See United States v. Sica*, Nov. 5, 2015 Sent. Tr. (Dkt. No. 92) at 40 (Court stating that Sica's "drugs were responsible for the deaths of three people and there was time to stop, there was time to change, and it didn't happen."). However, Judge Siebel also recognized that Sica "expressed remorse," and, unlike Ortega, was "not a high-level drug dealer. He's by no means a kingpin or a dealer who is living a life of luxury off his profits. He's a small time, small town drug dealer." *Id.* at 39. Judge Siebel considered imposing a life sentence, but did not do so primarily because Sica pled guilty before trial. *Id.* at 46 ("I am not going to impose a life sentence. I do think giving the defendant the same sentence after a plea that he would get had he been convicted at trial sends the wrong message to other people in his situation."). Judge Siebel, therefore, imposed a sentence of 35 years, or 420 months. *Id.* at 46-47. In the Government's view, Ortega is far more culpable than Sica, for many of the reasons discussed: his leadership role—that, unlike Sica, Ortega was, in fact, a high-level drug dealer who was living a life of luxury off of his drug

34

profits; his lack of remorse or acceptance of responsibility—indeed, he obstructed justice by threatening a cooperating witness; and the extent of his personal responsibility for the three deaths—the fact that he personally bagged up the fentanyl-laced drugs and passed them off onto his unsuspecting victims, who thought they were receiving cocaine.[24]

## III.    The Defendant's Arguments for Leniency Are Unpersuasive

The Court should reject Ortega's arguments for a variance, let alone a variance to the mandatory minimum sentence.

Principally, Ortega complains about the conditions in the Metropolitan Detention Center ("MDC").  (Dkt. 171 ("Def. Mem.") at 8-14).  While the defense asserts a host of issues relating to the MDC, only two of the assertions specifically refer to Ortega's experience at the MDC.  The defense first asserts that "Ortega has been requesting to see a psychologist/therapist for at least three months, yet there has been no appointment scheduled." (*Id.* at 11).[25]  The defense also asserts that "[o]n one occasion Mr. Ortega was unable to do laundry for three weeks as the machine was broken."

These complaints do not merit leniency.  As an initial matter, many, if not most, of the defense's factual assertions regarding the conditions at MDC are put forth without any citations.  (*See id.* at 11-14).  Further, the defense has not raised any issues with Ortega's conditions of confinement with the Government, or with the Court, previously.  If Ortega had been experiencing

---

[24] A life sentence would also not be disproportionate to sentences received in other fatal drug poisoning cases in the country.  *See, e.g.*, *United States v. Trumaine Muller*, 18 Cr. 85 (MMH) (M.D. FL.) (imposition of life sentence where defendant sold fentanyl to an 18 year-old woman who died); *United States v. Christopher Defilippis*, 20 Cr. 342 (SCB) (M.D. FL.) (imposition of life sentence where defendant sold fentanyl to a victim who died).

[25] The Government has obtained and produced to the defense Ortega's medical records from the MDC.  Those records make no mention of Ortega's claimed requests for mental health treatment; they do show that Ortega requested dental treatment, but when the MDC scheduled Ortega to see an oral surgeon, Ortega refused the appointment.

conditions that were truly "shocking and inhumane" (*id.* at 14), one would expect that Ortega would have raised these conditions *prior to* his sentencing submission, but he has not.  Indeed, while the MDC has, at time, had challenges, the Government does not agree that the conditions are "shocking to the conscience" as Ortega claims.[26]

With respect to Ortega's issues in particular, they do not warrant any leniency.  While a three-month delay in receiving therapy—to the extent he has even requested it, contrary to his medical records—may be a disappointment, it is hardly a reason for imposing a lesser sentence in a case with conduct as serious this one.  Similarly, an inability to do laundry for three weeks pales in comparison to the harm and suffering that Ortega has inflicted on so many people by distributing the fentanyl that took away three lives.

Separately, the defense notes that this conviction is Ortega's first.  (*Id.* at 16).  While that is true, it does not carry much force in these circumstances.  First, to the extent a lack of prior convictions may at times suggest that deterrence is less important, that is not the case here.  The defendant has already faced a bigger "wake-up call" than a criminal conviction: the knowledge that he had killed three of his customers.  That did not stop him from continuing to deal dangerous drugs.  Even his arrest *and detention* did not stop him from attempting to obstruct justice.  And he has never accepted responsibility for his actions.  Second, one of the aggravating factors in this case is that the defendant was able to successfully conceal his leadership of a drug trafficking organization for so long, eluding law enforcement and avoiding a criminal record.

---

[26] While Ortega complains about frequent "lockdowns," he was not incarcerated at the MDC in 2020 or 2021, at the height of the COVID-19 pandemic where there were far more frequent lockdowns. In any event, "lockdowns are a routine fact of life for incarcerated defendants and are hardly extraordinary." *See United States v. Pinto-Thomas*, 454 F. Supp. 3d 327, 331 (S.D.N.Y. 2020)

The defense's request for the mandatory-minimum sentence does not grapple with that aggravating factor, or the host of other aggravating circumstances in this case.  With respect to mandatory minimums, it is instructive to consider the mandatory sentence that the defendant would be subject to if he had not caused the death of a single person (much less three people): 15 years. On the defendant's recommendation, Ortega would serve only an additional 10 years as a result of taking the lives of three young people  Indeed, the mandatory minimum that Ortega faces would be the same if he had only killed (or even just seriously injured) one person—as would the Guidelines-recommended sentence of life imprisonment.  Yet Ortega's conduct snuffed out three unique lives—a promising lawyer, a generous social worker, and an expectant father, who had long lives ahead with family, friends, and loved ones.  Ortega has left multiple families and whole communities in wreckage.  Adopting his recommended sentence would not be lenient.  It would be unjust.

## <u>CONCLUSION</u>

The Government recognizes a sentence of life imprisonment is not often sought, and it is a recommendation that is not made lightly.  Billy Ortega led a significant drug organization for years. He protected it with firearms.  He obstructed justice.  He showed callous and total disregard for human life, and his conduct led directly to three deaths.  He has shown no remorse.  There is

an intense need to deter Ortega and other fentanyl traffickers like him in this city.  The most severe

sanction is warranted.

Dated:  New York, New York
        September 27, 2023

                                        Respectfully submitted,

                                        DAMIAN WILLIAMS
                                        United States Attorney

                        By:     _____/s/_____
                                        Micah F. Fergenson
                                        Michael R. Herman
                                        Assistant United States Attorneys
                                        (212) 637-2190 / -2221